**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ZONEPERFECT NUTRITION COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION |
| v. | ) NO. 04-10760 (REK) |
| | ) |
| HERSHEY FOODS CORPORATION, | ) |
| HERSHEY CHOCOLATE & | ) |
| CONFECTIONERY CORPORATION, and | ) |
| BARRY D. SEARS, | ) |
| | ) |
| Defendants. | ) |

## SCHEDULING ORDER

Pursuant to the parties' agreement, the following schedule shall govern plaintiff's motion for a preliminary injunction in this action:

1.     Plaintiff shall serve its motion for preliminary injunction and supporting memorandum of law (but not affidavits or other evidence) on or before May 3, 2004. Defendants shall file their memoranda in response to the motion (but not affidavits or other evidence) and plaintiff shall serve its reply memorandum, if any, within the time periods provided in Local Rule 7.1.

2.     Defendants shall respond to the Complaint on or before May 10, 2004.

3.     The parties shall exchange the Initial Disclosures required by FED. R. CIV. P. 26(a)(1), on May 10, 2004.

4.     No later than May 12, 2004, the parties shall exchange document requests in the form of one page letters. These letter requests shall be treated as document demands under FED. R. CIV. P. 34. After receiving these requests, the parties shall confer no later than May 15, 2004, to discuss any objections to the requests. There shall be no interrogatories with respect to the preliminary injunction stage of this action.

5.      No later than May 27, 2004, the parties shall produce responsive documents and serve any objections to document requests.

6.      Depositions shall take place from June 1, 2004 to June 25, 2004, and shall be limited to five fact witnesses per side. Each deposition shall take place at the location of the witness unless otherwise agreed by the parties, and shall not exceed one day of seven hours. Non-party depositions shall be conducted as trial depositions, including direct and cross-examinations. The parties may designate portions of the non-party trial depositions for admission in evidence at the preliminary injunction hearing.

7.      The parties shall be limited for purposes of the preliminary injunction motion to two experts per side. No later than May 7, 2004, plaintiff shall serve the expert report of any survey expert, and defendants shall serve any survey expert reports of their own or in rebuttal no later than June 18, 2004. Plaintiff shall serve any expert reports not relating to surveys no later than May 14, 2004, and defendants shall serve any rebuttal expert reports not relating to surveys no later than June 18, 2004. Depositions of experts shall take place from June 18, 2004, until June 25, 2004, and shall not exceed one day of seven hours each.

8.      A status conference shall take place on June 18, 2004 at _____.

9.      No later than July 2, 2004, plaintiff shall submit the direct testimony of its witnesses in the form of affidavits and shall also submit proposed findings of fact and conclusions of law.

10.     No later than July 9, 2004, defendants shall submit the direct testimony of their witnesses in the form of affidavits and shall also submit proposed findings of fact and conclusions of law. The parties shall designate by July 12, 2004, all witnesses they intend to cross-examine at the preliminary injunction hearing.

11.     A preliminary injunction hearing shall be held commencing on July 15, 2004, at ___ a.m., and on July 16, 2004, if necessary. The direct testimony at the preliminary injunction hearing shall be in the form of the affidavits described in paragraphs 9-10 of this Order and the only live testimony will be by cross-examination of the affiants.

12.     The parties shall promptly enter into a protective order governing the confidentiality of documents and deposition testimony.

13.     This Scheduling Order shall apply only to plaintiff's motion for a preliminary injunction. The remaining aspects of this case shall be governed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Massachusetts, and any further Order of this Court. This Order shall not restrict any party's right to seek discovery on issues unrelated to plaintiff's motion for preliminary injunction; provided, however, that the parties shall not seek such discovery until plaintiff's motion for preliminary injunction has been resolved.

IT IS FURTHER ORDERED that the parties' obligations under FED. R. CIV. P. 26(f) and Local Rule 16.1 are waived.

SO ORDERED.

_____
Honorable Robert E. Keeton
United States District Court Judge

The parties, by their undersigned counsel, hereby consent to the entry of the foregoing Order.

Dated: April __, 2004.

BINGHAM MCCUTCHEN LLP

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.


Daniel L. Goldberg, BBO #197380
Joshua M. Dalton, BBO #636402
Matthew L. Mitchell, BBO #647902
150 Federal Street
Boston, MA 02110
(617) 951-8000
(617) 951-8736 (fax)

*Attorneys for Plaintiff*
*ZonePerfect Nutrition Company*

Seni M. Adio, BBO #566709
Matthew Hurley, BBO #643638
One Financial Center
Boston, MA 02111
(617) 348-4939
(617) 542-2241 (fax)

*Attorneys for Defendants*
*Hershey Foods Corporation and*
*Hershey Chocolate & Confectionery*
*Corporation*

TODD & WELD LLP


Lisa Arrowood, BBO #
Ian Crawford, BBO #
28 State Street, 31st Floor
Boston, MA 02109
(617) 624-4719
(617) 227-5777 (fax)

