UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZONEPERFECT NUTRITION COMPANY<br><br>  Plaintiff,<br><br>  v.<br><br>HERSHEY FOODS CORPORATION,<br>HERSHEY CHOCOLATE &<br>CONFECTIONERY CORPORATION, and<br>BARRY D. SEARS,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 04-10760 REK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S INITIAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Daniel L. Goldberg, BBO #197380
Charles L. Solomont, BBO # 557190
Joshua M. Dalton, BBO #636402
Matthew L. Mitchell BBO #647902
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110
(617) 951-8000

Counsel for Plaintiff
ZonePerfect Nutrition Company

Date: May 10, 2004

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

FACTS ...............................................................................................................................4

STANDARD OF REVIEW................................................................................................12

ARGUMENT ....................................................................................................................15

I.     AN INJUNCTION SHOULD ENTER TO PREVENT HERSHEY'S AND
SEARS' UNFAIR BUSINESS CONDUCT. ........................................................15

     A.    ZonePerfect is Likely to Succeed on the Merits of its Lanham Act
Claims as Well as its Claims for Common Law Trademark
Infringement, Trademark Dilution and Unfair Competition....................15

          1.    ZonePerfect has trademark priority in the ZONE Marks. ...........15

          2.    Defendant's present use of the ZONE Marks and logo has
created a serious likelihood of confusion among the
relevant purchasing public. ........................................................17

               a.    Similarity of the Trademarks. .........................................18

               b.    Similarity of the Products. ..............................................19

               c.    Channels of Trade; Advertising; Prospective
Purchasers. ....................................................................20

               d.    Actual Confusion. ...........................................................21

               e.    Defendant's Intent. .........................................................21

               f.    Strength of the Mark........................................................22

               g.    Summary...........................................................................25

     B.    Plaintiff is Also Likely to Succeed on its Claims for Unfair
Deceptive, False and Misleading Advertising. ........................................25

          1.    Falsity.........................................................................................26

          2.    Materiality. .................................................................................27

          3.    Consumer Deception...................................................................27

          4.    Interstate Commerce. ..................................................................28

          5.    Likely Injury. ..............................................................................28

          6.    Summary. ....................................................................................29

     C.    Plaintiff has Been and Will Continue to be Irreparably Harmed in
the Absence of an Injunction. ..................................................................29

| | D. | The Balance of Equities Strongly Favors Issuance of an Injunction, as Does a Balance of Harm to the Parties. | 31 |
| | E. | The Public Interest is Served by Issuance of an Injunction. | 32 |
| II. | | AN INJUNCTION SHOULD ISSUE ENFORCING THE TERMS OF THE OCTOBER 7, 2002 CONFIDENTIALITY AGREEMENT | 32 |
| | A. | ZonePerfect is Likely to Succeed on its Claim for Breach of the Confidentiality Agreement | 34 |
| | B. | ZonePerfect Will Suffer Irreparable Harm If an Injunction is Not Issued. | 35 |
| | C. | The Balance Of Equities Strongly Favors Issuance Of An Injunction, As Does A Balance Of Harm To The Parties. | 36 |
| | D. | The Public Interest Is Furthered By The Issuance Of An Injunction. | 36 |
| CONCLUSION | | | 37 |

LITDOCS:549986.1

## INTRODUCTION[1]

Plaintiff ZonePerfect Nutrition Company ("ZonePerfect") seeks to preliminarily enjoin the obvious trademark infringement of defendants – reflected by their choice of brand name, use of ZONE Marks, and stylization and placement of lettering on packaging – before the national product roll-out which will irreparably harm plaintiff. Of all the potential product names and logos available to defendants for their new product line – to be sold through the same channels of distribution and to be marketed to the same consumers as are plaintiff's products – defendants have selected those that are designed to trade on plaintiff's hard-earned goodwill. It is not defendants desire to enter into the nutritional bar industry – or to collaborate on each others' activities – that is at issue. Rather, what plaintiff seeks is to enjoin are efforts to misappropriate and jeopardize ZonePerfect's goodwill and confidential information.

ZonePerfect markets a highly successful line of food products in connection with the "ZONE™," "ZONE DIET," "ZONE PERFECT®," the stylized ZONE logo (the "ZONE logo"), and other related registered and common law "ZONE" trademarks (collectively the "ZONE Marks"). Through these efforts, ZonePerfect has become the sole and exclusive holder of rights in the ZONE Marks in connection with the sale of food products, and in particular in connection with ZonePerfect's flagship product – the ZonePerfect® nutrition bar. The ZonePerfect® nutrition bar has become known throughout the industry as the "Zone bar."

In late 2002, in explicit recognition of the commercial value and market strength of the ZONE Marks owned by ZonePerfect, Defendant Hershey Foods Corporation (collectively, with Defendant Hershey Chocolate and Confectionery Corporation, "Hershey")

---

[1] Pursuant to the Scheduling Order, Discovery will follow this initial submission, and further submissions are contemplated.

bid $127 million to purchase ZonePerfect's business. In the words of Hershey's CEO, in offering millions for ZonePerfect, it was Hershey's intent to "bring[] together ZonePerfect's strong name within the nutrition category with Hershey's leading position across the U.S. confectionery and snack market."[2] Hershey's offer to acquire ZonePerfect came after teams of Hershey representatives were provided with a virtual blueprint of every aspect of ZonePerfect's business during months of intensive, comprehensive due diligence efforts. Before commencing these efforts, Hershey entered into a strict confidentiality agreement.

