#### d.    Actual Confusion.

Particularly in cases such as these where a trademark holder moves with sufficient speed to seek injunctive relief to forestall the bulk of any actual use of its mark by the defendants, actual confusion need not be shown to demonstrate a likelihood of confusion. *See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 818 (1st Cir. 1987) (showing of actual confusion "is not essential in order to find a likelihood of confusion."). *See also,* 3 *McCarthy*, § 23.02[1] at 23-31 and 32 (actual confusion can often be difficult to prove, especially where an infringing use has yet to begin), *quoting, Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986). Further, actual confusion can be presumed when a party's use of another's mark is obviously and intentionally identical. *See, e.g., Boston Athletic Assoc. v. Sullivan,* 867 F.2d 22, 34 (1st Cir. 1989) (when there is intentional copying of a senior user's marks, "the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.") (quoting *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980)). Here, Hershey and Sears prominently use and intend to use the word "Zone" in their products' brand name, and, in the case of the "SmartZone" bar, intend to utilize a knock-off of ZonePerfect's ZONE Logo. Such obvious duplication of ZonePerfect's marks justifies a finding of confusion. *Id.* Such a finding is further supported by defendants' *intent* to unfairly copy and misappropriate ZONE Marks for their own benefit. *See* discussion, *infra.*

#### e.    Defendant's Intent.

While there is no need to show defendant's infringement was intentional in order to prevail on a trademark infringement claim, *see R.J. Toomey Co. v. Toomey*, 683 F. Supp. 873, 879 (D. Mass. 1988), in this case there can be little doubt as to the willful nature of the defendants' conduct. After all, Sears co-founded ZonePerfect and was its President for a number of years, while Hershey completed three months of intensive due diligence on ZonePerfect just a few months before announcing its plan to release the "SmartZone" bar.

Furthermore, as already discussed, Hershey and Sears do not merely intend to use the word "Zone" in a discrete and descriptive manner, but instead intend to feature the ZONE Marks on the front of its products. Such use at a minimum reflects an intent to ignore plaintiff's rights in its own trademarks. In fact, similar facts have created a presumption of bad faith. *See, e.g., R.J. Toomey Co.*, 683 F. Supp. at 873 (infringement was bad faith where parties' products and markets overlapped substantially, and defendant was indisputably aware of plaintiff's mark).

Given defendants' stated intent to use the ZONE Marks in this manner, it would truly be "more than naïve to suppose that defendants were not motivated by an intent to present their products to the public in a guise which would confuse ordinary purchasers." *Bristol-Myers Co. v. Approved Pharmaceutical Corp.*, 149 U.S.P.Q. 896, 898 (N.Y. Sup. 1966). Courts are nearly unanimous in holding that such intentional copying of a mark creates presumptive confusion. *See, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) ("intentional copying gives rise to a presumption of likelihood of confusion")[12]

### f.   **Strength of the Mark.**

The ZONE Marks are strong, having become synonymous in the market with the market-leading balanced nutrition bar distributed by ZonePerfect for over six years. The strength of a particular mark depends on its inherent distinctiveness and its commercial strength in the marketplace. *See Boston Athletic Ass'n.*, 867 F.2d at 32 ("The distinctiveness

---

[12] *See also Academy of Motion Picture Arts & Sciences v. House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (when a junior user selects a mark similar to another, a court can properly presume that defendant intends to confuse and will accomplish its purpose); *Osem Food Industries Ltd. v. Sherwood Foods, Inc.* 917 F.2d 161, 164-65 (4th Cir. 1990) ("logic requires . . . that from such intentional copying arises a presumption that the newcomer is successful and that there is a likelihood of confusion"); *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171-72 (11th Cir. 1991) ("intent to copy in itself creates a refutable presumption of likelihood of confusion").

