UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZONEPERFECT NUTRITION ) COMPANY, ) )     Plaintiff, ) ) v. ) ) HERSHEY FOODS CORPORATION, ) HERSHEY CHOCOLATE & ) CONFECTIONERY CORPORATION, ) DR. BARRY D. SEARS, AND ) ZONE LABS, INC., ) )     Defendants. ) ) ) DR. BARRY D. SEARS and ) ZONE LABS, INC., ) )     Plaintiffs-in-Counterclaim, ) ) v. ) ) ZONEPERFECT NUTRITION COMPANY )     Defendant-in-Counterclaim and )     Third-Party Defendant ) | CIVIL ACTION NO: 04-10760 REK |

## DEFENDANT DR. BARRY D. SEARS' INITIAL
## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Under the guise of seeking to protect its trademarks, the plaintiff ZonePerfect

Nutrition Company ("ZonePerfect") has embarked on a strike suit intended to discourage

competition and to perpetuate consumer confusion about its own goods.

ZonePerfect formerly made nutrition bars which had been created and endorsed by

Dr. Barry D. Sears ("Dr. Sears") based upon the nutritional principles articulated in Dr.

Sears' path-breaking, best-selling books, including "The Zone" (1995) and "Mastering The Zone" (1997). In 1999, however, ZonePerfect, without final approval by Dr. Sears, rolled out a line of so-called "nutrition bars" which are in fact nothing more than candy bars with a little extra protein. Soon thereafter, ZonePerfect stopped selling the bars Dr. Sears created. Although Dr. Sears long ago disassociated himself from ZonePerfect and its products, ZonePerfect has deliberately attempted to foster consumer confusion about Dr. Sears' affiliation with the company and his endorsement of its products. It continued to use Dr. Sears' name on its 'nutrition' bars through at least 2002, despite actual knowledge of Dr. Sears' opinion of its products. It has also employed such deceptive practices as creating a website which misleadingly describes itself as "the Official Website of the Zone Diet," and it has published on that website articles lifted essentially verbatim from Dr. Sears' books.

Now, in an effort to ensure that nutrition bars which Dr. Sears has endorsed are kept from the public, ZonePerfect seeks to enjoin Dr. Sears from using the seal DR. SEARS ZONE APPROVED/ZONEDIET.COM™ on products which in fact subscribe to the principles articulated in Dr. Sears' books. Those products include the *SmartZone*™ bar to be manufactured and marketed by defendants Hershey Foods Corporation and Hershey Chocolate & Confectionery Corporation ("Hershey"). ZonePerfect also seeks to enjoin Dr. Sears' company, Zone Labs, Inc., from selling OmegaZone® bars, which have been on the market since 2002.

As discussed in greater detail below, ZonePerfect is not entitled to injunctive relief. Its lawsuit has no likelihood of success on the merits. The use of the marks *SmartZone*™, OmegaZone®, and The Dr. Sears Zone Approved/ZoneDiet.com™ seal do not infringe upon any legally protected interest of ZonePerfect. Dr. Sears has not engaged in any deceptive or

2

misleading advertising. Indeed, ZonePerfect demonstrably has no interest in two of the three

supposed 'marks' that it seeks to protect, as it has neither registered nor sold products under

"Zone" or "Zone Diet.' At that, the requested injunction amounts to a gag order which

would directly infringe upon Dr. Sears' First Amendment rights to inform the public that

ZonePerfect's "nutrition bars" are nutrition disasters because of the high glycemic load (i.e.

sugar content) of the bars. Because ZonePerfect has no likelihood of success on the merits,

can demonstrate no irreparable harm, and because the balance of harms and the public

interest weigh heavily against it, the requested injunction cannot issue.

## FACTS

### A.    The Discovery of Zone Principles

Dr. Sears is a well-known biochemist who has published ten books on improving

health and wellness through the medicinal use of food to control hormonal responses. His

publications include The Zone, Mastering the Zone, and The Omega Rx Zone. Zone Labs,

Inc. sells, among other products, Dr. Barry Sears Omega Rx® ultra-refined fish oil and

OmegaZone® nutrition bars. He holds a Ph.D. degree in biochemistry from Indiana

University and has worked as a researcher at the University of Virginia School of Medicine,

the Boston University School of Medicine, and the Massachusetts Institute of Technology.

After receiving his Ph.D., Dr. Sears focused his research on the structure of

phospholipids, fat derivatives that are one of the major constituents of cell membranes. In

the early 1980's, his work began to focus on how little-known hormones called eicosanoids

could cause or influence chronic disease states, including heart disease, cancer, and diabetes.

Eicosanoids are generated by body tissue in response to stimuli. They are formed from

highly unsaturated fatty acids that can be acquired only by consuming them in foods or supplements.

In particular, Dr. Sears began to study methods of controlling the production of eicosanoids at the cellular level by controlling the production of insulin. His work and the work of others (including studies conducted at the Harvard Medical School) confirmed that appropriate levels of the essential long chain fatty acids Omega-3 (in particular, eicosapentaenoic acid, or "EPA") and Omega-6 (gamma linolenic acid, or "GLA") could aid in the treatment of type II diabetes and heart disease as well as significantly increase performance in elite athletes.

While working with the Stanford University Swim Team in the early 1990's, Dr. Sears found that a diet with a ratio of protein to carbohydrate between 0.6 and 1.0 could optimize athletic performance in combination with appropriate use of EPA and GLA. In particular, Dr. Sears established that such a regime could control insulin and blood sugar levels, thereby achieving a state of hormonal balance that Dr. Sears would later call "the Zone." Also at that time, Dr. Sears created the first nutrition bar based on his insulin control theories. As a result, in part, of Dr. Sears' work, the Men's and Women's Stanford Swim Teams dominated collegiate swimming in the early 1990's, and Stanford swimmers won seven gold medals in the 1992 Barcelona Olympics. Dr. Sears' path-breaking work and its results were reflected in favorable articles in sports and fitness magazines, sample articles are attached hereto at **Tab A**. Nevertheless, his findings remained largely unknown to the general public.

In 1995, Dr. Sears published The Zone. The book, which represented the summation of his life's work to that point, was ignored by most media outlets and sank to the bottom of

4

the trade lists. As a result of Dr. Sears' own efforts to publicize the book, however, it slowly developed a cadre of devoted followers. By April 1996, word-of-mouth advertising lifted The Zone to #1 on the New York Times Best Sellers List. Dr. Sears thereafter published numerous other books on Zone principles, including Zone Perfect Meals In Minutes and The Omega Rx Zone. Dr. Sears owns the United States copyright on each of those books, and those copyrights have been registered by Dr. Sears' publisher, Harper Collins. Dr. Sears' books have been translated into 22 languages and have sold 4 million copies in the United States alone.

Since The Zone in 1995, all of Dr. Sears' books have had the term "Zone" in the title, and they have typically featured a distinctive cover design for the "Zone" element in the title. In that design, "Zone" appears in block letters. The letter "o" in "Zone" overlaps the capital "Z" and appears in a contrasting color to the rest of the word. Examples taken from the cover of Dr. Sears' books are attached hereto at **Tab B**.

