EXHIBIT D

MAR 01 2004  2:33 PM FR DECHERT LLP 36    2159942222 TO 916146243074    P.02

## AGREEMENT

This Agreement, dated as of October 1 7, 2001 (the "Agreement"), is by and among ZonePerfect Nutrition Company (formerly known as "Eicotech Corporation"), a Delaware corporation (the "Company"), Barry D. Sears ("BDS"), Douglas Sears ("DS"), Surfactant Technologies, Inc., a Massachusetts corporation ("STI"), BDS, Inc., Christopher P. Baker ("Baker"), Harry P. Haveles ("HPH"), Laurence S. Chud ("Chud"), Anasazi Partners ("Anasazi"), and Steven G. Lampe ("Lampe"). The persons and entities referred to above are sometimes in this Agreement individually referred to as a "Party" and collectively as the "Parties." BDS, DS and STI are sometimes in this Agreement individually referred to as a "Selling Shareholder" and collectively as the "Selling Shareholders."

### RECITALS

WHEREAS, certain of the Parties entered into a Stock Purchase and Holders Agreement, dated September 19, 1996;

WHEREAS, under the 1996 Agreement, BDS, DS and STI (i) sold, transferred and assigned certain tangible and intangible assets and rights to the Company, and (ii) entered into certain covenants and agreements;

WHEREAS, the Company and BDS entered into an Employment Agreement dated as of September 19, 1996 (the "BDS Employment Agreement");

WHEREAS, BDS, DS and STI are presently the respective record holders of the shares of Company Class A Common Stock, par value $.01 per share (the "Common Stock"), all as set forth in Schedule 1 hereto;

WHEREAS, the Company desires to repurchase all shares of Common Stock held by each of the Selling Shareholders, as shown on Schedule 1 hereto, and each of the Selling Shareholders desires to sell the same to the Company on the terms and conditions set forth herein;

WHEREAS, the Company desires to sell, assign and transfer to the Selling Shareholders certain of the assets transferred to the Company under the 1996 Agreement, subject to the retention by the Company of the right to use certain of those assets as provided for herein;

WHEREAS, the Company and the Selling Shareholders desire to resolve the situation regarding the ownership, registration and use of their respective marks containing the terms "Zone" and "Zone Diet" as provided for herein; and

2041955v2

WHEREAS, the Company and the Selling Shareholders desire to provide for the phase out and eventual termination of the Company's use of the name, likeness and image of BDS in connection with the manufacture, promotion and sale of its products.

NOW, THEREFORE, in consideration of the foregoing and the agreements, representations, warranties and covenants contained herein, the parties hereto mutually agree as follows:

1.    CERTAIN DEFINITIONS.

(a)    "Assets" shall means the "Transferred Assets" as such term is defined in Section 1.1(p) of the 1996 Agreement.

(b)    "Books" means the following books (published or communicated, in the past or future, in any media known or unknown) authored or co-authored by BDS: The Zone, Mastering the Zone, Zone Perfect Meals in Minutes, the Anti-Aging Zone, Zone Food Blocks, Top 100 Zone Foods, A Week in the Zone and The Soy Zone.

(c)    "Change of Control" means (i) a merger, consolidation, stock sale, or other transaction (or any series of transactions) in which the holders of the voting stock of the Company immediately prior to such transaction or series of transactions hold 50% or less of the voting power thereof immediately after such transaction or series of transactions, or (ii) a sale of all or substantially all of the assets of the Company.

(d)    "Closing" means the closing of the transactions contemplated in this Agreement as provided for in Section 13 hereof.

(e)    "Closing Date" means the date of the Closing as provided for in Section 13 hereof.

(f)    "Designated Period" means the period of time commencing on September 19, 1996 and terminating as of December 31, 1998.

(g)    "Envion Lawsuit" means the litigation currently pending in the United States District Court for the District of Massachusetts captioned *Surfactant Technologies, Inc. v. Pure Distributors, Inc. d/b/a Envion International et al.*, Civil Action No. 96-11155-RGS, including all appeals and other proceedings directly relating thereto.

(h)    "Ingestible Products" shall mean any ingestible food product intended for human consumption.

(i)    "Lien" means, with respect to any Asset, any mortgage, lien, pledge, charge, security interest, equitable interest, claim, right of first refusal, option, assignment, restriction or encumbrance of any kind in respect of such Asset.

- 2 -

(j)    "Other Sears Assets" shall have the meaning set forth in Section 2(e) below.

(k)    "Person" means an individual, corporation, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

(l)    "Skin Assets" shall mean any formulations or products that are intended or marketed for use in connection with dermatological or other skin care uses or treatments, and shall also mean any processes that are intended or marketed for use in connection with dermatological or other skin care uses or treatments but not for Ingestible Products.

(m)    "Zone Diet" means the diet program or programs based on the ideas and principles set forth in the Books.

2.    REPURCHASE OF COMMON STOCK/ASSIGNMENT OF ASSETS.

(a)    Sale and Repurchase of Common Stock. As of the Closing, the Company hereby purchases from each Selling Shareholder, and each Selling Shareholder, severally but not jointly, hereby sells to the Company, all of the shares of Common Stock owned by such Selling Shareholder as set forth on Schedule 1 hereto (the "Acquired Common Stock").