*Attorneys for Defendant*
*Barry D. Sears*

LIT 1456002v1

**<u>EXHIBIT B</u>**

## AGREEMENT

This Agreement, dated as of October 17, 2001 (the "Agreement"), is by and among ZonePerfect Nutrition Company (formerly known as "Eicotech Corporation"), a Delaware corporation (the "Company"), Barry D. Sears ("BDS"), Douglas Sears ("DS"), Surfactant Technologies, Inc., a Massachusetts corporation ("STI"), BDS, Inc., Christopher P. Baker ("Baker"), Harry P. Haveles ("HPH"), Laurence S. Chud ("Chud"), Anasazi Partners ("Anasazi"), and Steven G. Lampe ("Lampe"). The persons and entities referred to above are sometimes in this Agreement individually referred to as a "Party" and collectively as the "Parties." BDS, DS and STI are sometimes in this Agreement individually referred to as a "Selling Shareholder" and collectively as the "Selling Shareholders."

### RECITALS

WHEREAS, certain of the Parties entered into a Stock Purchase and Holders Agreement, dated September 19, 1996;

WHEREAS, under the 1996 Agreement, BDS, DS and STI (i) sold, transferred and assigned certain tangible and intangible assets and rights to the Company, and (ii) entered into certain covenants and agreements;

WHEREAS, the Company and BDS entered into an Employment Agreement dated as of September 19, 1996 (the "BDS Employment Agreement");

WHEREAS, BDS, DS and STI are presently the respective record holders of the shares of Company Class A Common Stock, par value $.01 per share (the "Common Stock"), all as set forth in Schedule 1 hereto;

WHEREAS, the Company desires to repurchase all shares of Common Stock held by each of the Selling Shareholders, as shown on Schedule 1 hereto, and each of the Selling Shareholders desires to sell the same to the Company on the terms and conditions set forth herein;

WHEREAS, the Company desires to sell, assign and transfer to the Selling Shareholders certain of the assets transferred to the Company under the 1996 Agreement, subject to the retention by the Company of the right to use certain of those assets as provided for herein;

WHEREAS, the Company and the Selling Shareholders desire to resolve the situation regarding the ownership, registration and use of their respective marks containing the terms "Zone" and "Zone Diet" as provided for herein; and

2041955v2

WHEREAS, the Company and the Selling Shareholders desire to provide for the phase out and eventual termination of the Company's use of the name, likeness and image of BDS in connection with the manufacture, promotion and sale of its products.

NOW, THEREFORE, in consideration of the foregoing and the agreements, representations, warranties and covenants contained herein, the parties hereto mutually agree as follows:

1.    CERTAIN DEFINITIONS.

(a)    "Assets" shall means the "Transferred Assets" as such term is defined in Section 1.1(p) of the 1996 Agreement.

(b)    "Books" means the following books (published or communicated, in the past or future, in any media known or unknown) authored or co-authored by BDS: The Zone, Mastering the Zone, Zone Perfect Meals in Minutes, the Anti-Aging Zone, Zone Food Blocks, Top 100 Zone Foods, A Week in the Zone and The Soy Zone.

(c)    "Change of Control" means (i) a merger, consolidation, stock sale, or other transaction (or any series of transactions) in which the holders of the voting stock of the Company immediately prior to such transaction or series of transactions hold 50% or less of the voting power thereof immediately after such transaction or series of transactions, or (ii) a sale of all or substantially all of the assets of the Company.

(d)    "Closing" means the closing of the transactions contemplated in this Agreement as provided for in Section 13 hereof.

(e)    "Closing Date" means the date of the Closing as provided for in Section 13 hereof.

(f)    "Designated Period" means the period of time commencing on September 19, 1996 and terminating as of December 31, 1998.

(g)    "Envion Lawsuit" means the litigation currently pending in the United States District Court for the District of Massachusetts captioned *Surfactant Technologies, Inc. v. Pure Distributors, Inc. d/b/a Envion International et al.*, Civil Action No. 96-11155-RGS, including all appeals and other proceedings directly relating thereto.

(h)    "Ingestible Products" shall mean any ingestible food product intended for human consumption.

(i)    "Lien" means, with respect to any Asset, any mortgage, lien, pledge, charge, security interest, equitable interest, claim, right of first refusal, option, assignment, restriction or encumbrance of any kind in respect of such Asset.

(j)    "Other Sears Assets" shall have the meaning set forth in Section 2(e) below.

(k)    "Person" means an individual, corporation, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

(l)    "Skin Assets" shall mean any formulations or products that are intended or marketed for use in connection with dermatological or other skin care uses or treatments, and shall also mean any processes that are intended or marketed for use in connection with dermatological or other skin care uses or treatments but not for Ingestible Products.

(m)    "Zone Diet" means the diet program or programs based on the ideas and principles set forth in the Books.

2.    REPURCHASE OF COMMON STOCK/ASSIGNMENT OF ASSETS.

(a)    Sale and Repurchase of Common Stock.  As of the Closing, the Company hereby purchases from each Selling Shareholder, and each Selling Shareholder, severally but not jointly, hereby sells to the Company, all of the shares of Common Stock owned by such Selling Shareholder as set forth on Schedule 1 hereto (the "Acquired Common Stock").