Having learned the details of ZonePerfect's business through the acquisition due diligence process, and having recognized the value of the "ZONE" name owned by ZonePerfect, Hershey now embarks on a brazen attempt to misappropriate ZonePerfect's trademarks, trade secrets and goodwill in blatant use of a "Zone" named product with packaging remarkably similar to ZonePerfect's – in effect, simply to take what it did not buy. In February 2004, a mere six months after the sale of ZonePerfect to another bidder, Hershey announced a plan to "partner" with defendant Barry D. Sears (the co-founder and former President and promotional "face" of ZonePerfect) to market the "SmartZone" bar – a nutrition bar that misappropriates ZonePerfect's ZONE Marks and will compete directly with the ZonePerfect® bar. Hershey's "development" of a "new" nutritional bar product is the fruit of its misappropriation of a plethora of information about, among other things, the nutrition bar market and ZonePerfect's business that ZonePerfect disclosed to it under a strict confidentiality agreement. The name and logo which Hershey proposes to use are obvious efforts to trade off ZonePerfect's goodwill; the value of the development costs inherent in bringing a new product to market that Hershey avoided through its breach of its due diligence confidentiality obligations are incalculable. Hershey's and Sears' conduct also

---

[2] *See January 14, 2003 Letter, Complaint,* **Exhibit 21** (emphasis added).

violates the express terms of the agreement between Sears and ZonePerfect entered into when Sears sold his interests in ZonePerfect.

The front of the packaging of the "SmartZone" bar will prominently feature a "Dr. Sears Zone Approved" seal – a logo that is a "knock off" of ZonePerfect's ZONE logo. *See* Comparison of the ZonePerfect® logo and bar and the proposed Hershey/Sears logo and bar, *Complaint*, **Exhibit 1.** Further, the "SmartZone" bar has been touted by both Hershey and Dr. Sears as the "first" nutrition bar "approved" by Sears – a statement that is patently false, given Sears' prior ownership interest in ZonePerfect and his years of work there personally designing and approving ZonePerfect® nutrition bars.

Fortunately, this litigation was commenced, and the Court will address the preliminary injunction, before Hershey has actually started to distribute its offending product or to engage in the extensive consumer advertising which can be expected upon a product's launch. Thus, any injunction will not require removal of product from retail shelves, withdrawal of point of sale materials, or any of the myriad of actions that typify the usual trademark infringement preliminary injunction. By its Motion for Preliminary Injunction, plaintiff seeks merely to preserve the status quo pending full trial on the merits. As more fully described in its Motion, plaintiff requests a preliminary injunction:

(1)    Preventing Hershey and Sears from marketing the SmartZone bar or any other new food products or other related goods and services using the ZONE Marks;

(2)    Restraining Hershey from selling any nutrition bar, and/or otherwise entering the nutrition bar market through any of the efforts of any persons involved in reviewing ZonePerfect's Confidential Information, as that term is defined in the October 7, 2002 Confidentiality Agreement; and

(3)    Halting Hershey's and Sears' false and misleading promotional activities.

## FACTS[3/]

### *Evolution of ZonePerfect and the ZONE Marks*

In 1995, Sears wrote The Zone, which quickly became a New York Times #1 best-selling book. In the book, Sears advocates a diet consisting of 40% carbohydrates from fruits and vegetables, 30% low-fat protein, and 30% healthy monounsaturated fats at every meal (the "Zone Diet"). To facilitate the development and general commercialization of nutrition, health, and cosmetic products based on Zone Diet principles, Sears formed Eicotech Corporation in 1996 – the corporate predecessor of ZonePerfect (hereinafter ZonePerfect and its corporate predecessor are referred to collectively as "ZonePerfect"). The creation of ZonePerfect is memorialized in a Stock Purchase and Holders Agreement dated September 19, 1996 (the "1996 Agreement"). *See* 1996 Agreement, *Complaint*, **Exhibit 4**. Thereafter, Sears worked to develop products for the company and provided his personal endorsement, likeness, and signature to ZonePerfect's products.

Through the 1996 Agreement, Sears transferred to ZonePerfect for consideration, among other things, the exclusive right to manufacture, distribute, market, sell and exploit essentially all product rights owned or controlled by Sears and his affiliated companies (other than products relating to intravenous drug delivery and magnetic coatings) including any trademark rights related to same. 1996 Agreement §§ 1.1(q) and 7.1(e).

In or about January 1997, ZonePerfect began selling nutrition bars under a new brand name "Eicozone." Sears endorsed the Eicozone bar and authorized the use of his name on its packaging. In or about February 1997, the company conceived of the brand name "ZonePerfect" to replace the Eicozone brand on all consumer products.