and reknown [sic] of a trademark determine its relative strength or weakness, which, in turn, defines the scope of protection to be accorded the mark against others which are confusingly similar.") (internal citations omitted). Courts view a mark's inherent distinctiveness along a spectrum: At one end of the spectrum there are generic terms that have passed into common usage to identify a product, and can never be protected. In the middle there are so-called "descriptive" terms, such as a geographical term, which can be protected, but only if it has acquired a "secondary meaning" by which consumers associate it with a particular product or source. At the other end of the spectrum, there are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered "inherently distinctive." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir. 1993) (internal citations omitted). Factors deemed useful in determining the commercial strength of plaintiff's mark (i.e., whether the mark retains secondary meaning to consumers) include: the length of time a mark has been used; the strength of the mark in plaintiff's field of business; and plaintiff's actions in promoting the mark. *See Boston Athletic Ass'n.*, 867 F.2d at 32. A relatively strong mark is accorded a broader scope of protection than a relatively weak one, as against other marks which are confusingly similar. *Id.*

As ZonePerfect will demonstrate, including by evidence of its strong sales and market penetration, the ZONE Marks are strong and deserve broad protection in the nutrition bar arena. However, defendants' own conduct is once again telling on this point. The ZONE Marks, including the word "Zone," are inherently distinct and commercially strong in the nutrition bar market. During Sears' tenure as President of ZonePerfect, Sears-approved packaging stated that "Zone" was a trademark of ZonePerfect. Indeed, defendants' insistence on selling nutrition bars using a stylized knock-off of ZonePerfect's ZONE Logo (in a clearly non-descriptive fashion) and prominent use of the word "Zone" in their products' brand names provides a strong indication that the ZONE Marks (especially the

23

word "ZONE") have developed a great deal of goodwill and secondary meaning in the relevant market.[13]

Any argument that "Zone" is or has become a generic or merely descriptive term in the nutrition bar market, without secondary meaning, is without substance. The ZONE Marks, including the word "Zone" as used by ZonePerfect in connection with the goods with which they appear, have long been the subject of substantial advertising and promotion by ZonePerfect in the United States, and are widely recognized by retailers and consumers. In fact, ZonePerfect is the only company to market and distribute (on any substantial level) nutrition bars in connection with the term "Zone" or the ZONE Marks.[14]    The ZonePerfect® bar is sufficiently well-known to be often referred to simply as the "Zone bar," further demonstrating its strength and secondary meaning in the nutrition bar market. *See generally* 1 Gilson & Samuels, *Trademark Protection and Practice,* § 2.06 (public use of a shorter version of product's name itself entitled to protection). These factors combine

_____

[13] Moreover, because plaintiff's Registered ZONE Marks have been registered by the PTO on the Principal Register, it is entitled to a legal presumption of validity. *See* 15 U.S.C. § 1115 (a) (registration of mark on Principal Register "shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate"). Section 1115(a) entitles the plaintiff to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive. *See Quahaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977) (federal registration "is prima facie evidence that such mark has become distinctive of the goods in commerce"); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986).

[14] ZonePerfect has identified certain *de minimus* use of the term "Zone" in connection with nutrition or energy bars, including Sears' OmegaZone line, the "BodyZone" bar, and the "E-Zone" bar. Such usage, however, is insignificant and limited to companies selling small amounts of products to limited consumers over the internet. Other than ZonePerfect, no company offers nutrition bars, on any significant level, using the ZONE Marks.

24

to demonstrate the inherent strength and distinctiveness of the ZONE Marks, particularly in the relevant market.

### g.    Summary.

Analysis of the foregoing factors overwhelmingly dictates but one conclusion: defendants' stated intent to use the ZONE Marks as part of a nationally launched, retail-oriented nutrition bar will inevitably cause confusion in the marketplace. Such an outcome is manifest by the *Keds* factors, to say nothing of common sense. There will be a substantial likelihood of confusion as to the source or sponsorship of the SmartZone bar. Plaintiff is thus likely to succeed on the merits of its claims for trademark infringement and unfair competition.