**The Founding of Eicotech Corporation**

Sometime in the spring of 1996, Dr. Sears met Christopher Baker, a principal in C.P. Baker & Company. In August, 1996, they formed Eicotech Corporation. As of 1996, The Zone was still a best seller, and an 800 number included for readers who wanted further information continued to generate telephone calls.

In the fall of 1996, Eicotech began selling a nutrition bar that Dr. Sears had developed. The market for the bars consisted largely of callers to the 800 number and the ever-increasing coterie of Zone enthusiasts who responded to Dr. Sears' teachings in his books or at lectures he presented through the country. At approximately the same time, Dr. Sears, at Mr. Baker's behest, signed the Stock Purchase and Holders Agreement attached to

5

ZonePerfect's complaint as Ex. 4. By that agreement, Dr. Sears agreed to convey certain intellectual property to ZonePerfect. That Agreement was drafted by attorneys at what was then Dechert, Price & Rhoads, a law firm in which Mr. Baker's wife was a partner.

At the time the Stock Purchase and Holders Agreement was signed, Dr. Sears, his brother Douglas Sears ("Doug Sears") and a corporation that Dr. Sears and Doug Sears had previously formed, Surfactant Technologies, Inc., owned a majority of Eicotech's common stock. Surfactant at that time was selling nutrition bars under the Eicotec® name. In the early years of Eicotech, Dr. Sears was also for all practical purposes in charge of the company's daily operations except for finance. Eicotech's products, including the nutrition bars that Dr. Sears had developed, were marketed under the Eicotech brand to medical professionals and under the Eicozone brand to the general public. Dr. Sears' association with the product was of critical importance to its acceptance among consumers. Indeed, the presence of literally millions of Zone books written by Dr. Sears in homes and bookstores across the country was the company's only marketing vehicle at the time.

In 1998 or thereabouts, Eicotech decided to change the name of the consumer bar to ZonePerfect. As the plaintiff's own complaint admits, the design of the ZonePerfect logo was deliberately intended to mimic the 'Zone' design on some of Dr. Sears' books. The model for the ZonePerfect logo, however, was the 'Zone' design found on Dr. Sears' book "Zone Perfect Meals in Minutes," published in 1997, rather than the original Zone logo. In the newer design, the 'o' does not significantly overlap the 'z', as it did in the earlier version. Rather, a highly distinctive set of crosshairs (like the sight on a rifle) appears in the 'o' and consists of a single color rather than the contrasting red and yellow design of the earlier Zone books. Compare **Tab B**, where the cover designs for the first generation Zone books appear,

6

and **Tab C**, where the cover designs for the later Zone books with the o-and-crosshairs
design is reproduced.

In early 1998, Dr. Sears and Doug Sears began negotiations to leave Eicotech. Mr.
Baker agreed and through 1998 the parties worked amiably on the terms of Dr. Sears' and
Doug Sears' separation from Eicotech, including a buy-out of the Sears' Eicotech stock.

### Eicotech Develops the Slab Bar

At approximately the time that Dr. Sears made known his intention to leave Eicotech,
the company without informing Dr. Sears began to develop what it would later term the
'slab' bar. The bar was brought to Eicotech primarily through the efforts of a consultant,
David Thibodeau. At the time the product was being formulated, Dr. Sears had left the
employ of Eicotech and was serving as a consultant. In February 1999, Dr. Sears, as a
consultant, was shown a nutritional breakdown of the proposed bars, but no ingredient lists.

As Dr. Sears discovered later in 1999 when he was finally provided with the
ingredient lists, the 'slab' bars would have a direct negative effect on blood sugar levels
(contrary to the purpose of the Zone Diet) because of the presence of corn syrup or other
high-glycemic index sweetening agents used to make soy protein nuggets palatable. These
same sweetening agents increase the glycemic response to the product such that the bars
create a blood sugar 'spike' in the consumer – precisely the opposite of the controlled insulin
production which the Zone Diet intends to create. At the same time, ZonePerfect reduced the
amount of long-chain Omega 3 fatty acids in the bars.

After Dr. Sears became aware of the composition of the slab bars, he informed Mr.
Baker that the bars were completely unacceptable and demanded that they either be
reformulated or removed from the market. From that point forward, negotiations on the

7

terms of Dr. Sears' and Doug Sears' separation from ZonePerfect became adversarial. Mr. Baker in December 1999 ordered Dr. Sears not to visit the company's headquarters, even though he, his brother, and the corporation they owned, Surfactant, continued to be the company's largest shareholders.

There followed a protracted period of negotiations between ZonePerfect and Dr. Sears regarding, among other things, repurchase of Dr. Sears' stock and the parties' respective rights in intellectual property. These negotiations continued literally for years. In time, Eicotech phased out the bars that Dr. Sears had developed to focus exclusively on the slab bars. Nevertheless, Eicotech continued prominently to feature the name "Dr. Barry Sears" on its packaging despite the fact that Eicotech and Mr. Baker were well aware that Dr. Sears considered the slab bars to be the nutritional equivalent of candy bars. Indeed, Dr. Sears believed (and expressed to ZonePerfect his belief) that the nutrition bars were in some respects worse than candy bars, since Type II diabetics who ate slab bars would experience an unhealthy and possibly dangerous impact on their blood sugar levels while believing that they were consuming a healthy, Zone-favorable product.

In June 2000, Eicotech changed its name to ZonePerfect Nutrition Company after Dr. Sears and Doug Sears had been removed from the Board of Directors. The next year, the extended negotiations between Eicotech/ZonePerfect and Dr. Sears at last culminated in an Agreement dated as of October 17, 2001 (the "2001 Agreement") between ZonePerfect, Dr. Sears and others. A copy is attached hereto at **Tab D**. The 2001 Agreement:

- Did not contain a restrictive covenant forbidding Dr. Sears from creating new products for other companies or from endorsing products for other companies, although ZonePerfect at numerous points in the negotiations attempted to obtain one. In fact, the contract explicitly provided that there would be "no restrictions, limitations or prohibitions" on Dr. Sears' activities except as provided in the contract. Tab D, § 8(a).

8

- Did <u>not</u> contain a non-disparagement clause forbidding Dr. Sears from criticizing ZonePerfect or its goods, although ZonePerfect well knew Dr. Sears' opinion of its principal product.

- Did <u>not</u>, as ZonePerfect's complaint alleges, provide the plaintiff with exclusive rights (or any other rights) for the terms 'Zone' or 'Zone diet.' <u>See</u> <u>id</u>., §§ 1.1(p)(10) and (11), 4.1.

- <u>Did</u> provide ZonePerfect with the right to use the 'o' with crosshairs design element. <u>See</u> Tab D at § 4(b) and Schedule 4 thereto. ZonePerfect did not obtain any rights to any other design elements of Dr. Sears' books, including the 'Zone' design where the contrasting color 'o' overlaps the Z. <u>Id</u>. and § 4(a).