(b)    Transfer and Assignment of Assets. As of the Closing, the Company hereby sells, transfers and assigns all its right, title and interest in and to all the Assets (including, without limitation, all goodwill, causes of action, claims and rights connected therewith, and all transferable licenses, government permits and authorizations connected therewith), free and clear of all Liens, to BDS, except for the Retained Assets as provided for in Section 2(c) hereof (the Assets being so sold, transferred and assigned to BDS hereby are collectively called the "Retransferred Assets"), and subject to the retention by the Company of an irrevocable, royalty-free, nonexclusive, world-wide, perpetual, transferable (including, without limitation, sublicensable in multiple tiers) right and license to use , for the development, manufacture, marketing, sale and distribution of Ingestible Products, all those Retransferred Assets set forth in Sections 1.1(p)(3), 1.1(p)(4), 1.1(p)(5), and 1.1(p) (6) of the 1996 Agreement that are being sold, transferred or assigned to BDS under this Agreement. The Parties acknowledge and agree that the Retransferred Assets set forth in Sections 1.1(p)(3), 1.1(p)(4) and 1.1(p)(6) of the 1996 Agreement shall not include rights in and to the marks EICOTEC, EICOZONE or EICOPRO. The retransfer of the Retransferred Assets set forth in Section 1.1(p)(12) of the 1996 Agreement shall not limit or restrict the right of the Company to develop, market and exploit consumer nutrition centers and medical treatment centers. At the Closing, the Company shall instruct its counsel to deliver to BDS all books, records, papers and files related to the Retransferred Assets set forth in Section 1.1(p)(11), (p)(13) and (p)(14) of the 1996 Agreement that are in such counsel's possession.

- 3 -

(c)    Retained Assets. The Company shall retain all right, title and interest in and to (i) the assets listed on Schedule 2 hereto (subject to the exceptions and qualifications set forth in such Schedule), and (ii) those Assets described in the following sections of the 1996 Agreement: Section 1.1(p)(10) (except for the trademark EICODERM and the goodwill associated therewith), Section 1.1(p)(20), Section 1.1(p)(21), Section 1.1(p)(22), Section 1.1(p)(23), Section 1.1(p)(24) (except as such materials relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing), Section 1.1(p)(25), Section 1.1(p)(26) (except as such rights relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing); and Section 1.1(p)(27) (except as such rights relate to the Retransferred Assets or the Other Sears Assets, which related materials shall be deemed to be delivered at Closing) (collectively, all such assets shall be known as the "Retained Assets").

(d)    Skin Care Assets. The Parties acknowledge and agree that notwithstanding anything in this Agreement to the contrary, all right, title and interest in or to any intellectual property rights relating or pertaining to the Skin Assets that were created, developed or acquired by or for the Selling Shareholders either before or during the Designated Period shall belong exclusively to DS.

(e)    Other Rights. Notwithstanding anything herein to the contrary, it is accepted and agreed that the Company shall have no rights in or to any inventions, product formulations, developments, innovations, techniques, designs, processes, procedures, improvements, works of authorship created or developed by BDS, DS or STI after the end of the Designated Period, including any intellectual property rights therein or thereto. Nothing in this Agreement shall amend, qualify, limit or restrict (i) the exclusive ownership of BDS or STI in and to (A) the copyrights for The Zone and Mastering the Zone, (B) the copyrights for any hardcover or paperback books based on The Zone, (C) the copyrights for any books written by BDS, (D) the rights of BDS or STI in any royalties derived from the publication of The Zone, (E) the rights of BDS or STI in any hardcover or paperback books, and (F) any lecture fees earned by BDS,, or (ii) the exclusive ownership of DS in and to any payment to DS as a result of a settlement of the Envion Lawsuit, in each case under clauses (i) and (ii) of this Section 2(e) regardless of whether created, developed or acquired by or for BDS, DS or STI , as the case may be, before, during or after the Designated Period (collectively, all of the foregoing shall be known as the "Other Sears Assets")

(f)    Other Actions. The Parties shall take all steps to sign and file all documents and to do all other acts reasonably necessary or desirable to sell, transfer and assign to BDS all the Company's right, title and interest in and to, and legal protection with respect to, the Retransferred Assets at the Closing, and whenever reasonably requested, after the Closing.

3.    NOTES AND OTHER CONSIDERATION.

(a)    Issuance and Payment of Notes. At the Closing, the Company shall issue promissory notes to BDS, DS and STI in the principal amounts of Two Million, Eight

Hundred and Eighty Seven Thousand, Five Hundred Dollars ($2,887,500), One Million, Five Hundred and Thirty Seven Thousand, Five Hundred Dollars ($1,537,500), and Nine Hundred and Seventy Five Thousand Dollars ($975,000), respectively, with interest at the rate of six percent (6%) per annum payable quarterly in arrears, to be payable on or before March 31, 2004, such notes to be in the form set forth as Exhibit A hereto (the "Notes"), provided that the Company shall pay a minimum of Twenty Six Thousand, Seven Hundred and Thirty Six Dollars and Eleven Cents ($26,736.11), Fourteen Thousand, Two Hundred and Thirty Six Dollars and Eleven Cents ($14,236.11), and Nine Thousand, Twenty Seven Dollars and Seventy Eight Cents ($9,027.78), respectively, in principal and interest per month on the Notes, which payments shall commence on November 15, 2001 and shall continue on the fifteenth day of each consecutive calendar month thereafter for a further twenty-seven (27) calendar months as provided for in and subject to the terms of such Notes.

(b)    Acceleration of Payment. The payment of the principal and interest payable on the Notes shall be accelerated and all amounts owing under the Notes shall be paid in full in the event of (i) a Change of Control , or (ii) certain uncured, material breaches of this Agreement by the Company as provided for in the Notes.

(c)    Subordination to Other Indebtedness. The Notes shall be junior in payment and subordinated to (i) all notes and other outstanding indebtedness or lines of credit of the Company as of the Closing, including without limitation, the line of credit from First Massachusetts Bank, N.A., which are in the aggregate amount of Five Million Dollars ($5,000,000), and (ii) any future indebtedness of the Company as a result of any debt instruments that the Company may enter into up to an aggregate maximum of Seven Million Dollars ($7,000,000) in the twelve (12) month period following the Closing Date.