(b)    Transfer and Assignment of Assets.  As of the Closing, the Company hereby sells, transfers and assigns all its right, title and interest in and to all the Assets (including, without limitation, all goodwill, causes of action, claims and rights connected therewith, and all transferable licenses, government permits and authorizations connected therewith), free and clear of all Liens, to BDS, except for the Retained Assets as provided for in Section 2(c) hereof (the Assets being so sold, transferred and assigned to BDS hereby are collectively called the "Retransferred Assets"), and subject to the retention by the Company of an irrevocable, royalty-free, nonexclusive, world-wide, perpetual, transferable (including, without limitation, sublicensable in multiple tiers) right and license to use , for the development, manufacture, marketing, sale and distribution of Ingestible Products, all those Retransferred Assets set forth in Sections 1.1(p)(3), 1.1(p)(4), 1.1(p)(5), and 1.1(p) (6) of the 1996 Agreement that are being sold, transferred or assigned to BDS under this Agreement. The Parties acknowledge and agree that the Retransferred Assets set forth in Sections 1.1(p)(3), 1.1(p)(4) and 1.1(p)(6) of the 1996 Agreement shall not include rights in and to the marks EICOTEC, EICOZONE or EICOPRO. The retransfer of the Retransferred Assets set forth in Section 1.1(p)(12) of the 1996 Agreement shall not limit or restrict the right of the Company to develop, market and exploit consumer nutrition centers and medical treatment centers. At the Closing, the Company shall instruct its counsel to deliver to BDS all books, records, papers and files related to the Retransferred Assets set forth in Section 1.1(p)(11), (p)(13) and (p)(14) of the 1996 Agreement that are in such counsel's possession.

(c)    Retained Assets. The Company shall retain all right, title and interest in and to (i) the assets listed on Schedule 2 hereto (subject to the exceptions and qualifications set forth in such Schedule), and (ii) those Assets described in the following sections of the 1996 Agreement: Section 1.1(p)(10) (except for the trademark EICODERM and the goodwill associated therewith), Section 1.1(p)(20), Section 1.1(p)(21), Section 1.1(p)(22), Section 1.1(p)(23), Section 1.1(p)(24) (except as such materials relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing), Section 1.1(p)(25), Section 1.1(p)(26) (except as such rights relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing); and Section 1.1(p)(27) (except as such rights relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing) (collectively, all such assets shall be known as the "Retained Assets").

(d)    Skin Care Assets. The Parties acknowledge and agree that notwithstanding anything in this Agreement to the contrary, all right, title and interest in or to any intellectual property rights relating or pertaining to the Skin Assets that were created, developed or acquired by or for the Selling Shareholders either before or during the Designated Period shall belong exclusively to DS.

(e)    Other Rights. Notwithstanding anything herein to the contrary, it is accepted and agreed that the Company shall have no rights in or to any inventions, product formulations, developments, innovations, techniques, designs, processes, procedures, improvements, works of authorship created or developed by BDS, DS or STI after the end of the Designated Period, including any intellectual property rights therein or thereto. Nothing in this Agreement shall amend, qualify, limit or restrict (i) the exclusive ownership of BDS or STI in and to (A) the copyrights for The Zone and Mastering the Zone, (B) the copyrights for any hardcover or paperback books based on The Zone, (C) the copyrights for any books written by BDS, (D) the rights of BDS or STI in any royalties derived from the publication of The Zone, (E) the rights of BDS or STI in any hardcover or paperback books, and (F) any lecture fees earned by BDS,, or (ii) the exclusive ownership of DS in and to any payment to DS as a result of a settlement of the Envion Lawsuit, in each case under clauses (i) and (ii) of this Section 2(e) regardless of whether created, developed or acquired by or for BDS, DS or STI , as the case may be, before, during or after the Designated Period (collectively, all of the foregoing shall be known as the "Other Sears Assets")

(f)    Other Actions. The Parties shall take all steps to sign and file all documents and to do all other acts reasonably necessary or desirable to sell, transfer and assign to BDS all the Company's right, title and interest in and to, and legal protection with respect to, the Retransferred Assets at the Closing, and whenever reasonably requested, after the Closing.

3.    NOTES AND OTHER CONSIDERATION.

(a)    Issuance and Payment of Notes. At the Closing, the Company shall issue promissory notes to BDS, DS and STI in the principal amounts of Two Million, Eight

Hundred and Eighty Seven Thousand, Five Hundred Dollars ($2,887,500), One Million, Five Hundred and Thirty Seven Thousand, Five Hundred Dollars ($1,537,500), and Nine Hundred and Seventy Five Thousand Dollars ($975,000), respectively, with interest at the rate of six percent (6%) per annum payable quarterly in arrears, to be payable on or before March 31, 2004, such notes to be in the form set forth as Exhibit A hereto (the "Notes"), provided that the Company shall pay a minimum of Twenty Six Thousand, Seven Hundred and Thirty Six Dollars and Eleven Cents ($26,736.11), Fourteen Thousand, Two Hundred and Thirty Six Dollars and Eleven Cents ($14,236.11), and Nine Thousand, Twenty Seven Dollars and Seventy Eight Cents ($9,027.78), respectively, in principal and interest per month on the Notes, which payments shall commence on November 15, 2001 and shall continue on the fifteenth day of each consecutive calendar month thereafter for a further twenty-seven (27) calendar months as provided for in and subject to the terms of such Notes.