---

[3/] The facts recited herein are based largely on ZonePerfect's Complaint filed on April 15, 2004. ZonePerfect will submit affidavits and other evidence in support of this Facts section when and as required by the Scheduling Order agreed to by the parties and entered by this Court. ZonePerfect reserves the right to supplement the Facts section.

4

The first ZonePerfect® logo featured the word "Zone" in a distinctive block-letter font (the "ZONE logo") with the word "perfect" in small, thin block letters approximately a fifth the size of letters in the ZONE logo and placed along the bottom of the ZONE logo. *see* Copy of the first ZonePerfect® logo, *Complaint*, **Exhibit 5**. The ZONE logo used in the ZonePerfect® logo was designed, with Sears' approval, to closely approximate the distinctive font used for the word "ZONE" on the book covers of The Zone and Mastering the Zone ("Sears' Zone Books") in an effort to expressly tie the ZonePerfect® bar to the Zone Diet and Sears' publications. For over six years, the ZONE logo has been a fixture on each of ZonePerfect's products and each of Sears' book covers. *See* Copies of The Zone and selected other Sears' book covers, *Complaint*, **Exhibits 6, 8**.[4/]

Each original ZonePerfect® bar also featured Sears' signed testimonial and endorsement on the side, in which Sears proclaims: "The ZonePerfect™ Nutrition Bar is the easiest way to enter the Zone™. ZonePerfect™ is formulated with a precise ratio of protein, carbohydrate and fat that triggers the burning of stored body fat for the next four to six hours." Likewise, the backs of boxes of twelve contained Sears' likeness and signed testimonial, including his "personal guarantee that the product represents the cutting edge of Zone™" technology. *See* Copies of the 1997 ZonePerfect® bar packaging and 12-pack box, *Complaint*, **Exhibit 7**.

Once ZonePerfect established the ZonePerfect® brand in 1997, it began to establish a network of initially small, and then increasingly larger retail customers. Then in late 1998, ZonePerfect negotiated a deal with its first major national retailer, CVS Pharmacy, to sell ZonePerfect® bars at CVS Pharmacy locations.

---

[4/] In early 2001, the ZonePerfect® logo was redesigned to its current iteration. The current ZonePerfect® logo retains and features the ZONE logo with a scripted "Perfect" placed below and secondary to the ZONE logo. *See* Copy of the current ZonePerfect® logo, *Complaint*, **Exhibit 11**.

5

ZonePerfect and Sears developed a new type of ZonePerfect® bar called the "crunch bar" or "slab bar" in 1998. The bar came in four flavors: Strawberry Yogurt, Apple Cinnamon, Chocolate Raspberry, and Strawberry Fruit Crunch, the first three of which ZonePerfect still offers today using the same formulas developed by Sears in 1998.[5]

The ZonePerfect® bars were shipped in twelve-pack boxes and the new ZonePerfect® bars featured Sears' likeness, signature, and a similar endorsement and guarantee from Sears as that on the existing bars. *See* Copy of the 1999 ZonePerfect 12-pack box, attached to the Complaint as **Exhibit 10**. The bottom panel of the 12-pack box was imprinted with the same 800 number featured in Sears' books, the ZonePerfect website address, and a statement that "Zone™ and ZonePerfect™ are trademarks of Eicotech Corporation [the former name of ZonePerfect]."

Today, ZonePerfect is a market leader, with sales in 2003 of $100 million. ZonePerfect's flagship product remains the ZonePerfect® nutrition bar. By last estimate, the ZonePerfect® nutrition bar retains a 25% share of its relevant market. ZonePerfect's products have featured the ZONE Marks continuously in various forms and styles since 1997. These products have been sold throughout the United States under the ZONE Marks.[6] The ZONE Marks are famous, inherently strong, and distinctive marks in connection with the goods with which they appear, and are widely recognized by retailers and consumers. Indeed, as a quick review of any popular internet search engine will attest, ZonePerfect® bars are the only ZONE-marked bars that are widely distributed, and have

---

[5] In 1998, ZonePerfect launched additional food products under the ZonePerfect® brand, including: prepackaged meals, protein powders, and diet drinks. These products were also developed by ZonePerfect in cooperation with, and with the endorsement of, Sears.

[6] ZonePerfect has registered among other ZONE Marks, the ZONE PERFECT® stylized mark and the ZONE PERFECT® word mark for use on and in connection with, among other things, the sale of food, beverage, and nutritional supplement products in the United States (the "Registered ZONE Marks"). *Complaint*, **Exhibits 12-18.**

become widely known throughout the market by its brand name Zoneperfect®, but also simply as *the* "Zone bar."