## B.    Plaintiff is Also Likely to Succeed on its Claims for Unfair Deceptive, False and Misleading Advertising.

Defendants have made, and continue to make, statements to the public that not only falsely suggest that the "SmartZone" bar is the first to be endorsed or approved by Barry Sears but by extension suggest to those familiar with Sears that **no** other products (including ZonePerfect's) have ever been so endorsed or approved, unfairly calling their quality into question. Plaintiff is thus likely to succeed on its false advertising-related claims. *See* 15 U.S.C. § 1125 (a)(1) (prohibiting "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion").

To prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the

25

misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 33 (1st Cir. 2000).

In this case, the foregoing factors, taken together, demonstrate a likelihood of success in ZonePerfect's false advertising-related claims and thereby justify preliminary injunctive relief.

### 1.    Falsity.

As outlined above, Hershey and Sears have repeatedly suggested, through advertising and announcements available to the general public, that the "SmartZone" bar is either the "first" or "only" nutrition bar "approved" by Sears. Such statements are patently false and misleading. For many years, all of ZonePerfect's bars were developed for ZonePerfect by Sears and carried his personal endorsement. In fact, a number of ZonePerfect® currently sold are manufactured with the exact formulae developed by Sears. Therefore, the falsity component of ZonePerfect's false advertising claim is likely to be established. *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002).

Even if by some tortured reading, Hershey's and Sears' advertisements are interpreted as "literally" true, at the very least, such advertisements *imply* the false notion that ZonePerfect products have never been approved or endorsed by Sears and/or are not compliant with Zone Diet principles. This *implication* is sufficient to justify injunctive relief. "A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false -- that is, the advertisement is true or ambiguous yet misleading." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002). Further, Courts have recognized that a plaintiff *need not* demonstrate literal falsity to justify injunctive relief for claims for false advertising under the Lanham Act. In *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154 (1st Cir. 1977), the First Circuit held that in the injunction context, a showing that the defendant's

activities are likely or have the tendency to cause confusion or to deceive customers is sufficient to warrant injunctive relief. See *id.* at 160-61. The obvious implication of the Hershey and Sears advertisements, by itself, is therefore sufficient to meet the falsity requirement for purposes of preliminary injunction. *See, e.g., Polar Corp. v. Coca-Cola Co.,* 871 F. Supp. 1520, 1521 (D. Mass. 1994) (emphasis added) ("By causing the polar bear to throw the can of Coke into a trash bin labeled "Keep the Arctic Pure," Polar has *implied* that Coke is not pure. Because there is no evidence suggesting that Coke is not "pure," the Court concludes that Polar has misrepresented the nature and quality of Coke. Coca-Cola has, therefore, shown a likelihood of success under 15 U.S.C. § 1125 (a)(1)(B).").

## 2. Materiality.

The materiality component of a false advertising claim is met if the defendants' deception is "likely to influence the purchasing decision." *Clorox Co. v. Proctor & Gamble Commer. Co.,* 228 F.3d 24, 33 (1st Cir. 2000). The component is established if the false or misleading statement relates to an "inherent quality or characteristic" or the product. *NBA v. Motorola, Inc.,* 105 F.3d 841, 855 (2nd Cir. 1997). Here, Hershey and Sears' false statements relate to the very heart of ZonePerfect products. Hershey's and Sears' advertisements attempt to confuse (and result in confusing) consumers as to whether or not ZonePerfect products have ever been endorsed by Barry Sears, the author of the Zone Diet books. Hershey's and Sears' false statements thus relate to core characteristics of ZonePerfect's product. As such, materiality is established. *See Polar Corp. v. Coca-Cola Co.,* 871 F. Supp. 1520, 1521 (D. Mass. 1994).