- <u>Did</u> clarify that all other rights in Dr. Sears' books, including design elements, belonged to him. <u>Id</u>. at § 2(e).

As a result of that agreement, ZonePerfect cancelled its trademark Registration No.

2,298,235 for 'Zone' in connection with printed materials. On Feb. 25, 2003, the Patent and

Trademark Office ("PTO") granted Dr. Sears Registration No. 2,689,749 for the mark

ZONE® (Stylized) in connection with diet and nutrition books. <u>See</u> **TAB E**.

Among the requirements of the 2001 Agreement was that ZonePerfect would cease to

have any rights of publicity in Dr. Sears' name or likeness after July 1, 2001 (plus three

months for the company to dispose of inventory). Tab D at § 5(a). Nevertheless,

ZonePerfect has then and since engaged in a calculated effort to confuse consumers into

believing that its products are Zone compliant and endorsed by Dr. Sears. As documented in

the correspondence attached to Dr. Sears' counterclaims, ZonePerfect continued to sell

nutrition bars with "Barry Sears, Ph.D." prominently displayed on the packaging long after

its right to do so ceased, and apparently provided packaging with "Barry Sears, Ph.D." to its

affiliate or licensee, ZonePerfect Canada, as recently as 2002. Its website claims, falsely, to

9

be the "Official Site of the Zone Diet." Dr. Sears did not authorize those statements of endorsement or association, and his attorneys complained about them.

Equally disturbing, after Dr. Sears left the company ZonePerfect began running short articles on its website that boldly plagiarized large segments of Dr. Sears' books. The information presented goes far beyond fair use, and is intended to suggest an association and affiliation which does not exist between Dr. Sears and ZonePerfect. ZonePerfect has also resorted to such ruses as prominently displaying a copy of one of Dr. Sears' books in photographs depicting ZonePerfect products, thereby misleadingly by implying that Dr. Sears somehow continues to be associated with the company or that he endorses its products.

Since 2001, Dr. Sears has sold products over the internet and by direct mail through Zone Labs, including ultra-refined fish oil under the name Dr. Sears Zone™ Omega Rx™ Fish Oil Supplement. Such oil is rich in both EPA and the Omega-3 fatty acid docosahexenoic acid ("DHA"), which can affect eicosanoid formation. Zone Labs also sells OmegaZone® nutrition bars containing EPA, DHA, and microencapsulated fish oil.

## THE PLAINTIFF'S BURDEN ON THIS MOTION

"A party seeking a preliminary injunction must establish that 1) it is substantially likely to succeed on the merits of its claim; 2) absent the injunction there is 'a significant risk of irreparable harm'; 3) the balance of hardships weighs in its favor; and 4) the injunction will not harm the public interest." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998), quoting TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996). "The burden is always on the movant to show entitlement to a preliminary injunction. . . . [It is] a drastic and extraordinary remedy that is not to be routinely granted." Holmes Prods. Corp. v. Catalina Lighting, Inc., 67 F. Supp. 2d 10, 12 (D. Mass. 1999)

10

(internal quotation and citation omitted). As an equitable remedy, issuance of an injunction

is discretionary with the Court, and even if the movant meets its heavy burden the Court may

refuse the requested injunction. See Cablevision of Boston, Inc. v. Public Improvement

Comm'n, 38 F. Supp. 2d 46, 53 (D. Mass), aff'd 184 F.3d 88 (1st Cir. 1999).

## I.    ZONEPERFECT HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIM

Without a showing of likelihood of success on the merits, an injunction may not

issue. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). The principal grounds for the

plaintiff's request for injunctive relief are its claims of likelihood of success on its trademark

infringement claims.[1]  Based on those claims it requests an injunction restraining:

1.    Dr. Sears and/or Hershey from using the term *SmartZone*™ in connection with Hershey's nutrition bar;

2.    Dr. Sears from using the "Dr. Sears Zone Approved/ZoneDiet.com"™ seal to endorse products which meet his criteria for Zone-favorable foods; and

3.    Dr. Sears from continuing to distribute the OmegaZone® bar, in which Dr. Sears has a valid registered trademark and which Dr. Sears' company, Zone Labs, Inc., has been selling since 2002.

In fact, ZonePerfect cannot succeed in showing that it is entitled to any of the relief it

seeks.

---

[1] Although ZonePerfect's memorandum refers in conclusory fashion to likelihood of success on claims for dilution and unfair competition, Memo at 15, the former does not appear to be addressed in any reasoned matter, and the latter appears largely duplicative of its infringement claims. See ZonePerfect Memo at 15-25. To the extent that the plaintiff does rely on its ch. 93A claim, it undoubtedly faces a heavier burden than it does on its infringement claims. Chapter 93A requires a level of "rascality" that ZonePerfect cannot hope to prove. See, e.g., Shaanxi Jinshan TCI Electronics Corp. v. Fleet Boston Financial Corp., 61 Mass. App. Ct. 41, 49 (2004) ("To prevail under G.L. c. 93A, a plaintiff must show more than a mere breach of a legal obligation under commercial law.") (internal quotation and citation omitted).

11

## A.     The 'Zone Marks' Are Not Protectible Trademarks

As a threshold matter, much of ZonePerfect's memorandum, and much of this case
generally, depends upon a sleight of hand.  ZonePerfect undoubtedly has a registered
trademark in "ZONE*Perfect*®", under which it has sold nutrition bars and other food
products since 1998 or so.  In addition, however, it has attempted to claim rights in the terms
"Zone" and "Zone Diet."  These supposed marks, ZonePerfect concedes, are not registered,
and there is no evidence anywhere that ZonePerfect in fact sells <u>any</u> product under the name
"Zone" (at least without being conjoined with some other term, as in ZONE*Perfect*®).[2]  The
same is true of "Zone Diet", which the plaintiff has apparently neither registered nor used in
commerce to identify goods.  ZonePerfect then rolls the terms Zone and Zone Diet (in which
it has no rights whatsoever) up with ZONE*Perfect*®, and it defines all three as "the Zone
marks."  It proceeds to base its infringement claims on this imaginary constellation of marks,
two of which are pure fantasy.

Furthermore, to the extent that ZonePerfect's definition of 'Zone marks' implies a
claim that it has priority in the use of Zone-derivative names to sell nutrition bars, that
implication is factually inaccurate.[3]  In fact, years before Dr. Sears and Christopher Baker
formed Eicotech (ZonePerfect's predecessor), Dr. Sears was affiliated with a company that
sold a bar he had developed under the BioZone name, and he held a registered trademark for
the name "BioZone."  That company (or its successor) continued to sell BioZone bars into

_____

[2] As demonstrated in part by the material attached as **Tab E** to this memorandum, ZonePerfect well
understands that it <u>cannot</u> claim any rights in the "Zone" mark.  Dr. Sears on May 22, 2000 applied to
the PTO to register "Zone" (Stylized) for books and other printed material.  The application was
granted February 25, 2003 and Registration No. 2,689,749 issued.  ZonePerfect relinquished its
trademark 'Zone' for books and other printed material, in which it formerly held registration No.
2,298,235.