(d)    Cash Payment. As of the Closing, Company shall pay the amount of Six Hundred Thousand ($600,000) in cash to BDS or a designee of BDS, such payment to be made by company check as of the Closing Date.

4.    TRADEMARKS.

(a)    Transfer and Voluntary Cancellation of Registrations. Subject to the terms and conditions of this Section 4, as of the Closing, the Company hereby sells, assigns and transfers to BDS on a quit claim basis all the Company's right, title and interest in the trademark registration set forth on Schedule 3 (the "Assigned Registration") and the goodwill of the business symbolized by the Assigned Registration. At the Closing, the Company shall execute an assignment substantially in the form of Exhibit B and such other assignment documents as may be reasonably necessary in order to record the assignment and transfer of the Assigned Registration to BDS in the relevant foreign governmental office(s). In addition, from time to time, the Company shall execute and file such documentation as is necessary voluntarily to cancel, with BDS's consent, its U.S. Registration Nos. 2,298,235 and 2,335,083, and from time to time, BDS shall execute and file such documentation as is necessary to abandon his U.S application Serial No. 76/054,553). At any time and from time to time after the Closing, the

· Company shall sign any and all documents reasonably necessary to facilitate the registration of
U.S. application Serial No. 76/054,646. In addition, the Company hereby consents to, and on
BDS's reasonable request shall sign, any and all documents reasonably necessary to facilitate the
registration of any other applications by BDS for the marks ZONE and ZONE DIET solely for
books in any medium published or communicated, including audio, digital, and electronic media,
throughout the world. Moreover, BDS may request from time to time that Company consent to
and sign any and all documents reasonably necessary to facilitate the registration by BDS of
other marks containing the terms "Zone" and "Zone Diet" solely for books in any medium
published or communicated; including audio, digital, and electronic media, throughout the world,
and Company shall not unreasonably withhold such consent or unreasonably refuse to sign such
documents.

        (b)    Design Element. The Selling Shareholders acknowledge and agree
that as between the Selling Shareholders and the Company, the Company owns, all right and title
in and to the design element set forth on Schedule 4 (the "Design Element"), including, without
limitation, all trademark rights therein and thereto; and the Company hereby agrees that BDS and
all those in the chain of distribution, including but not limited to publishers, distributors, seller
and buyers, shall have and shall be deemed to have had at all time prior to the date of this
Agreement, an exclusive (except as to the Company), irrevocable, perpetual, royalty-free,
worldwide license to use the Design Element solely in connection with the sale, marketing and
distribution (whether in hardcover or paperback) of the books Zone Perfect Meals in Minutes and
Zone Food Blocks.

        (c)    Zone Perfect. The Selling Shareholders acknowledge that the
Company claims ownership of the composite mark ZONE PERFECT; and the Company hereby
agrees that BDS and all those in the chain of distribution, including but not limited to publishers,
distributors, seller and buyers, shall have and shall be deemed to have had at all time prior to the
date of this Agreement, a non-exclusive, irrevocable, perpetual, royalty-free, worldwide license
to use ZONE PERFECT solely in the title of the book Zone Perfect Meals in Minutes.

        5.    **PUBLICITY RIGHTS**.

        (a)    Phase Out License. BDS hereby agrees that the Company shall
have the right to use the name, likeness, image, voice, signature, or picture of BDS (the
"Publicity Rights") in connection with the advertising, marketing, packaging, sale and
distribution of the Company's products through July 1, 2001 (and for a period of three (3)
months thereafter so as to permit the Company to sell or otherwise dispose of its inventory of
products existing as of that date), provided that the Company may only use the Publicity Rights
on or in connection with products that are substantially the same in nature and quality as those
products on or in connection with which the Company has used the Publicity Rights prior to the
Closing Date and in a manner substantially the same as the manner in which the Company used
such Publicity Rights prior to the Closing Date. Notwithstanding anything in this Agreement to
the contrary, however, the Company (1) shall have no right to use the Publicity Rights on the
Company's web site(s) in keywords, domain names or URLs, (2) shall not purchase or obtain

- 6 -

advertisement-related keywords that contain, in whole or part, the Publicity Rights, and (3) shall not create or maintain any link between the Company's web site and any other web site at any time created, maintained or operated by any Sears Entity unless expressly agreed in writing, after July 1, 2001. Nothing in this Agreement shall be construed as prohibiting or limiting any rights the Company may have under applicable laws of "fair use."

(b)    Indemnification. The Company shall defend, indemnify and hold harmless BDS and his respective heirs, successors and assigns from all losses, costs, liabilities, damages, claims, and expenses of every kind and description, including reasonable attorneys' fees and expenses, arising out of or resulting from any act or omission of the Company or any of its affiliates relating to the Company's use of the Publicity Rights pursuant to Section 5(a), including, without limitation, (i) unfair or fraudulent advertising claims, warranty claims and product defect or liability claims pertaining to the Company's products, and (ii) claims for unauthorized use or misuse of any patent, trademark, copyright, or other proprietary right owned, used or controlled by any third party pertaining to the production, packaging, distribution, licensing, marketing or sale of the Company's products but excluding any such losses, costs, liabilities, damages, claims, and expenses relating to a claim that BDS lacks the requisite rights and authority to grant the licenses set forth in Section 5(a) or that on or before the Closing Date, BDS had transferred or had granted exclusive rights to use the Publicity Rights to any third party.