          (b)    Acceleration of Payment.  The payment of the principal and interest payable on the Notes shall be accelerated and all amounts owing under the Notes shall be paid in full in the event of (i) a Change of Control , or (ii) certain uncured, material breaches of this Agreement by the Company as provided for in the Notes.

          (c)    Subordination to Other Indebtedness.  The Notes shall be junior in payment and subordinated to (i) all notes and other outstanding indebtedness or lines of credit of the Company as of the Closing, including without limitation, the line of credit from First Massachusetts Bank, N.A., which are in the aggregate amount of Five Million Dollars ($5,000,000), and (ii) any future indebtedness of the Company as a result of any debt instruments that the Company may enter into up to an aggregate maximum of Seven Million Dollars ($7,000,000) in the twelve (12) month period following the Closing Date.

          (d)    Cash Payment.  As of the Closing, Company shall pay the amount of Six Hundred Thousand ($600,000) in cash to BDS or a designee of BDS, such payment to be made by company check as of the Closing Date.

       4.    TRADEMARKS.

          (a)    Transfer and Voluntary Cancellation of Registrations.  Subject to the terms and conditions of this Section 4, as of the Closing, the Company hereby sells, assigns and transfers to BDS on a quit claim basis all the Company's right, title and interest in the trademark registration set forth on Schedule 3 (the "Assigned Registration") and the goodwill of the business symbolized by the Assigned Registration.  At the Closing, the Company shall execute an assignment substantially in the form of Exhibit B and such other assignment documents as may be reasonably necessary in order to record the assignment and transfer of the Assigned Registration to BDS in the relevant foreign governmental office(s).  In addition, from time to time, the Company shall execute and file such documentation as is necessary voluntarily to cancel, with BDS's consent, its U.S. Registration Nos. 2,298,235 and 2,335,083, and from time to time, BDS shall execute and file such documentation as is necessary to abandon his U.S. application Serial No. 76/054,553).  At any time and from time to time after the Closing, the

- 5 -

Company shall sign any and all documents reasonably necessary to facilitate the registration of U.S. application Serial No. 76/054,646. In addition, the Company hereby consents to, and on BDS's reasonable request shall sign, any and all documents reasonably necessary to facilitate the registration of any other applications by BDS for the marks ZONE and ZONE DIET solely for books in any medium published or communicated, including audio, digital, and electronic media, throughout the world. Moreover, BDS may request from time to time that Company consent to and sign any and all documents reasonably necessary to facilitate the registration by BDS of other marks containing the terms "Zone" and "Zone Diet" solely for books in any medium published or communicated, including audio, digital, and electronic media, throughout the world, and Company shall not unreasonably withhold such consent or unreasonably refuse to sign such documents.

(b)    Design Element. The Selling Shareholders acknowledge and agree that as between the Selling Shareholders and the Company, the Company owns, all right and title in and to the design element set forth on Schedule 4 (the "Design Element"), including, without limitation, all trademark rights therein and thereto; and the Company hereby agrees that BDS and all those in the chain of distribution, including but not limited to publishers, distributors, seller and buyers, shall have and shall be deemed to have had at all time prior to the date of this Agreement, an exclusive (except as to the Company), irrevocable, perpetual, royalty-free, worldwide license to use the Design Element solely in connection with the sale, marketing and distribution (whether in hardcover or paperback) of the books Zone Perfect Meals in Minutes and Zone Food Blocks.

(c)    Zone Perfect. The Selling Shareholders acknowledge that the Company claims ownership of the composite mark ZONE PERFECT; and the Company hereby agrees that BDS and all those in the chain of distribution, including but not limited to publishers, distributors, seller and buyers, shall have and shall be deemed to have had at all time prior to the date of this Agreement, a non-exclusive, irrevocable, perpetual, royalty-free, worldwide license to use ZONE PERFECT solely in the title of the book Zone Perfect Meals in Minutes.