### *ZonePerfect's Multi-Million Dollar Buy-Out of Sears and His Affiliates.*

On October 17, 2001, ZonePerfect and Sears executed a stock repurchase agreement (the "2001 Agreement"), whereby ZonePerfect agreed, *inter alia*, to Sears' requested buy-out of his equity interest in the ZonePerfect company. *See* 2001 Agreement, § 6, *Complaint*, **Exhibit 19**. ZonePerfect paid Sears and his affiliates a total of $5,400,000 as consideration for their shares of the company. *See* 2001 Agreement, §3. The parties' intent, as manifested in the 2001 Agreement, was to provide Sears with the right to continue selling and writing books, and for ZonePerfect to continue its exclusive commercialization of Zone-related, non-book products. The 2001 Agreement was expressly structured to protect and preserve the goodwill ZonePerfect had developed in the ZONE Marks in connection with food products which ZonePerfect has been marketing with success and, obviously, with the knowledge of Sears.

### *Hershey offers to purchase ZonePerfect*

By early 2002, ZonePerfect had become one of the nation's top sellers of nutrition bars, largely on the strength of ZonePerfect® bar sales. In late 2002, a number of companies emerged as potential buyers of the ZonePerfect business, including Hershey. ZonePerfect retained the investment banking services of Adams, Harkness & Hill ("AHH") to facilitate a potential sale of the business. AHH generated an initial collection of extensive confidential and proprietary information regarding multiple aspects of ZonePerfect's business.

To obtain a copy of the initial collection of confidential information, Hershey signed an agreement to keep the information it learned from the collection or through any further due diligence confidential, and to use that information only in connection with its investigation of acquiring ZonePerfect. *See* October 7, 2002 Confidentiality Agreement between ZonePerfect and Hershey, *Complaint*, **Exhibit 20**. In the Confidentiality Agreement, Hershey acknowledges that it would be "impossible" to measure the damage that

a breach of Hershey's confidentiality obligations could do to ZonePerfect. *See* Confidentiality Agreement, ¶ 5 (emphasis added) ("Each party agrees that it would be impossible or inadequate to measure and calculate the other party's damages from any breach of the covenants set forth in this letter agreement."). As such, Hershey confirms ZonePerfect's right to seek an injunction against any such conduct. *Id.*

After receiving this confidential overview of ZonePerfect's business, on or about January 14, 2003, Richard Lenny, Chairman, President, and Chief Executive Officer of Hershey, submitted a letter indicating an interest in pursuing an acquisition of ZonePerfect, but requesting that Hershey first be allowed to first conduct additional due diligence. *See* January 14, 2003 Letter, *Complaint*, **Exhibit 21**. In that letter C.E.O. Lenny states that Hershey is "very excited about the prospect of bringing together ZonePerfect's strong name within the functional foods category with Hershey's leadership position across the U.S. confectionery category." *Id.* (emphasis added).

For the rest of January and into February 2003, Hershey conducted extensive due diligence of ZonePerfect. Hershey gained access to highly confidential information fundamental to all facets of ZonePerfect's business operations and products, including the knowledge that Sears retained rights to use ZONE Marks solely in connection with books under the 2002 Agreement. On February 21, 2003, Hershey's C.E.O. submitted a proposal to acquire 100% of ZonePerfect for $92 million. *See* February 21, 2003 Letter, *Complaint*, **Exhibit 22**.

After an additional month of intensive review of ZonePerfect's confidential and private business information, on March 13, 2003, Hershey's C.E.O. submitted a second proposal raising Hershey's offer for ZonePerfect by $35 million to $127 million. *See* March 13, 2003 Letter, *Complaint*, **Exhibit 23**. The approval section of the March 13, 2003 letter requested a meeting between Hershey and Sears producing "satisfactory results" to Hershey, and states in closing, "We continue to remain very enthused about the prospect of bringing

8

together <u>ZonePerfect's strong name within the nutrition category</u> with Hershey's leadership position across the U.S. confectionery and snack market." *Id.* (emphasis added)

After submitting its March bid, Hershey continued to press for a meeting with Sears, in spite of his complete lack of any involvement with the company by that time. In light of these repeated requests, ZonePerfect arranged for an April 1, 2003 lunch meeting at Radius Restaurant in Boston between Sears and his representatives and representatives of Hershey, including its CEO, and its Vice President for Strategy and Innovation, Dennis Eshleman (the "Radius Lunch"). While ZonePerfect's CEO and representatives of its major investors were present for the first part of the meeting, they had been asked in advance by Hershey to excuse themselves midway through the lunch, and did so as requested. Hershey and Sears then held a private meeting.

Subsequent to the Radius Lunch, Hershey's interest in acquiring ZonePerfect flagged. Hershey did not submit another bid for ZonePerfect, and ultimately allowed itself to be outbid by Abbott Laboratories. Abbott Laboratories completed its purchase of ZonePerfect in August 2003.