## 3. Consumer Deception.

Because Hershey's and Sears' statements concerning the "SmartZone" bar are literally false, an injunction is justified without evidence of consumer deception. *See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311 (1st Cir. 2002) ("Where the advertisement is literally false, a violation may be established without evidence

27

of consumer deception."). However, even if falsity is merely implied in the Hershey and Sears advertisements, it is evident that the words carefully chosen by Hershey and Sears are *intended* to confuse the public as to whether ZonePerfect products have ever been endorsed or approved by Sears. Hershey and Sears' intent to deceive thereby relieves ZonePerfect from its burden of establishing consumer deception for purposes of an injunction. *See id.* at 311, n.8 ("a plaintiff alleging an implied falsity claim, however, is relieved of the burden of demonstrating consumer deception when there is evidence that defendants intentionally deceived the consuming public."); *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 693 (6th Cir. 2000) (noting that when a statement is literally false, "a plaintiff need not demonstrate actual customer deception in order to obtain relief "); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991) (ruling, with respect to an implied falsity claim, that "once it is shown that a defendant deliberately engaged in a deceptive commercial practice, we agree that a powerful inference may be drawn that the defendant has succeeded in confusing the public").

### 4.    Interstate Commerce.

Sears and Hershey have placed their false and misleading statements in interstate commerce. The February 9, 2004 Advertisement, including these false and misleading statements, has been widely reported upon by such media outlets as CBS Marketwatch, Forbes.com, and others. Moreover, Hershey's CAGNY presentation was subsequently published on Hershey's website, where it is remains available today to consumer across the country. Similarly, false and misleading statements contained on the front page of Sears' "The Omega Zone" e-Magazine were widely published and remain accessible on Sears' website.

### 5.    Likely Injury.

Many ZonePerfect customers know Sears and his books. Sears in fact co-founded ZonePerfect, and consumers are aware that he endorsed and approved its products --

including bars -- for a number of years. Any false public statements or advertisements undermining such understanding concerning ZonePerfect's products, especially false statements from Sears, results in *per se* injury to ZonePerfect, and justifies a finding of likely injury for purpose of preliminary injunction. *See Polar Corp. v. Coca-Cola Co.,* 871 F. Supp. 1520, 1521 (D. Mass. 1994) ("The Court further finds that Coca-Cola, engaged in an industry that relies heavily on the consumer's perception of quality and purity, has shown a potential for irreparable harm if the injunction is not granted.").

### 6.    Summary.

Analysis of the foregoing factors overwhelmingly dictates but one conclusion: defendant's duplicitous advertising has resulted in unfair competition and irreparable harm to ZonePerfect. ZonePerfect is thus likely to succeed on the merits of its Section 43(a) claims for false advertising.

### C.    Plaintiff has Been and Will Continue to be Irreparably Harmed in the Absence of an Injunction.

In the context of trademark infringement, unfair competition, and false advertising claims, evidence of likelihood of confusion creates a presumption of irreparable harm. *See, e.g., Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir. 1992) ("irreparable harm flows from an unlawful trademark infringement as a matter of law"); *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49 (D. Mass. 1990) (Keeton, J.) ("'The Lanham Act requires a liberal interpretation of the irreparable injury factor. . .' If Reebok is unlawfully infringing Tanel's trademark, irreparable harm follows from the injury to the goodwill and reputation plaintiff has developed in its mark.") (*quoting Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6 (1st Cir. 1986)). Indeed, "[t]rademark infringement and unfair competition are, by their very nature, activities that cause irreparable harm." *Sears, Roebuck and Co. v. Sears Financial Network, Inc.,* 576 F. Supp. 857, 864 (D.D.C. 1983); *accord Polar Corp. v. Coca-Cola Co.,* 871 F.

Supp. 1520, 1521 (D. Mass. 1994) (finding *per se* irreparable harm arising from advertisement resulting in public confusion).

In the context of a false advertising claim, the Lanham Act makes defendants liable to "any person who believes that he or she is or is likely to be damaged by [the described acts]," 15 U.S.C. §1125(a), and the courts have interpreted this phrase to mean that the plaintiff need not prove actual injury to obtain injunctive relief: "The correct standard is whether it is *likely* that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads actually resulted in some definite loss of sales." *Johnson & Johnson, Inc. v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980). Thus, "plaintiff need only show that it and the defendant are competitors within a certain market and that defendant's alleged statements could logically affect plaintiff's sales market. Such a showing establishes a reasonable belief on the part of the plaintiff that it is likely to be damaged within the meaning of §1125(a), and it will be entitled to injunctive relief." *American Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1443 (E.D.N.C. 1986) (citations omitted); *Johnson & Johnson*, 631 F.2d at 190-91.