[3] Priority of use is a necessary showing under the Lanham Act on which ZonePerfect bears the burden
of proof.  See Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 27 (1st. Cir. 1989).

2002 or 2003, and now sells bars under the BodyZone name. In short, the plaintiff has no rights whatsoever in the marks that it seeks to protect, and for the one mark in which it does have rights (ZONE*Perfect*®) its priority of use is suspect. Thus, ZonePerfect's rights are, at a minimum, significantly less than what it pretends they are.

## B.      The Plaintiff Has Failed to Meet Its Burden of Showing a Likelihood of Confusion Among the Public over the Particular Marks at Issue.

In order to prevail on a trademark infringement claim, the plaintiff must demonstrate a likelihood of confusion. "[T]he Lanham Act . . . requires that confusion, mistake or deception be 'likely', not merely 'possible.'" Sears Roebuck & Co. v. All States Life Ins. Co., 246 F.2d 161, 168 (5th Cir.) cert. denied, 355 U.S. 894 (1957). "The trademark statute does not give [mark holders] any property rights in their mark except the right to prevent confusion." WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42, 44 (1st Cir. 1990) (internal quotation and citation omitted; emphasis in original). Pignons S.A. deMecanique dePrecision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981) established a non-exclusive list of factors to be used in assessing likelihood of confusion: "The similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting the mark; and the strength of the plaintiff's mark." The factors are a guide to the ultimate inquiry of whether confusion is probable; they may be weighed differently in different cases, but all must be considered. See Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993). Considered as a whole, these factors favor a finding of no infringement.

13

### 1. Similarity of the marks

The marks at issue are highly dissimilar. Both OmegaZone® and *SmartZone*™ use
'Zone' as a suffix; ZONE*Perfect*® uses it as a prefix. The only common morphemic kernel
is "Zone," which has been used in literally hundreds of registered trademarks. See infra at
19, where the strength of the ZonePerfect mark is discussed. The Dr. Sears Zone
Approved/ZoneDiet.com™ seal is even less similar; it contains Dr. Sears' name and a web
domain name which brings the viewer directly to Dr. Sears' own website. The domain name
alone assures that there will be no confusion as to source of the goods. There is accordingly
little or no possibility of confusion with the ZonePerfect's mark.

Moreover, courts have consistently emphasized that the context in which the mark
appears bears upon whether the marks are similar. "Similarity is determined on the basis of
the designation's total effect and infringement does not exist, though the marks be identical
and the goods very similar, when the evidence indicates no [likelihood of confusion]."
International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center,
103 F.3d 196, 203-04 (1st Cir. 1996) (internal quotation and citation omitted). See also The
AltaVista Corp., Ltd. v. Digital Equip. Corp., 44 F. Supp. 2d 72, 76 (D. Mass. 1998) (holding
that AltaVista and Alta Vista are not similar "when viewed in their respective contexts"). As
between *SmartZone*™ and ZONE*Perfect*®, the color of the marks is significantly different,
the type face of the marks is significantly different, and the "Zone" in the ZONE*Perfect*®
logo contains the distinctive crosshairs in the 'o' which is not to be found in *SmartZone*™.
The *SmartZone*™ design appears against a brightly colored background; the ZONE*Perfect*®
design appears on an eggshell colored background. Even literally identical marks will not be
found likely to cause consumer confusion where the other design elements of the mark

negate an inference of common origin. See Suneblick v. Harrell, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) aff'd without op., 101 F.3d 684 (2d Cir.) ("Uptown" with Manhattan skyline design not likely to cause confusion with "Uptown" and cat logo, although both were used by record companies), cert. denied, 519 U.S. 964 (1996). Thus, there is no likelihood of confusion as between ZONE*Perfect*® and *SmartZone*™.

The other marks at issue are equally distinctive, particularly when one looks to "the total effect of the designation, rather than a comparison of the individual features." Pignons, 657 F.2d at 487. See **Tab F**. The OmegaZone® package design features the phrases "Patented Zone Meal with EPA & DHA" and "Controlled Release Nutrition" as well as photographs of bicyclists and a doctor. None of these is present in the ZONE*Perfect*® design. The "Zone" design in the Dr. Sears Zone Approved/Zone Diet.com™ seal is also substantially different, and modeled directly upon the cover design for Dr. Sears' 1995 best seller, The Zone and its 1997 follow-up, Mastering The Zone. See **Tab G** hereto, and compare with Tab B (book designs) This design pre-dates ZonePerfect's mark. Indeed, ZonePerfect can hardly claim now that the Zone design found in the seal is similar to the "Zone" design with the cross-hairs in the 'o' found in its own mark. In the parties' 2001 Agreement, ZonePerfect specifically bargained for and received the rights to use the 'o' with cross-hairs design element. See Tab D at § 4(b) and Schedule 4 thereto). It did not bargain for or obtain the right to use the 'Zone' design in red and yellow typeface with the 'o' overlapping the 'z', which is the design that appears on The Zone and Mastering the Zone, and the design upon which the Dr. Sears Zone Approved/Zone Diet.com mark is based.[4] See

---

[4] As the 2001 Agreement also made clear, all rights in Dr. Sears' books, including design elements, reverted to him.

Tab B. Having failed to protect its claimed rights at the bargaining table, ZonePerfect has no business now claiming that the designs are similar, and in fact they are not similar.

Perhaps most importantly, any similarity which can be found between marks can be substantially diminished and often negated altogether where the alleged infringing mark is used "in conjunction with the clearly displayed name and/or logo of the manufacturer." Aktiebologet Electrolux v. Armitron Int'l, Inc., 999 F.2d 1, 3 (1st Cir. 1993) quoting Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983). See also Pignon, 657 F.2d at 487 (finding use of house mark in conjunction with contested trademark to be of "exceptional significance " in establishing absence "in establishing absence of likely confusion) (internal quotation and citation omitted); Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 194-95 (1st Cir. 1980). The brand name Dr. Sears™ appears prominently on all OmegaZone™ products. The Dr. Sears Zone Approved/ZoneDiet.com™ seal is intended to appear only on products which other companies will make and which will prominently feature their brand name. Finally, there cannot be any reasonable quarrel about whether consumers are likely to be confused over the origin and source of the *SmartZone*™ bars when those bars will have the famous Hershey® brand name and logo prominently featured. These prominent house marks decisively negate any argument that consumers will confuse those products with ZonePerfect's. See Astra, 718 F.2d at 1205; Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 122 (D. Mass. 1999) (no likelihood of confusion between "Clue" and "Clue.com" where house marks helped emphasize origin of products). Accordingly, there is little similarity between the pertinent marks, and no similarity that is likely to cause consumer confusion.