6.    TERMINATION OF AGREEMENTS.

(a)    Termination of 1996 Agreement. As of the Closing, the 1996 Agreement is hereby terminated in its entirety and shall be of no further force and effect hereafter, and all rights, covenants, obligations, and liabilities of any party and of any nature whatsoever pursuant to the 1996 Agreement are hereby terminated and the respective parties thereto shall have no future, and irrevocably waive all past obligations and liabilities thereunder.

(b)    Termination of BDS Employment Agreements. The Parties hereby acknowledge and agree that the BDS Employment Agreement and any other employment agreements, understandings or arrangements by and between the Company and BDS terminated as of December 31, 1998 and have no further force and effect thereafter. All other rights, covenants, obligations, and liabilities of any party and of any nature whatsoever pursuant to the foregoing agreements, understandings or arrangements are hereby terminated. The respective parties to such agreements, understandings or arrangements irrevocably waive all obligations and liabilities thereunder. The Parties hereby acknowledge and agree that BDS's office as President of the Company and any other offices that he may have held with the Company or its subsidiaries terminated as of December 31, 1998.

(c)    Termination of DS Employment Agreements. The Parties hereby acknowledge and agree that all employment agreements, understandings or arrangements by and between the Company and DS terminated as of December 31, 1998 and have no further force and effect thereafter. All other rights, covenants, obligations, and liabilities of any party and of

- 7 -

any nature whatsoever pursuant to the foregoing agreements, understandings or arrangements are hereby terminated. The respective parties to such agreements, understandings or arrangements irrevocably waive all obligations and liabilities thereunder. The Parties hereby acknowledge and agree that any offices that DS may have held with the Company or its subsidiaries terminated as of December 31, 1998.

7.    ENVION LAWSUIT. Notwithstanding anything herein to the contrary, as of the Closing, the Company shall continue to have no further obligations to BDS or the other Selling Shareholders with respect to the Envion Lawsuit and the Selling Shareholders shall be solely responsible for all costs and expenses (including, without limitation, all attorneys fees and expenses) that the Selling Shareholders may have incurred (that were not previously reimbursed) or may incur hereafter in the prosecution and defense of the Envion Lawsuit. Notwithstanding anything herein to the contrary, the Company shall also not be responsible for any amounts which the Selling Shareholders may have paid or may have to pay hereafter in any judgments or in any settlements relating to the Envion Lawsuit.

8.    NO RESTRICTIONS ON ACTIVITIES.

(a)    No Restrictions on Activities.  Except as expressly provided for herein or required by law, there shall be no restrictions, limitations or prohibitions on the activities of the Selling Shareholders or the Company upon consummation of the Closing.

(b)    Injunctive Relief.  The Company acknowledges and agrees that breach of its obligations under this Agreement could result in immediate irreparable injury to the Selling Shareholders.  In the event of a breach or threatened breach of its obligations under this Agreement by the Company or its employees, agents or other representatives, the Selling Shareholders shall be entitled to seek from any court of competent jurisdiction, specific enforcement of such obligations and/or preliminary and permanent injunctive relief, including, but not limited to, temporary restraining orders, which remedy shall be cumulative and in addition to any other rights and remedies to which the Selling Shareholders may be entitled. Each Selling Shareholder acknowledges and agrees that breach of his/its obligations under this Agreement could result in immediate irreparable injury to the Company.  In the event of a breach or threatened breach of his/its obligations under this Agreement by a Selling Shareholder or its employees, agents or other representatives, the Company shall be entitled to seek from any court of competent jurisdiction, specific enforcement of such obligations and/or preliminary and permanent injunctive relief, including, but not limited to, temporary restraining orders, which remedy shall be cumulative and in addition to any other rights and remedies to which the Company may be entitled.

9.    COMPANY REPRESENTATIONS AND WARRANTIES.

The Company hereby represents and warrants to each Selling Shareholder as follows:

- 8 -

(a)    Corporate Existence and Authority. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation. The Company has, and on the Closing Date will have, full legal right, power and authority to enter into and perform its obligations under this Agreement, this Agreement has been duly authorized, executed, and delivered by the Company, and this Agreement is the valid and binding agreement of the Company enforceable against the Company in accordance with its terms. Schedule 1 sets forth a true and complete list of all holders (and their respective holdings) of the Company's outstanding capital stock.

(b)    Non-Contravention. The execution, delivery and performance by the Company of this Agreement does not and will not (i) contravene or conflict with the corporate charter or bylaws of the Company, (ii) to the knowledge of the Company, contravene or conflict with or constitute a violation of any provision of any law, regulation, judgment, injunction, order or decree binding upon or applicable to the Company, (iii) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Company or to a loss of any benefit relating to the Retransferred Assets to which the Company is entitled under any provision of any agreement, contract or other instrument binding upon the Company or by which any of the Retransferred Assets is or may be bound, or any law, administrative regulation or ruling or court decree applicable to the Company or any of the Retransferred Assets, or (iv) result in the creation or imposition of any Lien on any Retransferred Asset.

(c)    Required Consents. There are no contracts or other instruments binding upon the Company or any law, administrative regulation or ruling or court decree applicable to the Company or any of the Retransferred Assets requiring a consent as a result of the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)    Claims and Litigation. Except for the Envion Lawsuit, there is no action, suit, or proceeding pending and, to the knowledge of the Company, there is no investigation pending, and no action, suit or proceeding threatened against or affecting the Company before any court or arbitrator or any governmental body, agency or official that relates to any Retransferred Asset, or that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby.