5.    PUBLICITY RIGHTS.

(a)    Phase Out License. BDS hereby agrees that the Company shall have the right to use the name, likeness, image, voice, signature, or picture of BDS (the "Publicity Rights") in connection with the advertising, marketing, packaging, sale and distribution of the Company's products through July 1, 2001 (and for a period of three (3) months thereafter so as to permit the Company to sell or otherwise dispose of its inventory of products existing as of that date), provided that the Company may only use the Publicity Rights on or in connection with products that are substantially the same in nature and quality as those products on or in connection with which the Company has used the Publicity Rights prior to the Closing Date and in a manner substantially the same as the manner in which the Company used such Publicity Rights prior to the Closing Date. Notwithstanding anything in this Agreement to the contrary, however, the Company (1) shall have no right to use the Publicity Rights on the Company's web site(s) in keywords, domain names or URLs, (2) shall not purchase or obtain

advertisement-related keywords that contain, in whole or part, the Publicity Rights, and (3) shall not create or maintain any link between the Company's web site and any other web site at any time created, maintained or operated by any Sears Entity unless expressly agreed in writing, after July 1, 2001. Nothing in this Agreement shall be construed as prohibiting or limiting any rights the Company may have under applicable laws of "fair use."

(b)    Indemnification. The Company shall defend, indemnify and hold harmless BDS and his respective heirs, successors and assigns from all losses, costs, liabilities, damages, claims, and expenses of every kind and description, including reasonable attorneys' fees and expenses, arising out of or resulting from any act or omission of the Company or any of its affiliates relating to the Company's use of the Publicity Rights pursuant to Section 5(a), including, without limitation, (i) unfair or fraudulent advertising claims, warranty claims and product defect or liability claims pertaining to the Company's products, and (ii) claims for unauthorized use or misuse of any patent, trademark, copyright, or other proprietary right owned, used or controlled by any third party pertaining to the production, packaging, distribution, licensing, marketing or sale of the Company's products but excluding any such losses, costs, liabilities, damages, claims, and expenses relating to a claim that BDS lacks the requisite rights and authority to grant the licenses set forth in Section 5(a) or that on or before the Closing Date, BDS had transferred or had granted exclusive rights to use the Publicity Rights to any third party.

6.    TERMINATION OF AGREEMENTS.

(a)    Termination of 1996 Agreement. As of the Closing, the 1996 Agreement is hereby terminated in its entirety and shall be of no further force and effect hereafter, and all rights, covenants, obligations, and liabilities of any party and of any nature whatsoever pursuant to the 1996 Agreement are hereby terminated and the respective parties thereto shall have no future, and irrevocably waive all past obligations and liabilities thereunder.

(b)    Termination of BDS Employment Agreements. The Parties hereby acknowledge and agree that the BDS Employment Agreement and any other employment agreements, understandings or arrangements by and between the Company and BDS terminated as of December 31, 1998 and have no further force and effect thereafter. All other rights, covenants, obligations, and liabilities of any party and of any nature whatsoever pursuant to the foregoing agreements, understandings or arrangements are hereby terminated. The respective parties to such agreements, understandings or arrangements irrevocably waive all obligations and liabilities thereunder. The Parties hereby acknowledge and agree that BDS's office as President of the Company and any other offices that he may have held with the Company or its subsidiaries terminated as of December 31, 1998.

(c)    Termination of DS Employment Agreements. The Parties hereby acknowledge and agree that all employment agreements, understandings or arrangements by and between the Company and DS terminated as of December 31, 1998 and have no further force and effect thereafter. All other rights, covenants, obligations, and liabilities of any party and of

any nature whatsoever pursuant to the foregoing agreements, understandings or arrangements are hereby terminated. The respective parties to such agreements, understandings or arrangements irrevocably waive all obligations and liabilities thereunder. The Parties hereby acknowledge and agree that any offices that DS may have held with the Company or its subsidiaries terminated as of December 31, 1998.

       7.    ENVION LAWSUIT. Notwithstanding anything herein to the contrary, as of the Closing, the Company shall continue to have no further obligations to BDS or the other Selling Shareholders with respect to the Envion Lawsuit and the Selling Shareholders shall be solely responsible for all costs and expenses (including, without limitation, all attorneys fees and expenses) that the Selling Shareholders may have incurred (that were not previously reimbursed) or may incur hereafter in the prosecution and defense of the Envion Lawsuit. Notwithstanding anything herein to the contrary, the Company shall also not be responsible for any amounts which the Selling Shareholders may have paid or may have to pay hereafter in any judgments or in any settlements relating to the Envion Lawsuit.

       8.    NO RESTRICTIONS ON ACTIVITIES.

       (a)    No Restrictions on Activities. Except as expressly provided for herein or required by law, there shall be no restrictions, limitations or prohibitions on the activities of the Selling Shareholders or the Company upon consummation of the Closing.

       (b)    Injunctive Relief. The Company acknowledges and agrees that breach of its obligations under this Agreement could result in immediate irreparable injury to the Selling Shareholders. In the event of a breach or threatened breach of its obligations under this Agreement by the Company or its employees, agents or other representatives, the Selling Shareholders shall be entitled to seek from any court of competent jurisdiction, specific enforcement of such obligations and/or preliminary and permanent injunctive relief, including, but not limited to, temporary restraining orders, which remedy shall be cumulative and in addition to any other rights and remedies to which the Selling Shareholders may be entitled. Each Selling Shareholder acknowledges and agrees that breach of his/its obligations under this Agreement could result in immediate irreparable injury to the Company. In the event of a breach or threatened breach of his/its obligations under this Agreement by a Selling Shareholder or its employees, agents or other representatives, the Company shall be entitled to seek from any court of competent jurisdiction, specific enforcement of such obligations and/or preliminary and permanent injunctive relief, including, but not limited to, temporary restraining orders, which remedy shall be cumulative and in addition to any other rights and remedies to which the Company may be entitled.