### *Hershey and Sears Announce the "SmartZone" Bar*

A mere six months after the Abbott deal was completed, Hershey and Sears publicly announced that they had entered into a "partnership" to develop and market the "SmartZone" bar. The "SmartZone" bar will compete directly with the ZonePerfect® nutrition bar. A February 9, 2004 marketing and advertising announcement (the "February 9, 2004 Advertisement") published by Hershey, states in part:

> Hershey Foods Corporation and Dr. Barry Sears today announced plans to introduce the first-ever nutrition bars with the science-based nutritional benefits of the Zone Diet and the great taste consumers expect from Hershey. The products will be the <u>first to carry the "Dr. Sears Zone Approval"</u> seal and will be introduced during the third quarter.
>
> "Our new partnership with Dr. Sears is an outstanding match of Hershey's strong brand-building and business-system capabilities with his world-

9

renowned dietary expertise," said Richard H. Lenny, Chairman, President and Chief Executive Officer, Hershey Foods Corporation. "Together, we'll create innovative new products that deliver the superior nutritional benefits of his Zone Diet and the great taste consumers expect from Hershey. This is an exciting opportunity for us as we further expand our presence in the nutrition snack segment and work with Dr. Sears to meet the growing consumer demand for sound nutrition, convenience and a healthy lifestyle."

*See* February 9, 2004 Advertisement, *Complaint,* **Exhibit 24** (emphasis added).

In addition to using the ZONE mark in its bar's name, Hershey has stated its intent to feature a "Dr. Sears Zone Approved" seal on each "SmartZone" bar. This "seal" consists primarily of a large "Zone" logo essentially identical to the ZONE logo featured on ZonePerfect® bars and related products for over six years. *See* Copy of the "SmartZone" bar's packaging with its "Zone Approval seal," *Complaint,* **Exhibit 25.** Further, in light of Sears' years of work developing and endorsing ZonePerfect® bars, the statement that the "SmartZone" bar is the "first" nutrition bar "approved" by Sears is patently false and misleading.

The February 9, 2004 Advertisement, including these false and misleading statements, has been widely reported upon by such media outlets as CBS Marketwatch, Forbes.com, and others. *See* Sampling of published reports concerning February 9, 2004 Advertisement, *Complaint,* **Exhibit 26.**

Hershey and Sears have already engaged in efforts to notify the industry and the general public about the "SmartZone" bar. A few days after the February 9, 2004 Advertisement, Hershey's C.E.O., Richard Lenny, who was part of the ZonePerfect due diligence efforts, made a multi-media presentation at a major conference in Arizona, the Consumer Analyst Group of New York ("CAGNY") conference. In the presentation slides, Hershey's "partnership" with Sears is repeatedly cited, and the "SmartZone" bar is touted as the "only" nutrition bar to carry a "Dr. Sears Zone Approved Seal" which seal is utilized throughout the presentation. *See* Selected Hershey Presentation Slides from CAGNY conference, attached hereto *Complaint,* **Exhibit 27.** Hershey's presentation, misappropriates

the ZONE Marks, including those contained in the "Zone Approved Seal," in connection with Hershey's entire "Healthier Hershey" line of food products – further blurring the line between ZonePerfect's products and Hershey's products and implying Sears' involvement with Hershey products other than the "SmartZone" bar. *Id.* Hershey's CAGNY presentation was subsequently published on Hershey's website, where it is remains available today.

In the February 2004 edition of "The Omega Zone," Sears' "official e-magazine," Sears reserves front page coverage for an article advertising the "SmartZone" bar and announcing his affiliation with Hershey. The first page of the e-magazine falsely states that the "SmartZone" bar "will be the first to carry the 'Dr. Sears Zone Approved' seal and will be introduced during the third quarter [2004]." It also contains a picture showing Sears and his representatives together with Hershey's representatives - at least two of which were primarily involved in the due diligence of ZonePerfect. The second page offers a direct quote from Sears and states: "The innovative products to be developed through this new partnership will provide a fusion of my Zone technology with the outstanding food technology expertise of Hershey Foods." Archives of past issues of "The Omega Zone" E-Magazine remain available on Sears' website. *See Complaint*, **Exhibit 28**.

The front page of the February 2004 edition of The Omega Zone E-Magazine also contains a hyperlink to Sears' Zone Diet website, stating: "To buy the **only** Zone products endorsed by Dr. Sears, go to www.zonediet.com," thus falsely implying that ZonePerfect products have never been approved or endorsed by Sears and further damaging and diluting ZonePerfect's goodwill and confusing the public as to the source, association, affiliation, or sponsorship of ZonePerfect's products.

### *Sears' "OmegaZone" Products*

In his various websites accessible via drsears.com, zonedict.com, and other domain names, Sears has been marketing nutrition products, including food products, under the brand name "OmegaZone." OmegaZone products have been primarily sold directly to consumers over the internet. On information and belief, these sales have been modest. On

11

information and belief, Sears has never attempted to sell the OmegaZone products via retail channels. ZonePerfect recently learned that Sears has also utilized the ZONE logo on at least one product, a sea vegetable and mineral supplement called "SeaHealth PLUS."

### *The Status Quo*

As of the date of this filing, Hershey not launched the "SmartZone" product line. It has not engaged in wide scale manufacture of the "SmartZone" bar, has not placed produce on retail shelves or otherwise distributed the "SmartZone" bar to the consumer public, and has only engaged in limited anticipatory marketing of the "SmartZone" bar as described above.

Sears' "OmegaZone" and related products are advertised and available to consumers solely through Sears' website and likewise have not been made widely available through retail stores.