Similarly, Massachusetts law requires only a showing that the unfair competition or practice "***may have*** the effect of causing [a] loss of money or property" in order to permit injunctive relief. Mass. Gen. L. ch. 93A, §11 (emphasis added).

Nothing here suggests an exception to the presumption of irreparable harm in light of defendants' actions. In fact, defendants intend to compete directly against ZonePerfect for the same customers by exploiting ZonePerfect's goodwill in an unfair manner through manipulation of its trademarks and deceptive advertising given proof to the wisdom of such a presumption.

**D.    The Balance of Equities Strongly Favors Issuance of an Injunction, as Does a Balance of Harm to the Parties.**

The balance of equities clearly weighs in plaintiff's favor. To begin with, defendants have acted in bad faith by deliberately adopting marks for use in commerce that utilized the ZONE Marks in a manner well beyond merely describing its products. This conduct leaves defendants little room to argue that the equities would demand anything less than a preliminary injunction at this stage. In the context of plaintiff's false advertising claim, because defendants' advertisements make assertions directly and personally known to be false to both Hershey and Sears, the equities cannot favor defendants. *See, e.g., Gillette Co. v. Norelco Consumer Products Co.*, 946 F. Supp. 115, 119 (D. Mass. 1996) (literal falsehoods in defendants' advertisements satisfy balance of equity considerations).

Likewise, a balancing of harms resoundingly favors plaintiff. If the "SmartZone" bar is released to the general public, the damage to ZonePerfect's goodwill will be immeasurable and irreparable. ZonePerfect® currently exists as the only ZONE-related bar in general retail channels, and its goodwill is intact and well-established. Once the SmartZone bar invades retail shelves nationwide, consumers will be forever left confused as to the source, sponsorship or affiliation between the two bars. That confusion cannot be undone -- the bell cannot be un-rung. A preliminary injunction to preserve the status quo, however, will not require defendants to remove products from shelves or exit the market. Rather, it at most raises the prospect of a temporary loss of sales -- sales ZonePerfect believes defendants could only secure through false and misleading statements and selling products they are not legally entitled to sell. *See Callaway Golf Co. v. Golf Clean*, 915 F. Supp. 1206, 1215 (M.D. Fl. 1995) ("[a] preliminary injunction will not cause Defendants to suffer any legitimate harm because they are simply being prevented from selling a product they are not legally entitled to sell.").

**E.    The Public Interest is Served by Issuance of an Injunction.**

In the area of trademarks, the public interest is uniquely served by enjoining infringement and unfair competition and false advertising. "Preventing consumer confusion is clearly in the public interest." *Calamari Fisheries*, 698 F. Supp. at 1015. *See also Trak, Inc.*, 475 F. Supp. at 1078 ("the public interest is served by promoting fair competition"). Given that there exists a strong likelihood of confusion, *see supra*, the public interest is plainly served by the issuance of a preliminary injunction.

**II.    AN INJUNCTION SHOULD ISSUE ENFORCING THE TERMS OF THE OCTOBER 7, 2002 CONFIDENTIALITY AGREEMENT**

Just months after reviewing essentially everything about the company that will be its primary competitor, pursuant to a strict confidentiality agreement, Hershey now is ready to launch a nearly identical enterprise with a nearly identical product and a nearly identical name and logo. Hershey no doubt wants the Court to believe that Hershey's due diligence, which led to a $127 million bid, has no relationship to the timing or manner in which it plans to enter the nutrition bar business. The strong weight of common sense suggests otherwise, and discovery will confirm what is already clear by the involvement of at least two Hershey's executives in both the ZonePerfect and SmartZone projects: that far from the "Chinese Wall" that Hershey represented to the Court (at the initial hearing) had been established, there was in fact no barrier to effectively prevent those involved in the Hershey's ZonePerfect due diligence efforts from being involved in the SmartZone project. On this most important point, ZonePerfect wants to preserve the status quo by preventing Hershey from launching this enterprise until the Court determines the extent to which Hershey has misappropriated confidential information to do so.