## 2. Similarity of the goods and services

Whether the allegedly infringing goods are similar to the plaintiff's goods is measured under "an exacting standard." Id. at 77. See also Pignons, 657 F.2d at 487-88 (distinguishing between single lens reflex camera manufacturers where one sold low priced "instant" cameras and the other sold high priced "traditional" cameras). By this measure, neither of the bars at issue can be considered similar to the plaintiff's bars, which uniformly feature popped soy nuggets that vaguely resemble vulcanized Rice Krispies. Both the OmegaZone® bar and the *SmartZone*™ bar have significantly different textures, tastes and appearances. Thus, except for the fact that they exist within the same category, the products are not similar, and they are highly unlikely to be confused with ZonePerfect products.

## 3. Channels of trade, advertising; prospective purchasers

These factors are generally considered together. Alta Vista, 44 F. Supp. 2d at 98. Analysis of the advertising factor is conspicuously absent in ZonePerfect's Memorandum. See Plaintiff's Memo at 20. In fact, it appears that ZonePerfect does little or no advertising. In ZonePerfect's early days (when Dr. Sears was still associated with it), the presence of Dr. Sears' name on its wrappers was the company's marketing, and ZonePerfect relied exclusively on consumer association with Dr. Sears' Zone books, which had even by then sold millions of copies. Consequently, there can be no serious argument that either the OmegaZone® bar (which also does no media advertising) or the *SmartZone*™ bar have attempted to trade off ZonePerfect's advertising.[5]

---

[5] It is worth noting in passing that throughout ZonePerfect's complaint and moving papers it associates clarity with confusion – it often, for example, complains about the fact that consumers will conclude from the "Dr. Sears Zone Approved/ZoneDiet.com" that ZonePerfect's bars were not formulated by Dr. Sears. In fact, the bars now on the market were not created by Dr. Sears. The truth is that Dr. Sears is no longer associated with ZonePerfect, and ZonePerfect has no business claiming that selling products he created under his own name somehow causes "confusion" with the consumer.

The fact that the *SmartZone*™ bar may be distributed through some of the same channels and some of the same consumers is only weakly probative of likelihood of confusion. A product will not be found to infringe merely because it can be found in the same kind of establishment. See 4 J. Thomas McCarthy, McCarthy on Trademarks (4th ed. 2004) ("hereafter, "McCarthy") § 24:45. Furthermore, "a court called upon to assay likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark." Winship Green, 103 F.3d at 204 (citing Astra, 718 F.2d at 1206-07 and HQ Network Sys. v. Executive Headquarters, 755 F. Supp. 1110, 1118-19 (D. Mass. 1991)). OmegaZone® consumers are sophisticated purchasers who are willing to pay a premium price for a bar which bears Dr. Sears' imprimatur, which contains EPA and DHA, and which complies with Zone principles. (OmegaZone® bars in fact retail for about twice the price of ZonePerfect's bar.) As such, there is little overlap between the two bars' market segments, which is no doubt one reason why ZonePerfect has not lifted a finger in two years to attempt to stop OmegaZone® sales. That factor too argues strongly against a finding of a likelihood of success on the merits.

    4.    Actual confusion.

ZonePerfect attempts in its memorandum to relieve itself of the burden of showing actual confusion by claiming that it has moved with "sufficient speed to seek injunctive relief to forestall the bulk of any actual use . . . by defendants" that they do not need to show actual confusion. See Pl. Memo at 21. That statement is manifestly untrue for the OmegaZone® bar – or, for that matter, the BioZone™ or BodyZone™ bars or the Ezone™ bar or other bars which have 'Zone' in their names. These products have been on the market for years.

Likelihood of confusion can be negated by weak evidence of <u>actual</u> confusion. "[A]n

absence of actual confusion, or a negligible amount of it, between two products after a long

period of co-existence on the market is highly probative in showing that little likelihood of

confusion exists." <u>Aktiebolaget</u>, 999 F.2d at 4 (<u>citing</u> <u>Pignons</u>, 657 F.2d at 490 (co-existence

for four years); <u>Keebler Co. v. Rovira Biscuit Corp.</u>, 624 F.2d 366, 377 (1st Cir. 1980) (co-

existence for three and one half years)). Here, the only confusion that appears to exist

concerning the many Zone bars is with the large number of consumers who erroneously

believe that Dr. Sears is associated with ZonePerfect, an impression that ZonePerfect has

assiduously fostered. For present purposes, however, the pertinent point is that if there has

been no <u>actual</u> consumer confusion over those bar names, there is certainly no basis to

presume likely confusion over the *SmartZone*™ bar. And given that ZonePerfect has done

<u>nothing</u> to attempt to restrain the other Zone bar makers from distributing their products, it is

in no position now to say that confusion is likely. "To demonstrate a likelihood of confusion

a markholder . . . must show more than the theoretical possibility of confusion." <u>Winship</u>

<u>Green</u>, 103 F.3d at 201. Hence, ZonePerfect's inability to show consumer confusion (or,

worse, its refusal to do anything if any such confusion in fact existed) cuts against a finding

of likelihood of confusion.

### 5.    Defendants' Intent

There will be no evidence whatsoever that Dr. Sears intended to infringe on the

ZonePerfect trademark. Dr. Sears no doubt intended to use "Zone" in the OmegaZone® and

Dr. Sears Zone Approved/ZoneDiet.com™ marks, but mere awareness of the defendant's

mark is not probative of lack of good faith. <u>See</u> <u>also</u> <u>Aktiebolaget</u>, 999 F.2d at 3 (user of

junior mark did not act in bad faith although it "was aware of appellant's strong trademark

and the risk of legal challenge"). Dr. Sears does not want to be associated with ZonePerfect,

which is why he negotiated a contract forbidding it from using his name to promote their

goods. Dr. Sears coined the term "The Zone," he has a registered trademark for Zone

(Stylized)® for books and printed materials, and he first began creating nutrition bars with

'Zone' in the name before ZonePerfect even existed. Even if this Court were to find he has

no right to use the term, as it should not, Dr. Sears can surely be excused for believing

otherwise. The intent required for bad faith use is the "intent to confuse or deceive

prospective purchaser" by trading off the goodwill associated with the other mark.

CCBN.com, Inc. v. C-Call.com, Inc., 73 F. Supp. 2d, 106, 114 (D. Mass. 1999) (refusing

application by StreetEvents.com to enjoin use of StreetFusion.com as a mark). See also

Liebman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1363 (7th Cir. 1995), cert. denied, 517

U.S. 1234 (1996) (holding that "competition [is] not bad faith, provided that there is no

intention to confuse").[6] Hence, Dr. Sears did not as a matter of law act in bad faith.

### 6. The Strength of the Mark

*ZONEperfect*® is not an inherently strong mark. Indeed, ZonePerfect's own

memorandum sets forth the usual trademark taxonomy (arbitrary, fanciful, suggestive,

descriptive, and generic) without ever taking a firm position as to which rubric applies to its

own mark – or, for that matter, even saying which of the three supposed 'zone' marks

(*ZONEperfect*®, Zone or Zone Diet) it is even talking about.