10.    SELLING SHAREHOLDERS REPRESENTATIONS AND WARRANTIES.

Each of the Selling Shareholders, severally but not jointly, represents and warrants to the Company as follows:

(a)    Ownership of Shares. Such Selling Shareholder is the lawful owner of the Common Stock as set forth on Schedule 1 which represents all of the capital stock of the Company owned by such Selling Shareholder. Such Selling Shareholder has good and

valid title to such Common Stock, free of all restrictions on transfer, liens, encumbrances, security interests and claims whatsoever. The Common Stock to be sold pursuant to this Agreement by such Selling Shareholder is registered in the name of such Selling Shareholder.

(b)     Authorization; Due Execution. Such Selling Shareholders has, and on the Closing Date will have, full legal right, power and authority to enter into and perform this Agreement and to exchange, sell and deliver the shares of his or its Common Stock to the Company, and this Agreement has been duly authorized, executed, and delivered by such Selling Shareholder, and this Agreement is the valid and binding agreement of such Selling Shareholder enforceable against such Selling Shareholder in accordance with its terms.

(c)     Consents; Conflicts. The execution, delivery and performance of this Agreement by such Selling Shareholder and the consummation of the transactions contemplated hereby will not require such Selling Shareholder to obtain any consent, approval, authorization or other order of, or to make any filing, declaration or registration with, any court, regulatory body, administrative agency or other governmental body, or conflict with or constitute a breach or default (with or without notice or lapse of the time or both) under any agreement, indenture or other instrument to which such Selling Shareholder is a party or by which such Selling Shareholder or property of such Selling Shareholder is bound, or to the knowledge of such Selling Shareholder, violate or conflict with any laws, administrative regulation or ruling or court decree applicable to such Selling Shareholder or property of such Selling Shareholder.

11.     WARRANTY DISCLAIMERS. EXCEPT FOR THE EXPRESS WARRANTIES AND REPRESENTATIONS OF THE PARTIES CONTAINED IN THIS AGREEMENT ABOVE, NONE OF THE PARTIES MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THOSE OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT TO ANY OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR AS TO OR IN CONNECTION WITH ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE COMPANY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE TRADEMARK SOLD, ASSIGNED AND TRANSFERRED BY THE COMPANY PURSUANT TO SECTION 4(a) OR LICENSED BY THE COMPANY PURSUANT TO SECTIONS 4(b) AND 4(c) , INCLUDING, WITHOUT LIMITATION, ANY IMPLIED REPRESENTATIONS OR WARRANTIES AS TO TITLE, VALIDITY OR NONINFRINGEMENT.

12.     NO CONSEQUENTIAL DAMAGES. EXCEPT FOR LOSSES OR DAMAGES ARISING OUT OF OR RESULTING FROM SUCH PARTY'S WILLFUL MISCONDUCT OR INTENTIONAL ACTS, IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT FOR ANY LOSS OF REVENUE OR PROFIT OR FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, OR OTHER SIMILAR DAMAGES, WHETHER BASED ON TORT (INCLUDING, WITHOUT

LIMITATION, NEGLIGENCE OR STRICT LIABILITY), CONTRACT, OR OTHER LEGAL
OR EQUITABLE GROUNDS, EVEN IF SUCH PARTY HAS BEEN ADVISED OR HAD
REASON TO KNOW OF THE POSSIBILITY OF SUCH DAMAGES.

13.    CLOSING.  The closing shall take place at the offices of the Company,
120 Boylston Street, Suite 800, Boston, Massachusetts 02116, at 10:00 a.m., Boston time, on
October 17, 2001.

14.    CLOSING CONDITIONS.

(a)    Closing Documents from the Company.  The Selling Shareholders
shall have received such closing documents as they may reasonably request, all in form and
substance reasonably satisfactory to the Selling Shareholders, including, without limitation, the
assignment documents for the Assigned Registration and any other patents, trademark
registrations or applications, or other intellectual property assets sold, assigned or transferred to
BDS under this Agreement.

(b)    Closing Documents from the Selling Shareholders.  The Company
shall have received such closing documents as it may reasonably request, all in form and
substance reasonably satisfactory to the Company.

(c)    Financial Reports.  The Company shall provide the Selling
Shareholders with an unaudited, consolidated balance sheet of the Company as of December 31,
2000, and an unaudited statement of operations, cash flows and stockholders' equity for the
twelve-month period ended December 31, 2000.  In addition, although not a condition of
Closing, Company shall provide the Selling Shareholders with an interim unaudited,
consolidated balance sheet of the Company as of April 30, 2001, and an interim unaudited
statement of operations, cash flows and stockholders' equity for the six-month period ending
April 30, 2001 as soon as such financial statements are available.

15.    CONFIDENTIALITY.  Each Party other than BDS, DS, STI or BDS,
Inc. shall hold and shall use his or its reasonable efforts to cause his or its respective officers,
directors, employees, accountants, counsel, consultants, advisors and agents to hold, in
confidence, unless compelled to disclose by judicial or administrative process or by other
requirements of law or in connection with disclosure appropriate in future business transactions
with third parties, all proprietary confidential information of any other Party included in the
Retransferred Assets, provided that such Parties may disclose such information to his or its
officers, directors, employees, accountants, counsel, consultants, advisors and agents so long as
such persons are informed of the confidential nature of such information and are directed to treat
such information confidentially.  Each of BDS, DS, STI or BDS, Inc. shall hold and shall use his
or its reasonable efforts to cause his or its respective officers, directors, employees, accountants,
counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by
judicial or administrative process or by other requirements of law or in connection with
disclosure appropriate in future business transactions with third parties, all proprietary

- 11 -

confidential information of any other Party included in the Retained Assets, provided that BDS, DS, STI or BDS, Inc. may disclose such information to his or its officers, directors, employees, accountants, counsel, consultants, advisors and agents so long as such persons are informed of the confidential nature of such information and are directed to treat such information confidentially. The obligation of the Parties to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information.