       9.    COMPANY REPRESENTATIONS AND WARRANTIES.

       The Company hereby represents and warrants to each Selling Shareholder as follows:

(a)    Corporate Existence and Authority. The Company is a corporation
duly incorporated, validly existing and in good standing under the laws of its jurisdiction of
incorporation. The Company has, and on the Closing Date will have, full legal right, power and
authority to enter into and perform its obligations under this Agreement, this Agreement has
been duly authorized, executed, and delivered by the Company, and this Agreement is the valid
and binding agreement of the Company enforceable against the Company in accordance with its
terms. Schedule 1 sets forth a true and complete list of all holders (and their respective holdings)
of the Company's outstanding capital stock.

(b)    Non-Contravention. The execution, delivery and performance by
the Company of this Agreement does not and will not (i) contravene or conflict with the
corporate charter or bylaws of the Company, (ii) to the knowledge of the Company, contravene
or conflict with or constitute a violation of any provision of any law, regulation, judgment,
injunction, order or decree binding upon or applicable to the Company, (iii) constitute a default
under or give rise to any right of termination, cancellation or acceleration of any right or
obligation of the Company or to a loss of any benefit relating to the Retransferred Assets to
which the Company is entitled under any provision of any agreement, contract or other
instrument binding upon the Company or by which any of the Retransferred Assets is or may be
bound, or any law, administrative regulation or ruling or court decree applicable to the Company
or any of the Retransferred Assets, or (iv) result in the creation or imposition of any Lien on any
Retransferred Asset.

(c)    Required Consents. There are no contracts or other instruments
binding upon the Company or any law, administrative regulation or ruling or court decree
applicable to the Company or any of the Retransferred Assets requiring a consent as a result of
the execution, delivery and performance of this Agreement or the consummation of the
transactions contemplated hereby.

(d)    Claims and Litigation. Except for the Envion Lawsuit, there is no
action, suit, or proceeding pending and, to the knowledge of the Company, there is no
investigation pending, and no action, suit or proceeding threatened against or affecting the
Company before any court or arbitrator or any governmental body, agency or official that relates
to any Retransferred Asset, or that in any manner challenges or seeks to prevent, enjoin, alter or
materially delay the transactions contemplated hereby.

10.    SELLING SHAREHOLDERS REPRESENTATIONS AND
WARRANTIES.

Each of the Selling Shareholders, severally but not jointly, represents and
warrants to the Company as follows:

(a)    Ownership of Shares. Such Selling Shareholder is the lawful
owner of the Common Stock as set forth on Schedule 1 which represents all of the capital stock
of the Company owned by such Selling Shareholder. Such Selling Shareholder has good and

valid title to such Common Stock, free of all restrictions on transfer, liens, encumbrances, security interests and claims whatsoever. The Common Stock to be sold pursuant to this Agreement by such Selling Shareholder is registered in the name of such Selling Shareholder.

(b)    Authorization; Due Execution. Such Selling Shareholders has, and on the Closing Date will have, full legal right, power and authority to enter into and perform this Agreement and to exchange, sell and deliver the shares of his or its Common Stock to the Company, and this Agreement has been duly authorized, executed, and delivered by such Selling Shareholder, and this Agreement is the valid and binding agreement of such Selling Shareholder enforceable against such Selling Shareholder in accordance with its terms.

(c)    Consents; Conflicts. The execution, delivery and performance of this Agreement by such Selling Shareholder and the consummation of the transactions contemplated hereby will not require such Selling Shareholder to obtain any consent, approval, authorization or other order of, or to make any filing, declaration or registration with, any court, regulatory body, administrative agency or other governmental body, or conflict with or constitute a breach or default (with or without notice or lapse of the time or both) under any agreement, indenture or other instrument to which such Selling Shareholder is a party or by which such Selling Shareholder or property of such Selling Shareholder is bound, or to the knowledge of such Selling Shareholder, violate or conflict with any laws, administrative regulation or ruling or court decree applicable to such Selling Shareholder or property of such Selling Shareholder.

11.    WARRANTY DISCLAIMERS. EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS OF THE PARTIES CONTAINED IN THIS AGREEMENT ABOVE, NONE OF THE PARTIES MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT TO ANY OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR AS TO OR IN CONNECTION WITH ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE COMPANY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE TRADEMARK SOLD, ASSIGNED AND TRANSFERRED BY THE COMPANY PURSUANT TO SECTION 4(a) OR LICENSED BY THE COMPANY PURSUANT TO SECTIONS 4(b) AND 4(c), INCLUDING, WITHOUT LIMITATION, ANY IMPLIED REPRESENTATIONS OR WARRANTIES AS TO TITLE, VALIDITY OR NONINFRINGEMENT.