Thus, neither defendant is yet engaged in extensive consumer marketing or sale or distribution of the offending products through the channels of trade which are the most vital to ZonePerfect's marketing and distribution efforts.    The defendants have likewise confirmed that they will not do so prior to the scheduled preliminary injunction hearing date of July 15, 2004, ensuring that they will not be forced to call back product or remove it from retail stores should an injunction be entered. Preservation of the status quo, then, will be enough to prevent substantial irreparable harm in advance of a resolution of this matter at trial.

### STANDARD OF REVIEW

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) (citing *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). Thus, if judgment ultimately enters for the movant,

a preliminary injunction provides the Court with a method for preventing or minimizing any current or future wrongs caused by the defendant. *CMM Cable Rep.*, 48 F.3d at 620; *American Bd. of Psychiatry & Neurology v. Johnson-Powell*, 129 F.3d 1, 4 (1st Cir. 1997) (citing *CCM Cable Rep.* in the context of a trademark infringement action).

A preliminary injunction may be granted where the plaintiff establishes that: (1) the plaintiff will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm that the opposing party would suffer if the injunction were granted; (3) there is a likelihood that the plaintiff will succeed on the merits at trial; and (4) the public interest will not be adversely affected if the injunction is granted.[7] *See Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986); *accord Digital Equipment Corp. v. AltaVista Technology, Inc.*, 960 F. Supp. 456, 472 (D. Mass. 1997) (in context of trademark infringement) and *Polar Corp. v. Coca-Cola Co.*, 871 F. Supp. 1520, 1521 (D. Mass. 1994) (in context of false advertising claim).

For those grounds on which ZonePerfect is seeking a preliminary injunction, the most critical factor in obtaining the injunction is likelihood of success on the merits. The First Circuit has found this to be the case in trademark infringement, unfair competition, and false advertising claims, holding that "the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on the plaintiff's reputation." *Camel Hair and Cashmere*, 799 F.2d at 14.[8] The irreparable injury arises from "the

---

[7] The Massachusetts Consumer and Business Protection Act requires only a showing that unfair competition or practice "*may have* the effect of causing [a] loss of money or property" in order to permit injunctive relief. M.G.L. ch. 93A, §11 (emphasis added). Thus, should plaintiff show a likelihood that its intellectual property is being harmed by defendant's conduct, sufficient grounds will also exist to enter an injunction under Chapter 93A.

[8] *See also Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1005 (D. Mass. 1988); *R.J. Toomey Co. v. Toomey*, 683 F. Supp. 873, 879 (D. Mass. 1988);

(footnote continued to next page)

inherent difficulty of proving damages caused by confusion" and "the impairment of intangible values such as the strength of the mark, reputation and goodwill." *Id.* Put simply, "[f]ew harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it." *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir. 1987). This is especially true where, as here, the Defendants' "SmartZone" bars will be sold side by side with ZonePerfect® nutrition bars.

Irreparable harm may also be presumed upon a showing of a likelihood that defendant misappropriated plaintiff's trade secret or confidential information. *See Picker Intern. Corp. v. Imaging Equip. Services, Inc.,* 931 F. Supp. 18, 44 (D. Mass. 1995) ("misuse of trade secrets is generally deemed to involve irreparable harm"). Indeed, in executing the agreement that allowed it to gain access to the myriad of proprietary and confidential information regarding ZonePerfect, Hershey expressly acknowledged that it would be "impossible" to measure the damage that a breach of Hershey's confidentiality obligations could do to ZonePerfect. *See* Confidentiality Agreement, ¶ 5. As such, Hershey confirms ZonePerfect's right to seek an injunction against any such conduct. *Id.*

---

(footnote continued from previous page)

*Schering Corp. v. Schering Aktiengesellschaft,* 667 F. Supp. 175, 190 (D.N.J. 1987), vacated per settlement, 709 F. Supp. 529 (D.N.J. 1988) (incalculable irreparable injury ordinarily follows when likelihood of confusion appears).

LITDOCS:549986.1

## ARGUMENT

## I.    AN INJUNCTION SHOULD ENTER TO PREVENT HERSHEY'S AND SEARS' UNFAIR BUSINESS CONDUCT.

### A.    ZonePerfect is Likely to Succeed on the Merits of its Lanham Act Claims as Well as its Claims for Common Law Trademark Infringement, Trademark Dilution and Unfair Competition.[9]

ZonePerfect's likelihood of success on the merits of its trademark infringement and unfair competition claims is overwhelming given ZonePerfect's priority of use of the ZONE Marks and Hershey and Sears' misleading use of the ZONE Marks in connection with their proposed "SmartZone" bar and (in the case of Sears) the misleading use of the ZONE Marks on the "OmegaZone" bar and related line of food products.  Lest there be any doubt, Hershey's and Sears' use of the ZONE Marks far exceeds any use of the word "zone" to merely describe some attribute of its products (as defendants have suggested) and squarely constitutes use of ZonePerfect's well-established trademarks to confuse and mislead the consuming public.  A likelihood of confusion is not only clear, but indeed presumed: given the obviously intentional nature of Hershey's and Sears' misappropriation, the likelihood that consumers will be confused becomes all but a forgone conclusion.  *See* discussion, *infra.*