As part of Hershey's due diligence, ZonePerfect allowed teams of Hershey's representatives to study volumes of company files which contained highly confidential information concerning, *inter alia*:

a.   Branding strategies for, and brand recognition of, the ZONE Marks;

b.   ZonePerfect's financial performance;

c.   ZonePerfect's customer accounts;

d.   Revenue data for each ZonePerfect® product;

e.   ZonePerfect's product pricing, sales, marketing and distribution strategies;

f.   ZonePerfect's accounts receivable and accounts payable;

g.   ZonePerfect's corporate organization and governance;

h.   ZonePerfect's co-manufacturers and suppliers;

i.   Detailed information about the ZonePerfect® bars, including ingredients, product preparation techniques, quality control standards, physical requirements, shelf life, storage procedures, and packaging requirements; and

j.   ZonePerfect contracts, including the 1996 Agreement and the 2001 Agreement concerning Sears.

Such highly confidential and proprietary information provided Hershey a complete blueprint to ZonePerfect's business.

In return for access ZonePerfect's confidential and proprietary information, Hershey signed the October 7, 2002 Confidentiality Agreement. The agreement expressly limits Hershey's use of ZonePerfect confidential information to "consideration of a possible transaction with [ZonePerfect]." *Confidentiality Agreement,* Introductory Paragraph

Mere months after signing this agreement and viewing the complete blueprint to ZonePerfect's business, Hershey entered into an agreement with Sears and now intends to market its "SmartZone" 40-30-30 nutrition bar to compete the ZonePerfect's 40-30-30 bar, through the same market channels, to the same distribution customers, and directly to the same consumers. Hershey's obviously improper use of ZonePerfect's confidential business information and a balance of the equities justifies injunctive relief.

33

**A.    ZonePerfect is Likely to Succeed on its Claim for Breach of the Confidentiality Agreement.**

Hershey cannot say with a straight face that ZonePerfect's confidential information gained during the ZonePerfect due diligence was shielded from those involved in the development and marketing of the SmartZone bar. Hershey represented to this Court that a "Chinese Wall" was created to insure that ZonePerfect's confidential information was not used in the formulation and marketing of the "SmartZone" bar. Given that individuals cannot erase from their consciousness what they learned in one project when they work on the next, only an impenetrable "Chinese Wall" which kept two entirely separate groups -- one for due diligence and one for product development -- would have a chance at complying with Hershey's confidentiality obligations.    However, even with discovery yet to be undertaken, there are already serious questions as the efficacy of any such wall if one was indeed erected.

For example, Hershey's CEO, Richard Lenny, and its Vice President for Strategy and Innovation, Dennis Eshleman, were intimately involved in Hershey's bid for ZonePerfect. As key decision-makers with respect to Hershey's $127 million bid for ZonePerfect, they were no doubt involved in assessing ZonePerfect's confidential information in order to decide whether to bid and how much to bid.    However, Lenny has also been involved, as demonstrated by the CAGNY presentation and other public statements, at a fundamental level with the development and marketing of the "SmartZone" bar.    Further, Hershey's "Chinese Wall" argument presumes that Hershey was able to formulate and market a 40-30-40 nutrition bar (and the entire business structure around it) – a feat that took ZonePerfect years to accomplish – in a matter of months.    Common sense suggests that Hershey formulated and pre-marketed the "SmartZone" bar because it had access to the successful (confidential) road map established and developed by ZonePerfect through years of business in the nutrition bar market.    Hershey's misappropriation of ZonePerfect's confidential business information is a violation of the October 7, 2002 Confidentiality Agreement, and

34

Hershey's continued use of ZonePerfect's confidential information through the development, production, and marketing of the "SmartZone" bar should therefore preliminarily enjoined pending a full trial on the merits.