For the reasons already set forth, ZONE*Perfect*® is a weak mark whatever category it

fits into. The evidence at the hearing will show that there are hundreds or even thousands of

---

[6] To the extent that there is any sort of similarity between the marks, of course, that similarity derives
largely from Dr. Sears own involvement with ZonePerfect, and the decision to name the bars after Dr.
Sears' own books. In effect, therefore, ZonePerfect has accused Dr. Sears of trading off Dr. Sears'
own good will. Of course, ZonePerfect has no possibility of prevailing on **that** claim. See Giorgio
Beverly Hills, Inc. v. Revlon Consumer Prods. Corp., 869 F. Supp. 176, 185 (S.D.N.Y. 1994).

third-party uses of the term 'Zone'; from AutoZone® to Botanical Zone® (shampoos) to

Comfort Zone® (alcoholic beverages) to Zoo Zone®. The sheer number of third party uses,

without more, argues strongly against finding that ZonePerfect is a strong mark. Northern

Trust Corp. v. Northern Bank & Trust Co., 1991 U.S. Dist. LEXIS 20349 (D. Mass.) at *12-

13 (existence of numerous banks with "Northern" in name rendered mark weak). The

product itself has been widely distributed for only five years. See Security Works!, Inc. v.

Security World Int'l, 1994 U.S. Dist. LEXIS 199938 (S.D. Fla. 1994) (no secondary meaning

where mark used only for four and one half years). It appears not to have been the subject of

extensive advertising. Other Zone bars have co-existed with it, and the BioZone bar

preceded it in the market. Thus, those facts as well militate against the issuance of an

injunction.

Finally, throughout its argument, ZonePerfect appears to assume that because its

mark has become associated with Zone-compliant nutrition bars that its mark somehow

protects that association. Trademarks, however, serve to designate origin, not ideas. See

also WCVB-TV, 926 F.2d at 45. Consequently, the concept of Zone compliance is not

embraced or protected by ZonePerfect's mark. See Hoopla Sports and Entertainment, Inc. v

Nike, Inc., 947 F. Supp. 347, 353 (N.D. Ill. 1996) (a trademark "cannot protect the idea

behind that product from being used by others") (citing many cases); Brown v. Armstrong,

957 F. Supp. 1293, 1301 (D. Mass.), aff'd 129 F.3d 1252 (1st Cir. 1997) ("I have not found, a

case supporting the proposition that the Lanham Act creates or confers proprietary rights in

ideas. To the contrary, courts that have considered such arguments have rejected it.") (citing

cases). Accordingly, the plaintiff's implicit claim that any other Zone bar which calls itself a

Zone bar is an infringer is simply erroneous.

In short, none of the parties who is involved in making the *SmartZone*™ bar want its

products to be confused with ZonePerfect's products, and there is virtually no possibility,

much less a likelihood, that they will.  OmegaZone® and Dr. Sears Zone

Approved/ZoneDiet.com™ also will not create any consumer confusion.  Accordingly,

ZonePerfect has no likelihood of success on the merits of its trademark claims and an

injunction may not issue.

## II.    ZONEPERFECT IS UNLIKELY TO SUCCEED ON ITS MERITS OF ITS FALSE ADVERTISING CLAIM

The other claim upon which ZonePerfect relies is its false advertising claim under

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[7]  To prove a false advertising

claim, the plaintiff must demonstrate:

1.    the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

2.    the misrepresentation is material, in that it is likely to influence the purchasing decision;

3.    the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

4.    the defendant placed the false or misleading statement in interstate commerce; and

5.    the plaintiff has been or is likely to be injured as a result of the misrepresentation, wither by direct diversion of sales or by a lessening of goodwill associated with its products.

---

[7] "Any person who, on or in connection with any goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, quantities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125 (a) (1).

Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue, 284 F.3d 302 (1st Cir. 2002).

    The argument section of ZonePerfect's brief is noticeably reticent about the basis for

its claims, but its fact statement indicates that they derive largely from a February 9, 2004

press release issued by Hershey. Pl. Memo at 9-10. There, Hershey stated that:

> Hershey Foods Corporation and Dr. Sears today announced plans to introduce
> the first-ever nutrition bars with the science-based nutritional benefits of the
> Zone Diet **and** the great taste consumers expect from Hershey. The products
> will be the first to carry the "Dr. Sears Zone Approval" seal and will be
> introduced in the third quarter.

The press release is attached hereto **Tab H**. As to Dr. Sears, ZonePerfect alleges that the

February 2004 edition of "The OmegaZone," Dr. Sears' on-line magazine, includes an article

stating that the *SmartZone*™ bar will "be the first to carry the 'Dr. Sears Zone Approved'

seal and will be introduced during the third quarter." See **Tab I**. ZonePerfect is also vexed

by a hyperlink from the "The OmegaZone" newsletter to Dr. Sears' Zone Diet website,

which states that "to buy **only** Zone products endorsed by Dr. Sears, go to

www.zonediet.com." Pl. Memo at 11. Based on this the foregoing, the plaintiff seeks to

enjoin Dr. Sears from:

    1.    Stating or implying that the *SmartZone*™ bar is the "first" or "only" bar

endorsed by Dr. Sears;

    2.    Distributing further the February 2004 edition of "the OmegaZone"; and

    3.    Forbidding Dr. Sears from stating in "any advertisement, presentation and/or

related statements" that *SmartZone*™ bars are the "first ever nutrition bars with the science-

based nutritional benefits of the Zone Diet" or stating that the *SmartZone*™ bars will be "the

first to carry the Dr. Sears Zone Approval" seal. See Pl. Motion at Prayer D.

Lanham Act jurisprudence separates actionable false advertising claims into those where the challenged statements are literally false and those where the challenged statements are literally true but carry a false implication. See Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 128 (D. Mass. 1996). Here, all of the statements are literally true. The statement in the Hershey press release is framed in the conjunctive: *SmartZone*™ **is** the first-ever nutrition bar with the nutritional benefits of the Zone Diet **and** the great taste that consumers expect from Hershey.[8] Furthermore, the *SmartZone*™ bar is the first product to carry the Dr. Sears Zone Approved/Zone Diet.com™ seal. In fact, the seal did not even exist until recently. At least until the *SmartZone*™ bar comes to market, the only place to purchase the products Dr. Sears currently endorses is from Dr. Sears' web site. Thus, all of the statements that ZonePerfect finds so offensive are literally true.

Because the statements are literally true, they are 'false advertising' under the Lanham Act only if ZonePerfect can show that the statement conveyed a misleading message to those who heard it, i.e., ZonePerfect "must show how consumers have actually reacted to the challenged advertisement[s] rather than merely demonstrate how they could have reacted." Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 36 (1st Cir. 2000). Survey evidence is required. Id. It is surpassingly unlikely that ZonePerfect will be able to find any appreciable number of consumers interpret those statements the way ZonePerfect does. It complains that the above quoted statements "*imply* the false notion that ZonePerfect products have never been approved or endorsed by Dr. Sears and/or are not

---

[8] The implication that ZonePerfect seeks to read into this statement is that no products, or at least no nutrition bars, were ever endorsed by Dr. Sears until *SmartZone*™. That, of course, is absurd: right now Dr. Sears is selling OmegaZone® bars with his own name in it. The 'implication' ZonePerfect finds in the statement is therefore every bit as insulting to Dr. Sears' own bars as it is to ZonePerfect's bars, which is why the 'implication' is senseless.