16.    RELEASES

(a)    Except for claims, causes of action, demands, damages, costs, attorneys' fees, expenses or compensation in respect of which (i) a Selling Shareholder is entitled to indemnification under (A) the Company's corporate charter or bylaws, or (B) Section 5(b) above or (ii) BDS is required by any publisher of the Books or any other works authored by or for BDS through the date hereof to prosecute, pursue or join for alleged infringement by the Company, each Selling Shareholder hereby does for himself or itself, and his or its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, irrevocably release and discharge the Company and its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, and all persons, corporations or other entities that might be claimed to be jointly or severally liable with the Company, from any claim, cause of action, demand, suit, damage, cost, attorneys' fees, expenses, agreement, and compensation, in law or in equity, which have been asserted or could be asserted in connection with or arising from (a) the 1996 Agreement or any other agreements or understandings between the Company and such Selling Shareholder (whether oral or written), (b) the employment of BDS or DS by the Company and the termination of any such employment relationship, (c) any alleged breach of any fiduciary or other duties owed to such Selling Shareholder by virtue of his or its role as a director of the Company and/or his or its ownership of the Common Stock or any other debt or equity interest in the Company (other than the Notes to be issued hereunder), including, without limitation, any claims in connection with or arising from the Notice of Action by Less than Unanimous Written Consent of Stockholders, dated April 24, 2000, and any claims asserted or alleged in the letter from Testa, Hurwitz & Thibeault, LLP, dated May 22, 2000 and July 6, 2000, (d) any alleged misuse or inappropriate use by the Company of the Assets through the date hereof, (e) any alleged mislabeling of Company's products and/or the failure of such products to conform with or to the Zone Diet through the date hereof, (f) the Company's registration or use of any trademarks through the date hereof, (g) any alleged infringement by the Company of any copyrights in the Books or in any other works authored by or for such Selling Shareholder through the date hereof, and (h) rights to be reimbursed for damages and legal fees incurred in connection with the Envion Lawsuit (except to the extent previously reimbursed), including any claims asserted in the letter from Donnelly, Conroy & Gelhar, LLP, dated September 26, 2000, and the letter from Todd & Weld LLP, dated November 13, 2000.

(b)    The Company hereby does for itself, and its officers, directors, shareholders, employees, affiliates, attorneys, agents, and representatives, irrevocably release and discharge each Selling Shareholder and his or its officers, directors, shareholders,

- 12 -

employees, affiliates, attorneys, agents, and representatives, and all persons, corporations or other entities that might be claimed to be jointly or severally liable with such Selling Shareholder, from any claim, cause of action, demand, suit, damage, cost, attorneys' fees, expenses, agreement, and compensation, in law or in equity, which have been asserted or could be asserted in connection with or arising from (a) the 1996 Agreement or any other agreements or understandings between the Company and such Selling Shareholder (whether oral or written), (b) the employment of such Selling Shareholder by the Company and the termination of any such employment relationship, (c) any alleged breach of any fiduciary or other duties owed to the Company or its shareholders by virtue of such Selling Shareholder's role as a director or officer of the Company and/or such Selling Shareholder's ownership of the Common Stock or any other debt or equity interest in the Company, and (d) any alleged misuse or inappropriate use by such Selling Shareholder of the Company's assets through the date hereof, (e) any alleged mislabeling of Company's products and/or the failure of such products to conform with or to the Zone Diet through the date hereof, (f) the Company's registration or use of any trademarks through the date hereof.

17.    MISCELLANEOUS.

(a)    Notices. All notices, requests and other communications to either party hereunder shall be in writing (including telex, telecopy or similar writing) and shall be given to the Parties as follows:

If to the Company, to:

Christopher P. Baker
Chief Executive Officer
ZonePerfect Nutrition Company
120 Boylston Street, Suite 800
Boston, Massachusetts 02116
Fax: (617) 423-2127

If to BDS, to:

Barry D. Sears
42 Stanwood Road
Swampscott, MA 01907
Fax: (781) 639-8154

If to STI, to:

Surfactant Technologies, Inc.
c/o Barry D. Sears
42 Stanwood Road

- 13 -

Swampscott, MA 01907
Fax: (781) 639-8154

If to DS, to:

Douglas Sears
11 Maple Circle
Marblehead, Massachusetts 01945
Fax: (781) 639-8154

If to HPH, to:

Harry P. Haveles
15 Evans Road
Brookline, Massachusetts 02146
Fax: (617) 227-0930

If to Baker, to:

Christopher P. Baker
C.P. Baker & Co.
120 Boylston Street, Suite 800
Boston, Massachusetts 02116
Fax: (617) 423-2127

If to Chud, to:

Laurence S. Chud
86 Waban Hill Road
Chestnut Hill, Massachusetts 02467
Fax: (617) 630-4461

If to Anasazi, to:

Anasazi Partners
120 Boylston Street, Suite 800
Boston, Massachusetts 02116
Fax: (617) 423-2127

If to Lampe, to:

Steven G. Lampe
40 East 88th Street
Suite 10F

- 14 -

New York, New York 10128
Fax: (212) 581-8999

All such notices shall be deemed to have been duly given: (i) if delivered by hand, upon delivery, (ii) if mailed with postage prepaid, five (5) business days after being deposited in the mail, (iii) if telecopied, when receipt is acknowledged, provided a confirmation copy is also sent by registered or certified mail or air courier, or (iv) if sent by a reputable air courier service guaranteeing overnight delivery, the next business day after deposit with such service.