12.    NO CONSEQUENTIAL DAMAGES. EXCEPT FOR LOSSES OR DAMAGES ARISING OUT OF OR RESULTING FROM SUCH PARTY'S WILLFUL MISCONDUCT OR INTENTIONAL ACTS, IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT FOR ANY LOSS OF REVENUE OR PROFIT OR FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, OR OTHER SIMILAR DAMAGES, WHETHER BASED ON TORT (INCLUDING, WITHOUT

LIMITATION, NEGLIGENCE OR STRICT LIABILITY), CONTRACT, OR OTHER LEGAL OR EQUITABLE GROUNDS, EVEN IF SUCH PARTY HAS BEEN ADVISED OR HAD REASON TO KNOW OF THE POSSIBILITY OF SUCH DAMAGES.

13.    CLOSING. The closing shall take place at the offices of the Company, 120 Boylston Street, Suite 800, Boston, Massachusetts 02116, at 10:00 a.m., Boston time, on October 17, 2001.

14.    CLOSING CONDITIONS.

(a)    Closing Documents from the Company. The Selling Shareholders shall have received such closing documents as they may reasonably request, all in form and substance reasonably satisfactory to the Selling Shareholders, including, without limitation, the assignment documents for the Assigned Registration and any other patents, trademark registrations or applications, or other intellectual property assets sold, assigned or transferred to BDS under this Agreement.

(b)    Closing Documents from the Selling Shareholders. The Company shall have received such closing documents as it may reasonably request, all in form and substance reasonably satisfactory to the Company.

(c)    Financial Reports. The Company shall provide the Selling Shareholders with an unaudited, consolidated balance sheet of the Company as of December 31, 2000, and an unaudited statement of operations, cash flows and stockholders' equity for the twelve-month period ended December 31, 2000. In addition, although not a condition of Closing, Company shall provide the Selling Shareholders with an interim unaudited, consolidated balance sheet of the Company as of April 30, 2001, and an interim unaudited statement of operations, cash flows and stockholders' equity for the six-month period ending April 30, 2001 as soon as such financial statements are available.

15.    CONFIDENTIALITY. Each Party other than BDS, DS, STI or BDS, Inc. shall hold and shall use his or its reasonable efforts to cause his or its respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law or in connection with disclosure appropriate in future business transactions with third parties, all proprietary confidential information of any other Party included in the Retransferred Assets, provided that such Parties may disclose such information to his or its officers, directors, employees, accountants, counsel, consultants, advisors and agents so long as such persons are informed of the confidential nature of such information and are directed to treat such information confidentially. Each of BDS, DS, STI or BDS, Inc. shall hold and shall use his or its reasonable efforts to cause his or its respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law or in connection with disclosure appropriate in future business transactions with third parties, all proprietary

confidential information of any other Party included in the Retained Assets, provided that BDS, DS, STI or BDS, Inc. may disclose such information to his or its officers, directors, employees, accountants, counsel, consultants, advisors and agents so long as such persons are informed of the confidential nature of such information and are directed to treat such information confidentially. The obligation of the Parties to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information.

16.    RELEASES.

(a)    Except for claims, causes of action, demands, damages, costs, attorneys' fees, expenses or compensation in respect of which (i) a Selling Shareholder is entitled to indemnification under (A) the Company's corporate charter or bylaws, or (B) Section 5(b) above or (ii) BDS is required by any publisher of the Books or any other works authored by or for BDS through the date hereof to prosecute, pursue or join for alleged infringement by the Company, each Selling Shareholder hereby does for himself or itself, and his or its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, irrevocably release and discharge the Company and its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, and all persons, corporations or other entities that might be claimed to be jointly or severally liable with the Company, from any claim, cause of action, demand, suit, damage, cost, attorneys' fees, expenses, agreement, and compensation, in law or in equity, which have been asserted or could be asserted in connection with or arising from (a) the 1996 Agreement or any other agreements or understandings between the Company and such Selling Shareholder (whether oral or written), (b) the employment of BDS or DS by the Company and the termination of any such employment relationship, (c) any alleged breach of any fiduciary or other duties owed to such Selling Shareholder by virtue of his or its role as a director of the Company and/or his or its ownership of the Common Stock or any other debt or equity interest in the Company (other than the Notes to be issued hereunder), including, without limitation, any claims in connection with or arising from the Notice of Action by Less than Unanimous Written Consent of Stockholders, dated April 24, 2000, and any claims asserted or alleged in the letter from Testa, Hurwitz & Thibeault, LLP, dated May 22, 2000 and July 6, 2000, (d) any alleged misuse or inappropriate use by the Company of the Assets through the date hereof, (e) any alleged mislabeling of Company's products and/or the failure of such products to conform with or to the Zone Diet through the date hereof, (f) the Company's registration or use of any trademarks through the date hereof, (g) any alleged infringement by the Company of any copyrights in the Books or in any other works authored by or for such Selling Shareholder through the date hereof, and (h) rights to be reimbursed for damages and legal fees incurred in connection with the Envion Lawsuit (except to the extent previously reimbursed), including any claims asserted in the letter from Donnelly, Conroy & Gelhar, LLP, dated September 26, 2000, and the letter from Todd & Weld LLP, dated November 13, 2000.