### 1.    ZonePerfect has trademark priority in the ZONE Marks.

The Lanham Act, §32, prohibits the subsequent and unauthorized commercial use of a federally registered mark in connection with the sale, offer for sale, distribution or advertisements of goods or services with the scope of, as related to the goods or services

---

[9] ZonePerfect's contract-based counts assert that Hershey's and Sears' use and threatened use of ZonePerfect's trademarks and other assets to develop and market products that unfairly compete with ZonePerfect and misappropriate its goodwill and competitive position violates certain provisions of the 2001 Agreement and Confidentiality Agreement. Thus, arguments in the following section, as well as in Section II of this brief, demonstrate likelihood of success for ZonePerfect on such claims.

15

cited in the registration. *See* 15 U.S.C. §1114. Courts further recognize that § 43(a) of the Lanham Act protects a senior owner's rights in unregistered trademarks. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Quabaug Rubber Co. v Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir. 1977) ("Thus, one who may suffer adverse consequences from a violation of section 1125(a) has standing to sue regardless of whether he is the registrant of a trademark."). Exclusive rights in all trademarks, registered and unregistered, derive from priority of use. *See Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 27 (1st Cir. 1989) ("With respect to prior usage, it is axiomatic that 'registration does not create the underlying right in a trademark. That right, which accrues from the use of a particular name or symbol, is essentially a common law property right. . . .'") (quoting *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980)). Thus, the senior owner of a registered or unregistered trademark can prevent others from using a similar mark if infringement would result.

There is no dispute as to priority of use. ZonePerfect's products have featured the ZONE Marks, including the Registered ZONE Marks[10] continuously in various forms and styles as ZonePerfect's trademarks since 1997 – predating defendants' use of the "SmartZone" and "OmegaZone" by years.[11]    ZonePerfect's products have been sold

---

[10] ZonePerfect's registration of the Registered ZONE Marks is valid and subsisting and constitutes *prima facie* evidence of ZonePerfect's exclusive right to use the Registered ZONE Marks in interstate commerce on the goods and services specified in the registrations. *See* 15 U.S.C. § 1115 (a) (registration of mark on Principal Register "shall be  prima facie evidence of the validity of the registered mark . . . and of the registrant's right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate").

[11] Prior to the creation of ZonePerfect, Sears engaged in an ultimately unsuccessful foray into multi-level marketing of a limited number of food products and supplements. Included among those products was a nutritional bar developed by Sears and manufactured by Pure Distributors, Inc., called the "Biozone" bar.    The "Biozone" bar never saw commercial viability, and was never sold through retail channels. As such, the sporadic use

**(footnote continued to next page)**

throughout the United States under the ZONE Marks. Indeed, Hershey's and Sears' entire plan to use ZONE marks to create a presumption of affiliation or sponsorship hinges not just on the existence of ZonePerfect's products, and prior use of the mark and logo in that regard, but on ZonePerfect's reputation as a supplier of high-quality nutrition bars and other food products.

**2.    Defendant's present use of the ZONE Marks and logo has created a serious likelihood of confusion among the relevant purchasing public.**

The Court need look no further than **Exhibit 1** to ZonePerfect's Complaint to see that the labeling and packaging that Hershey and Sears intend to use on the "SmartZone" bar is highly likely to cause confusion as to the relationship between the new "SmartZone" bar and the ZonePerfect® bar. Such conduct is, of course, squarely prohibited by both § 32 (registered marks) and § 43(a). *See, e.g., Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542 (1st Cir. 1995) (Section 43(a) "is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of a confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff."); 15 U.S.C. § 1114 (prohibiting the "use in commerce of any reproduction, counterfeit, copy, or colorable imitation of a

---

(footnote continued from previous page)

of the "Biozone" brand name likely does not constitute cognizable use by Sears of ZONE Marks on nutrition bars that predates ZonePerfect's use. *See e.g., Quill Corp. v. Le Blanc*, 654 F. Supp. 380, 386 (D.N.H. 1987) (concluding that "sporadic sales are insufficient to establish the requisite 'continuous prior use' of a trademark necessary to create trademark rights.") In any event, there is no evidence whatsoever that Sears used the "Biozone" mark after 1997, and as such has abandoned the mark. *Gen. Healthcare Ltd. v. Qashat*, 2004 U.S. App. LEXIS 7126, *9 (1st Cir. 2004) ("A trademark owner who fails to use a mark for three consecutive years may be deemed to have abandoned the mark, which would then fall into the public domain."). This is not surprising, as it appears that as a result of a lawsuit between, *inter alia*, Sears and Pure Distributors, Sears was stripped of his right to the "Biozone" mark, complete with the cancellation of his prior registration thereof.

registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . .").