**B.    ZonePerfect Will Suffer Irreparable Harm If an Injunction is Not Issued.**

By law and by express contractual acknowledgement, ZonePerfect will suffer irreparable harm as long as Hershey is allowed to misappropriate its confidential information. As set forth in the express term of the agreement, Hershey acknowledges that it would be "impossible" or "inadequate" to measure the damage that a breach of Hershey's confidentiality obligations could do to ZonePerfect. *See* Confidentiality Agreement, ¶ 5. As such, Hershey confirms ZonePerfect's right to seek an injunction against any such conduct. *Id.; see e.g., EMC Corp. v. Allen*, 1997 WL 1366836 at *4 (Mass. Super. Ct., Dec. 15, 1997) (granting injunction and noting that noncompetition and confidentiality agreement itself provided that it would be enforceable by injunction).

Notwithstanding the contractual provision, the facts clearly demonstrate irreparable harm arising from Hershey's breach of the Confidentiality Agreement. Hershey had full access to ZonePerfect's confidential and proprietary information, including the most sensitive research and development data and marketing strategies.    Hershey has misappropriated such information for its own profits, is currently using such information to develop and market a product and is likely to continue to misappropriate, use and disclose those trade secrets unless enjoined by this Court.    ZonePerfect will have difficulty determining the lost customers, goodwill, and profits caused by Hershey's actions even to date, let alone going forward. Under these circumstances, ZonePerfect's remedy at law is inadequate, its harm irreparable. *See Picker Intern. Corp. v. Imaging Equip. Services, Inc.,* 931 F. Supp. 18, 44 (D. Mass. 1995) (finding *per se* irreparable harm arising from the misuse or misappropriate of confidential business information).

**C.    The Balance Of Equities Strongly Favors Issuance Of An Injunction, As Does A Balance Of Harm To The Parties.**

Through their breach of the October 7, 2002 Confidentiality Agreement, and misappropriation of ZonePerfect's confidential business information, Hershey has caused and will continue to cause ZonePerfect harm which outweighs any harm either defendant would suffer should an injunction be granted.    There can be no serious argument that Hershey should not be allowed to profit from the unauthorized use of ZonePerfect's confidential and proprietary information.    Any "harm" done to Hershey at this point would simply stem from removing an unfair advantage it should have never had to begin with. Hershey is herein being asked only to honor its "duty not to disclose or to use without permission confidential information acquired from another." *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 166-67 (Mass. 1979).    The balance favors ZonePerfect.

**D.    The Public Interest Is Furthered By The Issuance Of An Injunction.**

The ""public interest is not adversely affected by the protection of [an employer's] confidential information." *C.F. Bard, Inc. v. Intoccia,* 1994 WL 601944 at *3 (D. Mass. 1994); *see also Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 166-67 (Mass. 1979) ("The protection we afford trade secrets against one who wrongfully uses them is grounded on principles of public policy . . . .").    Companies cannot be expected to devote resources to improving its products if its work is for sale to any competitor for the price of one former employee's salary.    The public interest favors the issuance of an injunction in this case.

LITDOCS:549986.1

## CONCLUSION

There are several independent bases for this Court to issue a preliminary injunction which preserves the status quo pending a full trial on the merits. On claims of defendants' trademark infringement and defendants' breaches of contractual obligations, as well as the claim of false advertising, ZonePerfect has demonstrated both a likelihood of success and irreparable harm in the absence of injunctive relief. Only by preserving the status quo can ZonePerfect's rights be protected and the issues properly preserved pending a full trial.

Respectfully submitted,

**ZONEPERFECT NUTRITION COMPANY**

By its attorneys,

Daniel L. Goldberg, BBO #197380
Charles L. Solomont, BBO # 557190
Joshua M. Dalton, BBO #636402
Matthew L. Mitchell BBO #647902
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

Date: May 10, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party by mail on May 10, 2004.

Matthew L. Mitchell

LITDOCS:549986.1