24

compliant with Zone Diet principles. This *implication* is sufficient to justify injunctive relief." Pl. Memo at 26 (emphasis in original). To torture this *implication* out of factually true statements and then to seek an injunction preventing the dissemination of such implications, however, goes far beyond the recognized parameters of Lanham Act liability.[9] See Gillette, 946 F. Supp. 2d at 130-131 (holding that claims expressed in "broad, vague, and commendatory" language not actionable even where negative implications about competitor's product may arise).

If more were needed, the implication ZonePerfect purports to find in the above-quoted statements is in large part accurate. Although some ZonePerfect products have been approved and endorsed by Dr. Sears and some were (and presumably still are) compliant with Zone Diet principles, the slab bars were not designed by Dr. Sears, were not approved by Dr. Sears, and they are certainly are not now approved by Dr. Sears. Truthful statements carrying truthful implications do not violate the Lanham Act. See Gillette, 946 F. Supp. at 129-130. Thus, the plaintiff is unlikely to succeed on its false advertising claim.

In summary, the plaintiff has taken statements which are literally true and harmlessly self-congratulatory and twisted those statements into an implied denigration

---

[9] It is unlikely that the statements in Dr. Sears February e-magazine fall within the scope of the Lanham Act at all. The Lanham Act applies only to commercial speech. Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120-21 (8th Cir. 1999) ("commercial speech" is "a threshold requirement for Lanham Act liability"); 4 McCarthy, § 27:71 and cases cited at n. 3.1. "The 'commercial' requirement was inserted to ensure that § 43(a) does not infringe on free speech protected by the First Amendment." Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1383 (5th Cir. 1996). Dr. Sears' e-magazine provides readers with factual information concerning nutrition and health. The issue which contains the statements which offend ZonePerfect also contains Zone-favorable recipes, a discussion of where to find Zone-favorable foods on the menu of Benihana restaurant chain as well as commentary and fitness tips. ZonePerfect has no business attempting to silence Dr. Sears from exercising his First Amendment rights when speaking on matters of public importance and the Lanham Act does not provide a vehicle for ZonePerfect to do so.

of its product. It attempts to do so apparently without a single consumer survey

indicating that anyone else reads those statements to convey the same peculiar

implications. Even the implications that it seeks to draw from the statements are

largely true: the nutrition bars that it now sells were neither developed nor endorsed by

Dr. Sears, and they do not comply with Zone principles due to their high glycemic load.

On any of those grounds or all of them, therefore, ZonePerfect has no likelihood of

success on the merits of its false advertising claim.

## III.    ZONEPERFECT CANNOT DEMONSTRATE THE EXISTENCE OF IRREPARABLE HARM, NOR THAT THE BALANCE OF HARM FAVORS ISSUANCE OF AN INJUNCTION

As the plaintiff correctly notes, trademark law will generally presume irreparable

harm from the use of an infringing mark. However, "an unreasonable delay between the time

when a plaintiff is a first apprised of the infringing acts and the time of filing suit will rebut

the presumption of irreparable harm." Robert D. Fritz, DMA, Inc. v. Arthur D. Little, Inc.,

944 F. Supp. 95, 98 (D. Mass. 1996) (citing cases). Dr. Sears has for two years marketed

OmegaZone® bars to his customers, many of whom first became his customers when they

called the 800 number which appears in his book beginning in 1995. ZonePerfect has done

literally nothing to restrain OmegaZone® sales during those two years. It is axiomatic where

a party delays in seeking temporary injunctive relief, its harm is not irreparable. As one court

has explained in reversing a preliminary injunction based on the plaintiff's delay of *ten weeks*

in asserting its claim for trademark infringement:

> Preliminary injunctions are generally granted under the theory that there is an
> urgent need for speedy action to protect the plaintiffs' rights. Delay in
> seeking enforcement of those rights, however, tends to indicate at least a
> reduced need for such drastic, speedy action.

<u>Citibank, N.A. v. Cittrust & Citytrust Bancorp, Inc.</u>, 756 F.2d 273, 276 (2d Cir.

1985). Thus, the cases are legion where courts have denied preliminary injunctive

relief based upon delays by the plaintiff that were *less* than the delay in this action.

Courts have justly denied relief where the plaintiff delayed 2 weeks,[10] 18 weeks,[11] 3

months,[12] 4 months,[13] 4.5 months,[14] 5 months,[15] 6 months,[16] 7 months[17], 8 months,[18]

---

[10]  <u>Magnet Communications, LLC v. Magnet Communications, Inc.</u>, 2001 U.S. Dist. LEXIS 14460, *5 (S.D.N.Y. 2001) (no irreparable injury where plaintiff waited two weeks in seeking preliminary injunction in action for trademark infringement).

[11]  <u>ImOn, Inc. v. ImaginOn, Inc.</u>, 90 F. Supp. 2d 345, 349 (S.D.N.Y. 2000) (18 week delay rendered presumption of irreparable harm "not operative" in action for trademark infringement).

[12]  <u>Packerware Corp. v. Corning Consumer Prods. Co.</u>, 895 F. Supp. 1438, 1452 (D. Kan. 1995) (no irreparable harm where plaintiff delayed three months to seek preliminary injunctive relief in action for trademark infringement).

[13]  <u>Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.</u>, 116 F. Supp. 2d 405, 408-09 (S.D.N.Y. 2000) ("no presumption of irreparable harm exists" where plaintiff delayed approximately four months in requesting injunctive relief in action for trademark infringement); <u>Marcy Playground v. Capitol Records, Inc.</u>, 6 F. Supp. 2d 277, 281 (S.D.N.Y. 1998) (no irreparable harm in action for trademark infringement where plaintiff delayed five weeks in bringing suit and another three months in seeking preliminary injunction).

[14]  <u>Gidatex v. Campaniello Imports, Ltd.</u>, 13 F. Supp. 2d 417, 419-20 (S.D.N.Y. 1998) (4.5 month delay in seeking a preliminary injunction for alleged trademark infringement "clearly belied" any claim of irreparable injury").

[15]  <u>Cheng v. Dispeker</u>, 1995 U.S. Dist. LEXIS 2376, *16 (S.D.N.Y. 1995) (five month delay "vitiates plaintiffs' assertion that they will be irreparably harmed" in action for trademark infringement); <u>New Dana Perfumes Corp. v. The Disney Store, Inc.</u>, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (two month delay in presenting cease and desist letter and another five month delay in moving for injunctive relief, "alone, precludes a finding of irreparable harm.").

[16]  <u>Krueger Int'l, Inc. v. Nightingale Inc.</u>, 915 F. Supp. 595, 613 (S.D.N.Y. 1996) (no irreparable harm plaintiff delayed 6-9 months in seeking preliminary injunction in action for trade dress infringement).