(b)    Entire Agreement. This Agreement (including all Schedules and Exhibits) constitutes the entire agreement between or among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, both written and oral, between the Parties with respect to the subject matter of this Agreement. No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by any Party hereto. Except as expressly provided for herein, no provision in this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

(c)    Amendments  Any provisions of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(d)    No Waivers/Cumulative Remedies. No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(e)    Expenses. Except as otherwise may be provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

(f)    Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors in interest and assigns. Notwithstanding anything herein to the contrary, the Company shall have the right freely to assign the rights retained under Section 2(b) in the event of a Change of Control.

(g)    Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and shall be enforced to the greatest extent permitted by law.

- 15 -

      (h)    Governing Law. This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without regard to the conflicts of law rules of such state or any other state. Each Party hereby consents to the exclusive jurisdiction of the state courts of Commonwealth of Massachusetts and the federal courts located in that state with respect to any dispute which may arise with respect to this Agreement and hereby waives any defense based on personal jurisdiction, improper venue, forum non conveniens or similar defense. Each Party agrees to accept service of process by certified mail with respect to any such dispute.

      (i)    Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

      (j)    Captions. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

      (k)    Other. The Parties hereby acknowledge and agree that (i) BDS, Inc. was not organized as of the date of the execution and delivery of the 1996 Agreement or any date or time thereafter, and (ii) BDS, Inc. has been made a party to this Agreement for the purposes of completeness.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 16 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ZONEPERFECT NUTRITION COMPANY

By:

Christopher P. Baker
Chief Executive Officer

SURFACTANT TECHNOLOGIES, INC.

By:
Barry D. Sears
President

Barry D. Sears

Douglas Sears

Christopher P. Baker

Harry P. Haveles

Laurence S. Chud

Steven G. Lampe

- 17 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ZONEPERFECT NUTRITION COMPANY

By:_____
Christopher P. Baker
Chief Executive Officer

SURFACTANT TECHNOLOGIES, INC.

By:_____
Barry D. Sears
President

_____
Barry D. Sears

_____
Douglas Sears

_____
Christopher P. Baker

_____
Harry P. Haveles

_____
Laurence S. Chud

_____
Steven G. Lampe

777134.1.01 10/09/01 5:07 PM

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the day and year first above written.

                                ZONEPERFECT NUTRITION COMPANY


                                By:_____
                                Christopher P. Baker
                                Chief Executive Officer

                                SURFACTANT TECHNOLOGIES, INC.


                                By:_____
                                Barry D. Sears
                                President


                                _____

                                Barry D. Sears


                                _____

                                Douglas Sears


                                _____

                                Christopher P. Baker

                                _____

                                Harry P. Haveles


                                _____

                                Laurence S. Chud


                                _____

                                Steven G. Lampe




                                - 17 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ZONEPERFECT NUTRITION COMPANY

By:_____
Christopher P. Baker
Chief Executive Officer

SURFACTANT TECHNOLOGIES, INC.

By:_____
Barry D. Sears
President

_____

Barry D. Sears

_____

Douglas Sears

_____

Christopher P. Baker

_____

Harry P. Hayeles

_____

Laurence S. Chud

_____

Steven G. Lampe

777134.1.01 10/16/01 6:10 PM

MAR 01 2004   2:38 PM FR DECHERT LLP 36     2159942222 TO 916146243074     P.22
Oct 15 01 09:09p                                                           p.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the day and year first above written.

ZONEPERFECT NUTRITION COMPANY

By: _____
Christopher P. Baker
Chief Executive Officer

SURFACTANT TECHNOLOGIES, INC.

By: _____
Barry D. Sears
President

_____
Barry D. Sears

_____
Douglas Sears

_____
Christopher P. Baker

_____
Harry P. Haveles

_____
Laurence S. Chud

_____
Steven G. Lampe

- 17 -

ANASAZI PARTNERS

By C.P. BAKER, INC.
General Partner

By: _____
Christopher P. Baker

- 18 -

Schedule 1

## Common Stock of ZonePerfect Nutrition Company
### as of October    , 2001

|  | Shares of Class A Common Stock |
|---|---|
| Investor |  |
| Barry D. Sears | 385 |
| Douglas Sears | 205 |
| Surfactant Technologies, Inc. | 130 |
| Christopher P. Baker | 260 |
| CP Baker & Company | 17 |
| Harry P. Haveles | 30 |
| Anasazi Partners | 948 |
| Laurence S. Chud | 80 |
| Steve Lampe | 45 |
| TOTAL SHARES | 2100 |

2041955v2

Schedule 2

## Additional Retained Assets

1.    All rights in and to any works of authorship created by or for the Company by either BDS or DS in the scope of his employment by the Company during the Designated Period. The Parties acknowledge and agree that such works of authorship do not include the Books and, further, do not include any other additional works other than such other additional works authored or co-authored by BDS during the Designated Period that were created specifically for the Company within the scope of BDS's employment.

2.    All rights in and to any royalties generated from the sale of (a) the Eicotec Nutrition Bar and all similar bars, (b) the Eicozone Nutrition Bar and all similar bars, (c) the Biozone Nutrition Bar and all similar bars, (d) the Eicopro product and all similar products, and (e) the Eicoderm and all similar products received or earned by the Company for sales of such products during the period from September 19, 1996 through the Closing Date.

3.    All rights of BDS or STI in and to royalties received or earned during the period from September 19, 1996 through the Closing Date and attributable to the product called the Zone Calculator endorsed by BDS

4.    All rights of BDS or STI in and to any computer software created or developed by BDS or STI for the Company during the Designated Period.