(b)    The Company hereby does for itself, and its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, irrevocably release and discharge each Selling Shareholder and his or its officers, directors, shareholders,

employees, affiliates, attorneys, agents, and representatives, and all persons, corporations or other entities that might be claimed to be jointly or severally liable with such Selling Shareholder, from any claim, cause of action, demand, suit, damage, cost, attorneys' fees, expenses, agreement, and compensation, in law or in equity, which have been asserted or could be asserted in connection with or arising from (a) the 1996 Agreement or any other agreements or understandings between the Company and such Selling Shareholder (whether oral or written), (b) the employment of such Selling Shareholder by the Company and the termination of any such employment relationship, (c) any alleged breach of any fiduciary or other duties owed to the Company or its shareholders by virtue of such Selling Shareholder's role as a director or officer of the Company and/or such Selling Shareholder's ownership of the Common Stock or any other debt or equity interest in the Company, and (d) any alleged misuse or inappropriate use by such Selling Shareholder of the Company's assets through the date hereof, (e) any alleged mislabeling of Company's products and/or the failure of such products to conform with or to the Zone Diet through the date hereof, (f) the Company's registration or use of any trademarks through the date hereof.

      17.    MISCELLANEOUS.

        (a)    Notices. All notices, requests and other communications to either party hereunder shall be in writing (including telex, telecopy or similar writing) and shall be given to the Parties as follows:

If to the Company, to:

        Christopher P. Baker
        Chief Executive Officer
        ZonePerfect Nutrition Company
        120 Boylston Street, Suite 800
        Boston, Massachusetts 02116
        Fax: (617) 423-2127

If to BDS, to:

        Barry D. Sears
        42 Stanwood Road
        Swampscott, MA 01907
        Fax: (781) 639-8154

If to STI, to:

        Surfactant Technologies, Inc.
        c/o Barry D. Sears
        42 Stanwood Road

Swampscott, MA 01907
Fax: (781) 639-8154

If to DS, to:

Douglas Sears
11 Maple Circle
Marblehead, Massachusetts 01945
Fax: (781) 639-8154

If to HPH, to:

Harry P. Haveles
15 Evans Road
Brookline, Massachusetts 02146
Fax: (617) 227-0930

If to Baker, to:

Christopher P. Baker
C.P. Baker & Co.
120 Boylston Street, Suite 800
Boston, Massachusetts 02116
Fax: (617) 423-2127

If to Chud, to:

Laurence S. Chud
86 Waban Hill Road
Chestnut Hill, Massachusetts 02467
Fax: (617) 630-4461

If to Anasazi, to:

Anasazi Partners
120 Boylston Street, Suite 800
Boston, Massachusetts 02116
Fax: (617) 423-2127

If to Lampe, to:

Steven G. Lampe
40 East 88th Street
Suite 10F

- 14 -

New York, New York 10128
Fax: (212) 581-8999

All such notices shall be deemed to have been duly given: (i) if delivered by hand, upon delivery, (ii) if mailed with postage prepaid, five (5) business days after being deposited in the mail, (iii) if telecopied, when receipt is acknowledged, provided a confirmation copy is also sent by registered or certified mail or air courier, or (iv) if sent by a reputable air courier service guaranteeing overnight delivery, the next business day after deposit with such service.

(b)      Entire Agreement. This Agreement (including all Schedules and Exhibits) constitutes the entire agreement between or among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party hereto. Except as expressly provided for herein, no provision in this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

(c)      Amendments. Any provisions of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(d)      No Waivers/Cumulative Remedies. No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(e)      Expenses. Except as otherwise may be provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

(f)      Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors in interest and assigns. Notwithstanding anything herein to the contrary, the Company shall have the right freely to assign the rights retained under Section 2(b) in the event of a Change of Control.

(g)      Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and shall be enforced to the greatest extent permitted by law.

(h)     Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without regard to the conflicts of law rules of such state or any other state. Each Party hereby consents to the exclusive jurisdiction of the state courts of Commonwealth of Massachusetts and the federal courts located in that state with respect to any dispute which may arise with respect to this Agreement and hereby waives any defense based on personal jurisdiction, improper venue, forum non conveniens or similar defense. Each Party agrees to accept service of process by certified mail with respect to any such dispute.

(i)     Counterparts; Effectiveness.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(j)     Captions.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

(k)     Other.  The Parties hereby acknowledge and agree that (i) BDS, Inc. was not organized as of the date of the execution and delivery of the 1996 Agreement or any date or time thereafter, and (ii) BDS, Inc. has been made a party to this Agreement for the purposes of completeness.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]