There are eight commonly identified factors which must be weighed in order to determine whether there exists a likelihood of confusion from use of trademarks similar to the plaintiff's: (1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the mark; and (8) the strength of the mark. *Keds Corp. v. Reneed Int'l Trading Corp.,* 888 F.2d 215, 222 (1st Cir. 1989); *Volkswagenwerk Aktiengensellschaft v. Wheeler,* 814 F.2d 812, 817 (1st Cir. 1987). However, no one factor is necessary or determinative, and the Court, particularly at the injunction phase, must be allowed to exercise the discretion necessary to prevent irreparable harm that would flow from the use of an obviously similar mark. *See Keds Corp.,* 888 F.2d at 222 ("No one factor is necessarily determinative, but each must be considered.") (citing *Volkswagen AG v. Wheeler,* 814 F.2d 812, 817 (1st Cir. 1987)). In any event, the *Keds/Volkswagenwerk* factors, taken together, here stand united in favor of a finding of trademark infringement by the defendants.

### a.  Similarity of the Trademarks.

The key in determining the similarity of different trademarks is their "total effect" on the consumer, considering sight, sound and meaning. *See Volkswagenwerk,* 814 F.2d at 817; *Calamari Fisheries,* 698 F. Supp. at 1009. The marks need not be identical in order to create a likelihood of confusion and, indeed "small changes in words . . . are insufficient to distinguish marks," *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 382 (7th Cir.), *cert. denied,* 429 U.S. 830 (1976).

LITDOCS:549986.1

The marks at issue here are essentially identical. Not only do Hershey and Sears repeatedly use the ZONE Marks, but do so in a manner designed to draw attention to the mark's similarity. In the case of the "SmartZone" bar, defendants intend not merely to *describe* that their bar is *a* product endorsed by Sears or describe the bar as compliant with principles described in Sears' Zone Diet books. Instead, the defendants propose to aggressively misappropriate the ZONE Marks in their bar name. First, Hershey makes a large, capitalized "Zone" the single biggest element of its packaging, complete with the use of a dynamic font entirely differentiating it from the more traditional font used for the word "Smart" on the packaging to make the "Zone" portion of the proposed trademark the most prominent. Even worse, Hershey and Sears plan to feature a recently contrived "Dr. Sears ZONE Approved" seal on each "SmartZone" bar. This so-called "seal" is little more than an excuse for Hershey to use the ZONE Marks again, this time in the form of a large ZONE logo almost identical to the ZONE logo ZonePerfect has used on its ZonePerfect® bars and other products for over six years. The "seal" then surrounds the ZONE logo with much smaller letters stating "Dr. Sears Approved" and an even tinier reference to a zonediet.com domain name. As in the case of the "SmartZone" bar, Sears' "OmegaZone" mark also emphasizes as a trademark the word "Zone."

This strong similarity of the ZONE Marks used by Hershey and Sears to the ZONE Marks used by ZonePerfect is particularly damning to defendants since similarity is often deemed the most important factor in determining likelihood of confusion. *See Maple Grace Farms,* 974 F. Supp. 85, 95 (D. Mass. 1997) (concluding that similarity of trademarks "may be the most important" factor in the likelihood of confusion analysis) (citing *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 476 (3d Cir. 1994)).

### b.    Similarity of the Products.

The products here are, of course, the same: nutrition bars. Indeed, the products are nutrition bars consisting of a balanced ratio of proteins, carbohydrates and fats. The

LITDOCS:549986.1

similarity of these products is especially important in a trademark analysis, given that the scope of protection surrounding a given mark is strongest when an infringing mark is used on the same kind of product with which the mark is directly associated. *See generally* 4 J. Thomas McCarthy, *McCarthy on Trademarks* (herein after "McCarthy"), § 24:22 ("Where the goods or services are directly competitive, the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods or services.").

### c.    Channels of Trade; Advertising; Prospective Purchasers.

The channels of trade, advertising, and prospective purchaser factors are almost always considered together. *See, e.g., Volkswagenwerk*, 814 F.2d at 818; *R.J. Toomey Co.*, 683 F. Supp. at 877; *Calamari Fisheries*, 698 F. Supp. at 1010. Prospective purchasers and channels of trade, again, are identical here. As evidenced by the CAGNY presentation, Hershey and Sears intend to market the "SmartZone" bar to a class of prospective consumers identical to ZonePerfect's consumer target audience – consumers looking for balanced nutrition bars – and it plans for its products to be in retail outlets such a supermarkets and pharmacies, just where ZonePerfect products are. In fact, Hershey contemplates that "SmartZone" bars and ZonePerfect® bars are to sit side by side in store aisles. *See* CAGNY presentation, Complaint, **Exhibit 27**; *see generally Digital Equipment Corp. v. AltaVista Technology*, 960 F. Supp., 456, 477 (D. Mass. 1997) ("Here, again, there can be no serious dispute that both parties are now direct competitors in the same trade, selling computer software and Internet services, and that they compete for the same class of prospective purchasers, namely users of the Web. Both Digital and ATI also advertise their own products and services on their respective Web-sites.").

In the case of Sears' "OmegaZone" products, Sears' similarly markets his products to consumers interested in balanced nutrition products. *See Digital Equipment Corp. v. AltaVista Technology*, 960 F. Supp. at 47.

20