[17]  <u>Majorica, S.A. v. R.H. Macy & Co., Inc.</u>, 762 F.2d 7, 8 (2d Cir. 1985) (no irreparable injury where plaintiff waited seven months to seek preliminary injunctive relief after commencing trademark infringement action); <u>Warner-Lambert Co. v. McCrory's Corp.</u>, 718 F. Supp. 389, 395 (D. N.J. 1989) (7 month delay in seeking preliminary injunctive relief in action for trademark infringement "significantly weaken[ed] [plaintiff's] attempt to demonstrate irreparable harm."); <u>Lanvin Inc. v. Colonia, Inc.</u>, 739 F. Supp. 182, 192 (S.D.N.Y. 1990) (no irreparable harm where plaintiff waited over 7 months to move for injunctive relief in action for trademark infringement).

9 months,[19] 12 months,[20] 16 months,[21] and slightly over two years.[22] Hence,

ZonePerfect's delay in attempting to restrain Dr. Sears' alleged infringement, without

more, justifies finding that no irreparable harm has occurred.

Moreover, Dr. Sears' good faith use of the term Zone, which he invented and

popularized, not only precludes a finding of willful infringement, it provides an independent

basis for refusing injunctive relief. Cases have found that good faith investment by a

defendant will tip the balance of harms to make injunctive relief unsuitable even where the

plaintiff has proven infringement (as ZonePerfect certainly has not). See Mushroom Makers,

Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978), cert. denied, 439 U.S. 1116 (1979)

(refusing to enjoin use of MUSHROOM for ladies sportswear in suit by owner of

MUSHROOMS for ladies' shoes based on second user's substantial good faith investment);

Vitarroz Corp. v. Borden, Inc., 644 F.2d 960 (2d Cir. 1981) (refusing to enjoin second user of

---

[18] J&J Snack Foods, Corp. v. Nestle USA, Inc., 149 F. Supp. 2d 136,158 (D.N.J. 2001) (8 month delay "undercuts [plaintiff's] present claim of irreparable harm" in action for trademark infringement); Mylan Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30, 43-44 (D. D.C. 2000) (8 month delay in action ordering FDA to grant approval of drug "undercuts" claim of irreparable harm); Golden Bear Int'l, Inc. v. Bear U.S.A., Inc., 969 F. Supp. 742, 748 (N.D. Ga. 1996) (8 month delay in action for trademark infringement "speaks volumes about whether a plaintiff is being irreparably injured.").

[19] Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (reversing district court's finding of irreparable harm where plaintiff waited at least nine months to commence a trademark infringement action and four months longer before moving for preliminary injunctive relief).

[20] McDonald's Corp. v. Burger King Corp., 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999) (plaintiff's delay of at least one year "belies a claim of irreparable harm" in action for trademark infringement); Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 521 (S.D.N.Y. 1994) (delay of at least one year in seeking preliminary injunction in action for trademark infringement "'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'").

[21] TJM Corp. v. Xerox Corp., 1992 U.S. Dist. LEXIS 7260, *13 (E.D. La. 1992) (delay of "nearly one and a half years" in seeking preliminary injunctive relief "belies" plaintiff's claim of irreparable harm).

[22] Fritz, 944 F. Supp. at 99.

BRAVOS where name was applied to both crackers and tortilla chips based on second user's substantial good faith investment). The balance of harms therefore favors Dr. Sears, and on that basis as well, the Court should refuse to issue an injunction.

## IV. THE PUBLIC INTEREST WILL NOT BE SERVED BY THE ISSUANCE OF AN INJUNCTION

In determining whether to grant an injunction "[t]he court may also consider any adverse impact on the public interest for which a bond cannot compensate and withhold relief for this reason alone." Cablevision of Boston, Inc. v. Public Improvement Comm'n, 38 F. Supp. 2d 46, 53 (D. Mass. 1999). Closely intertwined with the question of the public interest is Dr. Sears' right to speak out, whether in his e-magazine or elsewhere, on matters of public concern, including whether products which purport to be nutrition bars embodying Zone principles in fact do so. "Protecting rights to free speech is *ipso facto* in the interest of the general public." Westfield High Schl. LIFE Club v. City of Westfield, 249 F. Supp. 2d 98, 128 (D. Mass. 2003).[23]

The public interest here is particularly acute given the relief that ZonePerfect seeks. Dr. Sears' nutritional principles remain controversial to a degree, but he was among the very first scientists to advise the public that carbohydrate-laden diets are unhealthy and that food can influence metabolism and therefore well-being as profoundly as any drug. Millions have bought his books, from elite athletes to the chronically obese, and many of them have improved their lives by adopting the principles he espouses. When products on the market do not reflect those principles he is entitled to say so, and when they do reflect those

---

[23] It is no response to say that Dr. Sears' statements involve commercial speech, because even if that were so they would be entitled to protection. See, e.g., Bose Corp. v. Consumers Union, 692 F.2d 189, 195 (1st Cir. 1982), aff'd, 466 U.S. 485 (1984) (applying First Amendment constraints to product disparagement suit); Unelko Corp. v. Rooney, 912 F.2d 1049, 1056 (9th Cir. 1990), cert. denied, 499 U.S. 961 (1991) (holding that columnist's statements concerning whether a product worked as claimed was speech of public interest subject to First Amendment analysis).

29

principles he is entitled to say that as well. Thus, an injunction may not issue to restrain in advance statements that ZonePerfect considers inaccurate.

Finally, as previously discussed (supra at 20), ZonePerfect seeks in substance to use trademark law to monopolize the field of Zone-favorable nutrition bars. Ironically, it does so in an effort to maintain the hegemony of a product which is not Zone favorable. Put differently, what really concerns ZonePerfect is the product that Hershey and Dr. Sears are developing and not the name under which they are marketing it. Robust competition, however, like free speech, is very much in the public interest, and the requested injunction would frustrate that strong and recognized policy. See, e.g., Liebman, 69 F.3d at 1363. Accordingly, for that reason as well, the Court should refuse to grant ZonePerfect the equitable relief it seeks.

## V.   EVEN IF ZONEPERFECT COULD DEMONSTRATE THAT IT WOULD OTHERWISE BE ENTITLED TO AN INJUNCTION, IT COMES TO THIS COURT WITH UNCLEAN HANDS

Even if an injunction would otherwise be warranted, as it is not, "a court may properly consider any inequitable conduct by the plaintiff" in determining whether grant equitable relief. Cablevision, 38 F. Supp. 2d at 53. In the trademark context, conduct held to constitute unclean hands includes intentional material misrepresentation about product ingredients and use of a deceptive mark. Siegrun D. Kane, Trademark Law: A Practitioner's Guide (4th ed. 2003), § 12:2:7 at 12-58. Thus, the mere fact that ZonePerfect has attempted to palm off its products as Zone-favorable would, without more, provide a basis to deny injunctive relief.

Dr. Sears also expects to introduce evidence that will leave the Court with no doubt that ZonePerfect has used the ZONE*Perfect*® mark to foster confusion about Dr. Sears'

30