5.    All rights of any of the Selling Shareholders in and to any products (other than Skin Assets) created by or for the Company by any of the Selling Shareholders during the Designated Period (including, without limitation, any such products created or developed for the Company by either BDS or DS in the scope of his employment by the Company during the Designated Period), including, without limitation, any nutrition bars that are based upon or otherwise similar to the product formulations or other know-how related to the Eicotec Nutrition Bar, the Eicozone Nutrition Bar and the Biozone Nutrition Bar.

6.    Anything in Sections 1, 4 or 5 of this Schedule 2 to the contrary notwithstanding, in no event shall the Company retain or obtain any right, title or interest, pursuant to Section 2(c) of the Agreement and this Schedule 2, in and to any of the Assets (except the Retained Assets specified in Section 2(c)(ii) of the Agreement), the Other Sears Assets, the Skin Assets or in and to any of the materials delivered by BDS and accepted by the Company as of the date hereof, which materials consist of (a) 175 pages of PowerPoint slides or similar presentation materials, and (b) 183 pages of various columns, responses and answers posted on the web site at drsears.com.

- 20 -

Schedule 3

## Assigned Registration

| Mark | Country | Registration Number |
|------|---------|---------------------|
| ZONE DIET | Japan | 4160723 |

Schedule 4

**Design Element**

[see attached]

- 22 -



Exhibit A

### Form of Notes

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR STATE SECURITIES LAWS OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION IS NOT REQUIRED.
PAYMENTS UNDER THIS NOTE ARE SUBJECT TO THE SUBORDINATION PROVISIONS HEREOF.

### ZONEPERFECT NUTRITION COMPANY

### 6% SUBORDINATED NOTE DUE MARCH 31, 2004

$_____                                                    October __, 2001

        ZonePerfect Nutrition Company, a Delaware corporation (the "Company," which term includes any successor corporation or other successor business entity), for value received, hereby promises to pay to the order of _____ ("Holder"), the principal sum of _____ ($_____) as reduced by payment of principal pursuant to Section 1 hereof, on the Maturity Date (as defined below), together with interest on the unpaid balance of the principal amount of this Note at the rate of six percent (6%) per annum, interest to be payable in the manner and at times provided herein. The maturity date under this Note shall be the earlier of (i) of March 31, 2004 or (ii) the date this Note becomes due and payable by reason of acceleration under Section 7(b) below (such earlier date hereinafter called the "Maturity Date").

        This Note is one of the 6% Subordinated Notes (the "Subordinated Notes") issued pursuant to the Agreement, dated as of October __, 2001 (as it may be amended from time to time, the "Agreement") by and among the Company, the Holder and the other parties thereto.

        1.    Monthly Payment of Principal and Interest.    Principal and interest on this Note will be paid in 28 equal monthly installments of $_____ each, commencing on November 15, 2001 and continuing on the fifteenth day of each consecutive month thereafter (each such date of payment being a "Payment Date") with a final payment of all unpaid principal and interest to be made on the Maturity Date. Each payment shall be applied first to accrued and unpaid interest and then to principal. Interest on this Note will accrue from the most recent date to which interest has been last paid, or if no interest has been paid, from the issuance date hereof. Interest will be computed on the basis of a 360-day year for the actual days elapsed. If a Payment Date is a Saturday, a Sunday or a legal holiday at a place of payment, payment may be made at that place on the next succeeding business day that is not a Saturday, Sunday or a legal holiday, and no interest on the amount payable shall accrue for the intervening period.

        2.    Prepayment.    This Note may be prepaid at any time in whole or in part without premium or penalty. Any prepayment of principal shall be accompanied by a payment of accrued interest in respect of the principal being prepaid.

- 23 -

       3.     Repayment/Acceleration. The principal of this Note, together with accrued but unpaid interest thereon, shall be immediately due and payable and shall be repaid in full upon the earliest occurrence of either of the following events:

(i)     the Maturity Date; or

(ii)    a Change of Control.

       For purposes of this Note, a "Change of Control" has the meaning set forth in the Agreement.

       4.     Method of Payment.

       The Company will pay principal and interest in currency of the United States that at the time of payments is legal tender for payment of public and private debts. Payments shall be made to Holder by delivering a check at Holder's address listed on the books of the Company or to such other address designated in writing to Holder and provided to the Company at least ten (10) business days before any Payment Date. If principal, interest or both on this Note is not paid in accordance with its terms, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of the principal and accrued interest, including, but not limited to, reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note. Upon and following any Event of Default (as defined below) which is continuing, the interest accruing on this Note shall automatically increase from 6% to the lesser of (i) the greater of (A) 12% or (B) two percent in excess of the prime rate as set forth from time to time in The Wall Street Journal or (ii) the highest interest rate lawful under applicable usury law.

       5.     Representations and Warranties.

       The Company hereby represents to the Holder that (i) the Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware, (ii) the Company has all requisite power and authority to execute and deliver this Note and to carry out the terms hereof, (iii) the Company has duly authorized the execution, delivery and performance of the Note, (iv) the execution, delivery and performance of this Note do not (a) violate any provision of the certificate of incorporation or bylaws of the Company, or (b) violate any statute, rule or regulation of any governmental authority to which the Company is subject or any material agreement or instrument to which it is a party, and (v) this Note is a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, moratorium and other laws affecting creditors rights generally and except as may be limited by equitable principles.

       6.     Subordination.

       (a)     Certain Defined Terms. The following terms shall have the following meanings:

       "Indebtedness" means, without duplication, with respect to any person, (1) all indebtedness of such person for borrowed money evidenced by notes, bonds, debentures or other similar instruments, (2) all obligations of such person under acceptance, letter of credit or similar facilities, (3) all Indebtedness of the type referred to in clauses (1) and (2) above guaranteed directly or indirectly in any manner by such person, and (4) all Indebtedness of the type referred to in clauses (1)

- 24 -