through (3) above secured by any lien on property owned by such person, even though such person has not assumed or become liable for the payment of such Indebtedness.

"Notes" means the Subordinated Notes issued by the Company pursuant to the Agreement in an aggregate principal amount of $5,400,000 and any Subordinated Notes issued as provided in the Agreement in replacement thereof, as such Subordinated Notes may be amended from time to time.

"Senior Debt" shall mean the principal of and premium, if any, and interest (including, without limitation, interest accruing or that would have accrued but for the filing of a bankruptcy, reorganization or other insolvency proceeding whether or not such interest constitutes an allowable claim in such proceeding) on, and any and all other fees, expenses, supplemental payments, reimbursement obligations, indemnities, and other amounts owing pursuant to the terms of all agreements, documents and instruments providing for, creating, securing, or evidencing, all Indebtedness of the Company, whether outstanding on the date hereof or thereafter created, incurred or assumed, in each case that are in favor of banks or similar financial institutions, including without limitation all debt payable to First Massachusetts Bank, N.A. and any amendments or refinancings thereof; provided that, the total aggregate principal amount of Senior Debt to which this Note is subordinated shall not exceed the amount equal to (A) $5,000,000 plus (B) up to an additional $7,000,000 incurred by the Company prior to the first anniversary of the Agreement. Notwithstanding the foregoing, Senior Debt shall not include (i) any Indebtedness of the Company to any Subsidiary of the Company, (ii) any Indebtedness of the Company which, by its terms or the terms of any instrument creating or evidencing it is expressly pari passu with or expressly subordinate in right of payment to this Note, (iii) Indebtedness to any employee of the Company, (iv) any liability for taxes, (v) amounts payable to trade creditors for goods and services and (vi) any Indebtedness of the Company which is not secured by liens on any of the property of the Company or its Subsidiaries. This Note is pari passu with the other Notes.

"Subordinated Debt" shall mean all Indebtedness of the Company under this Note, including (a) all principal of, and interest on, this Note and (b) all other indebtedness, fees, expenses, obligations and liabilities of the Company, now existing or hereafter incurred or created, under or pursuant to this Note or otherwise in respect of the Indebtedness evidenced by this Note, in each case, whether such amounts are due or not due, direct or indirect, absolute or contingent.

(b)    Subordination to Senior Debt. The Company, for itself and its successors, and the Holder, by acceptance of this Note, agree that the Subordinated Debt shall, to the extent and in the manner hereinafter set forth, be subordinate and junior to the prior payment in full of all Senior Debt.

This Section 6(b) will constitute a continuing offer to all persons who, in reliance upon its provisions, become holders of, or continue to hold, Senior Debt, and such provisions are made for the benefit of the holders of Senior Debt, and such holders are made obligees under this Section and they and/or each of them may enforce its provisions.

(c)    Company Not to Make Payments with Respect to Subordinated Debt and Other Provisions.

(i)    Unless and until all Senior Debt shall have been paid in full in cash, and all legally enforceable commitments to make loans of Senior Debt to the Company shall have terminated, no payment shall be made by or on behalf of the Company on or with respect to any Subordinated Debt, except (A) payment of regular monthly payments of interest and principal on the

- 25 -

Subordinated Debt when due and (B) payment of the principal amount of the Subordinated Debt and all accrued interest on the Maturity Date or a Change of Control; provided however that if (x) an event of default has occurred and is continuing under the terms of any Senior Debt, and notice in writing of which has been provided to the Holders or (y) such payment pursuant to (A) or (B) will give rise to an event of default under the terms of any Senior Debt and notice in writing of which has been provided to the Holders, then during the continuance of such default for a period of up to 180 consecutive days and thereafter if judicial proceedings shall have been instituted by the Senior Debt during such up to 180 consecutive day period with respect to such event of default and for so long as such judicial proceedings shall be continuing, or (if a shorter period) until such payment has been made or such event of default has been cured or waived in writing by such holder of Senior Debt, then and during the continuance of such event of default no payment of principal or interest on this Note shall be made by the Company or accepted by any holder of this Note who has received written notice from the Company or from a holder of Senior Debt of such event of default.  No such rights to block payment on this Note during such up to 180 consecutive day period shall be available to holders of Senior Debt more than once in any one year period, with each such one year period being deemed to commence on the first day of any such up to 180 consecutive day period.

(ii)    For so long as payment hereunder is prohibited pursuant to Section 6(c)(i) above, the Company shall not make and no holder of any Subordinated Debt shall demand, accept or receive (in cash or property or by set-off, exercise of contractual or statutory rights or otherwise), or shall attempt to collect or commence any legal proceedings to collect, any direct or indirect payment on account of any Subordinated Debt.

(iii)    Unless and until all Senior Debt shall have been paid in full in cash and all legally enforceable commitments to make loans of Senior Debt to the Company shall have terminated, no holder of any Subordinated Debt will commence or maintain any action, suit or any other legal or equitable proceedings against the Company, or join with any creditor in any such proceedings, under any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar law, unless (A) the holders of Senior Debt shall also join in bringing such proceedings, or (B) to the extent required to toll the running of any applicable statute of limitations, provided that this Section 6(c)(iii) shall not prohibit a holder of any Subordinated Debt from filing a proof of claim or otherwise participating in any such proceedings not commenced by it.

(iv)    The Company covenants that no Change of Control of the Company shall occur without the prior written consent of the holders of a majority of the then outstanding principal amount of the Notes (the "Majority Holders") unless all the then outstanding principal amount and accrued interest under the Notes are paid in full on or before such Change of Control.

(d)    Notes Subordinated to Prior Payment of all Senior Debt on Dissolution, Liquidation or Reorganization of Company.  In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to the Company or to substantially all of its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of the Company, whether or not involving insolvency or bankruptcy, then:

(i)    the holders of all Senior Debt shall first be entitled to receive payment in full in cash of the principal thereon, premium, if any, interest and all other amounts payable thereon (accruing before and after the commencement of the proceedings, whether or not allowed or

allowable as a claim in such proceedings) before the holders of any Subordinated Debt are entitled to receive any payment on account of the principal of, or interest on any Subordinated Debt;

(ii)    any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities to which the holders of any Subordinated Debt would be entitled, but for the provisions of this Note, shall be paid or distributed by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the holders of Senior Debt or any representative on behalf of the holders of Senior Debt, to the extent necessary to make payment in full in cash of Senior Debt remaining unpaid;

(iii)    the holders of all Subordinated Debt at the time outstanding irrevocably authorize and empower (without imposing any obligation on) each holder of Senior Debt at the time outstanding, and any representative on behalf of the holders of Senior Debt to demand, sue for, collect and receive such holders' ratable share of all such payments and distributions in respect of all Subordinated Debt and to give receipt therefor, and to file and prove all claims therefor and take all such other action not inconsistent with the foregoing (including the right to vote such Senior Debt holder's ratable share of the Subordinated Debt) in the name of the holders of Subordinated Debt or otherwise, as such holder of Senior Debt, or any representative on behalf of the holders of Senior Debt may determine to be necessary or appropriate for the enforcement of this Note; and

(iv)    the holders of Subordinated Debt shall execute and deliver to the holders of Senior Debt all such further instruments confirming the above authorization, and all such powers of attorney, proofs of claim, assignments of claim and other instruments, and shall take all such other action as may be requested by any holder of Senior Debt, in order to enable such holder to enforce all claims upon or in respect of each holder's ratable share of the Subordinated Debt.

(e)    Rights of Holders of Senior Debt; Subrogation.

(i)    Should any payment or distribution or security or the proceeds of any thereof be collected or received by any holder of Subordinated Debt in respect of any Subordinated Debt at a time when such payment or distribution should not have been so made or received because of the provisions of this Section 6, such holder of Subordinated Debt will forthwith deliver the same to the holders of Senior Debt for the equal and ratable benefit of the holders of the Senior Debt in precisely the form received (except for the endorsement or the assignment of or by such holder where necessary) for application to payment of all Senior Debt in full, after giving effect to any concurrent payment or distribution to the holders of Senior Debt and, until so delivered, the same shall be held in trust by such holder as the property of the holders of the Senior Debt.

(ii)    Upon the payment in full in cash of all Senior Debt, the holder of Subordinated Debt will be subrogated to the rights of the holders of Senior Debt to receive payments or distributions of assets of the Company applicable to the Senior Debt until all amounts owing on the Subordinated Debt have been paid in full, and for the purpose of such subrogation no such payments or distributions to the holders of Senior Debt by or on behalf of the Company or by or on behalf of the holders of Subordinated Debt by virtue of this Section 6 which otherwise would have been made to the holders of Subordinated Debt will, as between the Company and the holders of Subordinated Debt be deemed to be payment by the Company to or on account of the Senior Debt, it being understood that the provisions of this Section 6 are and are intended to be solely for the purpose of defining the relative rights of the holder of Subordinated Debt on the one hand, and holders of Senior Debt, on the other hand.

- 27 -

(f)    Subordination Rights Not Impaired by Acts or Omissions of the Company or Holders of Senior Debt.  No right of any present or future holders of any Senior Debt to enforce subordination as provided herein will at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, and absent gross negligence or willful misconduct by any such holder, or by any noncompliance by the Company with the terms of this Note regardless of any knowledge thereof which any such holder may have or otherwise be charged with.  The holders of Senior Debt may extend, renew, increase, modify or amend the terms of the Senior Debt or any security therefor and release, sell or exchange such security and otherwise deal freely with the Company; provided, however, that no such extension, renewal, increase, modification or amendment shall relieve the Company of its obligations to pay principal and interest as provided herein or alter the $12,000,000 limitation as more fully provided under the definition of "Senior Debt" above.

(g)    Subordination of Junior Debt.  To the extent that the Company incurs any Indebtedness for borrowed money that does not constitute Senior Debt (the "Junior Debt"), such Junior Debt shall be junior and subordinate to any and all rights of the Holders set forth in this Note.

7.    Events of Default.

(a)    An "Event of Default" occurs if:

(i)    the Company defaults in the payment of any principal of or interest on, this Note when the same becomes due and payable on any Change of Control or on the Maturity Date, whether upon acceleration; or otherwise;

(ii)    the Company defaults in the payment of any principal of, or interest on this Note on any Payment Date pursuant to Section 1, and such default continues for more than 10 days;

(iii)    the Company shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against the Company seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and in the case of any such proceeding instituted against the Company such proceeding shall not be stayed or dismissed within sixty (60) days from the date of institution thereof; or

(iv)    the Company fails to observe or perform, in any material respect, any other provision of this Note and such failure continues for a period of twenty days after the Holder has delivered written notice of such default to the Company.

(b)    Acceleration.  If an Event of Default (other than upon a Change of Control or an Event of Default specified in clause (a)(iii) of Section 7) occurs and is continuing, the Majority Holders, by written notice to the Company (an "Acceleration Notice"), may declare the unpaid principal of and accrued interest on this Note to be immediately due and payable.  Upon such declaration, if there is at such time any Senior Debt outstanding, the principal and interest on the Notes shall be due and payable upon the first to occur of an acceleration under the applicable Senior Debt instrument or thirty days after receipt by the holders of the Senior Debt of such Acceleration Notice given hereunder.  For purposes of this Section 7(b), the holders of the Senior Debt shall be deemed to

have received such Acceleration Notice when, in accordance with Section 11, the Company shall have received such Acceleration Notice. If a Change of Control or an Event of Default specified in clause (a)(iii) of Section 7 occurs, all principal of and interest on this Note shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Holder. The Majority Holders by written notice to the Company may rescind an acceleration and its consequences if (i) all existing Events of Default, other than the nonpayment of principal of or interest on this Note which has become due solely because of the acceleration, have been cured or waived and (ii) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction. Any amounts received by Holder in connection with any action taken pursuant to this Section 7(b) shall be subject to the provisions of Section 6.

        (c)    <u>Remedies Cumulative</u>. A delay or omission by the Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All remedies are cumulative to the extent permitted by law.

        8.    <u>Amendment and Waiver</u>.

        (a)    <u>Consent Required</u>. Any term, covenant, agreement or condition of this Note may, with the consent of the Company, be amended or compliance therewith may be waived (either generally or in a particular instance and either retroactively or prospectively), if the Company shall have obtained the consent in writing of the Majority Holders; provided, that no change in principal amount of, interest rate under or amount or due dates of payment due under this Note may be made without the consent in writing of the Holder. So long as there is Senior Debt outstanding, the subordination provisions of this Note may not be amended without the consent in writing of the holders of a majority in principal amount of the Senior Debt.

        (b)    <u>Effect of Amendment or Waiver</u>. Any amendment or waiver shall apply equally to all the holders of the Notes and shall be binding upon such holders, upon each future holder of any Note and upon the Company, whether or not such Notes shall have been marked to indicate such amendment or waiver. No such amendment or waiver shall extend to or affect any obligation not expressly amended or waived or impair any right consequent thereon.

        9.    <u>Replacement Notes</u>.

        If a mutilated Note is surrendered to the Company or if the Holder of this Note presents evidence to the reasonable satisfaction of the Company that this Note has been lost, destroyed or wrongfully taken, the Company shall issue a replacement Note of like tenor. If this Note has been lost, destroyed or wrongfully taken, an indemnity agreement may be required that is sufficient in the reasonable judgment of the Company to protect the Company from any loss which it may suffer. The Company may charge for its out-of-pocket expenses incurred in replacing this Note.

        10.    <u>No Recourse Against Others</u>.

        No director, officer, employee or stockholder, as such, of the Company shall have any liability for any obligations of the Company under this Note.

        11.    <u>Notices</u>.

        All notices, requests, consents and demands shall be made in writing and shall be given by registered or certified mail postage prepaid to the following addresses: if to the Company, to the

address set forth in the Agreement or to such other address as may be furnished in writing to the Holder to the Holder's address set forth in the Agreement or to such other address as may be furnished in writing to the Company. Unless otherwise indicated herein, notices hereunder shall be effective (and deemed to be received) when delivered, if delivered personally, or, if sent by mail, when mailed. The Company hereby expressly waives presentment, demand, and protest, notice of demand, dishonor and nonpayment of this Note, and all other notices or demands of any kind in connection with the delivery, acceptance, performance, default or enforcement hereof, and hereby consents to any delays, extensions of time, renewals, waivers or modifications that may be granted or consented to by the Holder with respect to the time of payment or any other provision thereof.

12.    Governing Law.

This Note shall be deemed a contract under, and shall be governed and construed in accordance with, the laws of the Commonwealth of Massachusetts without giving effect to principles of conflicts of laws.

13.    Successors, etc.; Entire Agreement; Assignment.

This Note shall be binding upon and shall inure to the benefit of the Holder and the Company and their respective successors and assigns. This Note constitutes the entire agreement between the parties, superseding all prior understandings and writings, with respect to the indebtedness represented hereby.

14.    Headings.

The section headings of this Note are for convenience only and shall not affect the meaning or interpretation of this Note or any provision hereof.

IN WITNESS WHEREOF, the Company has caused this Note to be executed by its duly authorized officer.

Dated: October __, 2001

ZONEPERFECT NUTRITION COMPANY

By: _____

    Name:  Christopher P. Baker
    Title:    Chief Executive Officer

Agreed:

_____

_____

Exhibit B

Form of Trademark Assignment

### DEED OF ASSIGNMENT

Effective on _____          Insert date of Assignment.

      15.    The undersigned

ZonePerfect Nutrition Company          Type full name of assignor
(formerly known as "Eicotech Corporation")

      of

120 Boylston Street, Suite 800          Type full address.

        (a)    Boston, Massachusetts 02116

        (b)    USA

assigns all rights to

      Japanese Trademark Registration Nos. 4160723

      to

Barry D. Sears, Ph.D.          Type full name of assignee

      of

        (c)    42 Stanwood Road

Swampscott, Massachusetts 01907          Type full address.

        (d)    USA

Dated this _____ day of _____ 2001    Insert the date.

Signature:_____

Name: Christopher P. Baker

Title: Chief Executive Officer
      ZonePerfect Nutrition Company          Insert representative's
signature. Typewrite full
name and title of signatory
under signature.
(assignor)

## POWER OF ATTORNEY

I/We, the undersigned ___ZonePerfect Nutrition Company_____      Type full name.
                                                                      of assignor

of ___120 Boylston Street, Suite 800, Boston, Massachusetts 02116 USA
              1.                                                       Type full address


do hereby constitute and appoint SHUSAKU YAMAMOTO,
registered patent attorney of Osaka, Japan, my/our lawful attorney,
with full power of substitution and revocation, in respect of Japanese
Trademark Registration Nos. __4160723_____

and receiving letters patent/certificates of registration
therefrom, and, if necessary, requesting examination,
converting the said application into one for patent or utility
model or design registration, demanding a trial against
rejection of the application or against decision of dismissal of
supplement or amendment, lodging an administrative petition
or suit from dissatisfaction with an administrative action, and
of withdrawing or abandoning the application, demand,
administrative petition or suit, and of making or withdrawing a
priority claim under the Japanese Patent Law Sec. 41(1) (Sec.
8(1) of the Japanese Utility Model Law), and of prosecuting
and conducting all other formalities and acts necessary and
proper in the premises under Sec. 8, of the Japanese Patent
Law, (Sec. 2-5 of the Japanese Utility Model Law, Sec. 68 of
the Japanese Design Law, Sec. 77 of the Japanese Trade Mark
Law) before and after completion of patenting or registration,
and of withdrawing a claim for the transitional benefit based
on use, and requesting an opinion as to registrability of utility
model.


Dated this _____ day of _____ 2001      Insert the date.

Signature: _____

Name: _Christopher P. Baker_____

Title: _Chief Executive Officer_____
          _ZonePerfect Nutrition Company_____

                        Insert representative's signature.
                        Typewrite full name and title of signatory
                        under signature.

2041955v2

(assignor)

## POWER OF ATTORNEY

I/We, the undersigned_____ Barry D. Sears, Ph.D._____     Type full name.
                                                                       of assignor
of _42 Stanwood Road, Swampscott, Massachusetts 01907 USA             Type full address

do hereby constitute and appoint SHUSAKU YAMAMOTO,
registered patent attorney of Osaka, Japan, my/our lawful attorney,
with full power of substitution and revocation, in respect of Japanese
Trademark Registration Nos. _4160723_____

and receiving letters patent/certificates of registration
therefrom, and, if necessary, requesting examination,
converting the said application into one for patent or utility
model or design registration, demanding a trial against
rejection of the application or against decision of dismissal of
supplement or amendment, lodging an administrative petition
or suit from dissatisfaction with an administrative action, and
of withdrawing or abandoning the application, demand,
administrative petition or suit, and of making or withdrawing a
priority claim under the Japanese Patent Law Sec. 41(1) (Sec.
8(1) of the Japanese Utility Model Law), and of prosecuting
and conducting all other formalities and acts necessary and
proper in the premises under Sec. 8, of the Japanese Patent
Law, (Sec. 2-5 of the Japanese Utility Model Law, Sec. 68 of
the Japanese Design Law, Sec. 77 of the Japanese Trade Mark
Law) before and after completion of patenting or registration,
and of withdrawing a claim for the transitional benefit based
on use, and requesting an opinion as to registrability of utility
model.

2041955v2

Dated this _____ day of _____ 2001    Insert the date.

Signature:_____

Name: <u>Barry D. Sears, Ph.D.</u> _____

Title:_____

Insert representative's signature.
Typewrite full name and title of signatory
under signature.
(assignee)

- 35 -

EXHIBIT E



## Trademark Electronic Search System(Tess)

*TESS was last updated on Sat May 22 04:40:19 EDT 2004*

PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | BOTTOM | HELP

Logout Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

Check Status *(TARR contains current status, correspondence address and attorney of record for this mark. Use the "Back" button of the Internet Browser to return to TESS)*

**Typed Drawing**

| | |
|---|---|
| **Word Mark** | ZONE |
| **Goods and Services** | IC 016. US 002 005 022 023 029 037 038 050. G & S: Publications, namely a series of books in the field of diet and nutrition. FIRST USE: 19950500. FIRST USE IN COMMERCE: 19950500 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76054646 |
| **Filing Date** | May 22, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | December 3, 2002 |
| **Registration Number** | 2689749 |
| **Registration Date** | February 25, 2003 |
| **Owner** | (REGISTRANT) Sears, Barry D. INDIVIDUAL UNITED STATES 21 Tioga Way Marblehead MASSACHUSETTS 01945 |
| **Attorney of Record** | JENNIFER K LAWSON |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | TOP | HELP |

**HOME | INDEX | SEARCH | SYSTEM ALERTS | BUSINESS CENTER | NEWS&NOTICES | CONTACT US | PRIVACY STATEMENT**



UNITED STATES PATENT AND TRADEMARK OFFICE

| Home | Index | Search | System Alerts | eBusiness Center | News & Notices | Contact Us |

## Trademark Electronic Search System(Tess)

*TESS was last updated on Sat May 22 04:40:19 EDT 2004*

| PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

Check Status  *(TARR contains current status, correspondence address and attorney of record for this mark. Use the "Back" button of the Internet Browser to return to TESS)*

**Typed Drawing**

| | |
|---|---|
| **Word Mark** | ZONE |
| **Goods and Services** | (CANCELLED) IC 016. US 002 005 022 023 029 037 038 050. G & S: Series of books in the field of diet and nutrition. FIRST USE: 19950500. FIRST USE IN COMMERCE: 19950500 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 75593048 |
| **Filing Date** | November 20, 1998 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 14, 1999 |
| **Registration Number** | 2298235 |
| **Registration Date** | December 7, 1999 |
| **Owner** | (REGISTRANT) EICOTECH CORPORATION CORPORATION DELAWARE 120 Boylston Street, Suite 800 Boston MASSACHUSETTS 02116 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | GLENN A GUNDERSEN |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |

| **Live/Dead Indicator** | DEAD |
|---|---|
| **Cancellation Date** | March 30, 2002 |

PTO HOME | TRADEMARK | TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | TOP | HELP

**HOME | INDEX | SEARCH | SYSTEM ALERTS | BUSINESS CENTER | NEWS&NOTICES | CONTACT US | PRIVACY STATEMENT**

.

EXHIBIT F



INGREDIENTS: SOY PROTEIN NUGGETS (ISOLATED SOY PROTEIN, RICE FLOUR, MALT, SALT), CORN SYRUP, SEMISWEET CHOCOLATE COATING (SUGAR, PALM KERNEL OILS, COCOA (COCOA, POTASSIUM CARBONATE), NONFAT MILK, SORBITAN MONOSTEARATE AND LECITHIN (EMULSIFIERS), AND VANILLA), SODIUM CASEINATE, COCOA BUTTER, PALM KERNEL OIL, NATURAL FLAVOR, FRUCTOSE, RASPBERRY FLAKES, LESS THAN 2% OF THE FOLLOWING: FIG PASTE, DATE PASTE, PRUNE BITS, SUNFLOWER OIL, BEET JUICE, OAT FIBER, GELLAN GUM, APPLE BITS, TOASTED BARLEY FLAKES, TOASTED ATS, CRISP BROWN RICE, GUM ARABIC, CITRIC ACID, GUAR GUM, GLYCERIN, SOY LECITHIN, ASCORBIC ACID, MAGNESIUM OXIDE, ASCORBYL PALMITATE, D-ALPH, TOCOPHERYL ACETATE, MALT EXTRACT, SALT, VANILLA, NIACINAMIDE, ZINC OXIDE, FISH OIL, PYRIDOXINE HYDROCHLORIDOE, CALCIUM PANTOTHENATE, RIBOFL IN, VITAMIN A PALMITATE, THIAMIN MONONITRATE, CHROMIUM CHLORIDE, FOLIC ACID, SODIUM SELENITE, SODIUM MOLYBDATE, BIOTIN, CYANOBALAHIN. MAY CONTAIN TRACES OF PEANUTS.

*The ZonePerfect® Nutrition Bars are an easy, convenient, and nutritious way to eat right when you're "on the go". These great tasting bars are made with our special formula of protein, carbohydrate and dietary fat, which makes them a reliable energy snack. For information or assistance with the ZonePerfect Nutrition Program™ call 1-800-666-6830 or visit www.zoneperfect.com*



Contains 3mg of OMEGA 3

ZonePerfect®

ALL NATURAL
NUTRITION BAR

with 14g PROTEIN

NET WT. 50g (1.76 oz)

CHOCOLATE RASPBERRY

| Nutrition Facts | Amount Per Serving | % Daily Value* | | Amount Per Serving | % Daily Value* |
|---|---|---|---|---|---|
| Serv. Size 1 Bar (50g) | Total Fat 7g | 11% | | Total Carb. 24g | 8% |
| Servings 1 | Saturated Fat 3.5g | 18% | | Dietary Fiber 2g | 8% |
| Calories 210 | Cholesterol 0mg | 0% | | Sugars 13g | |
| Fat Cal. 60 | Sodium 320mg | 13% | | Protein 14g | |
| Percent Daily Values are based on a 2,000 calorie diet. | Potassium 100mg | 3% | | | |

Vitamin A 59% • Vitamin C 200% • Calcium 4% • Iron 2% • Vitamin E 210% • Thiamin 50% • Riboflavin 50% • Niacin 100% • Vitamin B6 200% • Folate 40% • Vitamin B12 45% • Biotin 30% • Pantothenic Acid 35% • Phosphorus 15% • Magnesium 10% • Zinc 50% • Selenium 80% • Chromium 80% • Molybdenum 65%

To learn about other ZonePerfect® products call 1-800-666-6830 or www.zoneperfect.com

Rev.000

©2003 ZonePerfect Nutrition Company. A balance of 40% carbohydrate, 30% each of protein and dietary fat. Your complete satisfaction guaranteed. Call 1.800.666.6830 for further information or visit our website at www.zoneperfect.com. ZonePerfect® is a trademark of ZonePerfect Nutrition Company. Distributed by ZonePerfect Nutrition Company, 100 Cummings Center, Suite 335K, Beverly, MA 01915

BEFORE MAR 02 05H8



## Nutrition Facts

Serv. Size 1 bar (55g)
Serv. Per Container 1

**Calories** 220
Calories from Fat 70

*Percent Daily Values are based on a 2,000 calorie diet.

| Amount Per Serving | % Daily Value | Amount Per Serving | |
|---|---|---|---|
| Total Fat 7g | 12% | Total Carbohydrate 25g | 8% |
| Saturated Fat 3g | 14% | Dietary Fiber 2g | 7% |
| Cholesterol 15mg | 5% | Sugars 17g | |
| Sodium 180 mg | 7% | Other Carbohydrates 6g | |
| Potassium 85 mg | 2% | Protein 15g | |

Vitamin A 30% • Calcium 15% • Vitamin E 35% • Riboflavin 35% • Vitamin B6 30% • Vitamin B12 35% • Pantothenic Acid 30% • Iodine 30% • Zinc 30% • Manganese 4% • Vitamin C 30% • Iron 35% • Thiamin 35% • Niacin 35% • Folate 30% • Biotin 30% • Phosphorus 8% • Magnesium 4% • Copper 35%

exclusively for Sears Labs, Marblehead, MA 01945

OmegaZone™ and Dr. Sears™ are trademarks of Zone Enterprises, Inc.

U.S. PATENT # 6,100,304

Patented Zone Meal with EPA & DHA

Dr. Sears

## OmegaZone™

Controlled Release Nutrition

Peanut Butter     NET WT 1.93 OZ (55g)

8 50868 00022 9



## Nutrition Facts

Serving Size 1 Bar (52g)

**Calories** 190
  Calories from Fat 50

| Amount/Serving | % Daily Value* | | Amount/Serving | % Daily Value* |
|---|---|---|---|---|
| **Total Fat** 6g | 9% | | **Total Carbohydrate** 23g | 6% |
| Saturated Fat 1.5g | 8% | | Dietary Fiber 3g | 12% |
| **Cholesterol** 0mg | 0% | | Sugars 18g | |
| **Sodium** 190mg | 8% | | **Protein** 15g | |
| **Potassium** 180mg | 5% | | | |

Vitamin A 100% • Vitamin C 200% • Calcium 25% • Iron 40% • Vitamin D 35% • Vitamin E 200% • Vitamin K 35% • Thiamin 35% • Riboflavin 35% • Niacin 35% • Vitamin B6 35% • Folate 35% • Vitamin B12 35% • Biotin 35% • Pantothenic Acid 35% • Phosphorus 25% • Iodine 35% • Magnesium 10% • Zinc 40% • Selenium 35% • Copper 40% • Manganese 40% • Chromium 35% • Molybdenum 35%

*Percent Daily Values are based on a 2,000 calorie diet.

## Total Body Wellness

### BodyZone™

**Really Satisfies**

*Delicious Total Nutrition Bar*

With Other Natural Flavors

**Almond Brownie**

NET WT 52g (1.83 OZ)

**Ingredients:** Protein Blend (Soy protein isolate, calcium caseinate, whey protein isolate, toasted soy pieces, whey, whey protein concentrate), high fructose corn syrup, fructose, honey, ground almonds, cocoa powder, almond pieces, soy hull fiber, lecithin, milk mineral concentrate, water, cocoa butter, palm and palm kernel oils, natural flavors, gum arabic, canola oil, chicory extract, soybean oil, maltodextrin's, salt, monoglycerides, citric acid. **Vitamins and Minerals:** Ascorbic acid, DL-alpha-tocopheryl acetate, copper gluconate, ferric orthophosphate, beta-carotene, biotin, magnesium oxide, niacinamide, zinc oxide, **calcium pantothenate,** vitamin A palmitate, phytonadione, pyridoxine hydrochloride, manganese sulfate, riboflavin, thiamin mononitrate, cholecalciferol, potassium iodide, cyanocobalamin, chromium chloride, folic acid, sodium molybdate, sodium selenite. **May contain traces of various nuts.**

©2001. Distributed by Total Body Wellness
Gilford, NH 03249 • 1-800-436-8466
www.total-body-wellness.com
Product of Canada
Food exchange: 2 lean proteins and 1 1/2 fruits.

8  35791 00112  3

EXHIBIT G

# Hershey/Sears





EXHIBIT H



◆ **Corporate Profile**

◆ **News Releases**

◆ **Subscription Service**

◆ **FAQs by Media**

◆ **Investor Relations**

◆ **Corporate Philosophy**

◆ **Hershey Related Sites**

www.**HERSHEYS**.com

## News Releases

## Hershey Foods to Introduce First Nutrition Bars With Dr. Barry Sears' Zone Diet Seal of Approval

HERSHEY, Pa., Feb 9, 2004 /PRNewswire-FirstCall via COMTEX/ -- Hershey Foods Corporation and Dr. Barry Sears today announced plans to introduce the first-ever nutrition bars with the science-based nutritional benefits of the Zone Diet and the great taste consumers expect from Hershey. The products will be the first to carry the "Dr. Sears Zone Approval" seal and will be introduced during the third quarter.

"Our new partnership with Dr. Sears is an outstanding match of Hershey's strong brand-building and business-system capabilities with his world-renowned dietary expertise," said Richard H. Lenny, Chairman, President and Chief Executive Officer, Hershey Foods Corporation. "Together, we'll create innovative new products that deliver the superior nutritional benefits of his Zone Diet and the great taste consumers expect from Hershey. This is an exciting opportunity for us as we further expand our presence in the nutrition snack segment and work with Dr. Sears to meet the growing consumer demand for sound nutrition, convenience and a healthy lifestyle."

"Good nutrition is the foundation not only for feeling and performing at your best, but also for better health," said Dr. Barry Sears, Founder and President of Zone Labs. "The innovative products to be developed through this new partnership will provide a fusion of my Zone technology with the outstanding food technology expertise of Hershey Foods. Due to the unique formulation of these products, they will help stabilize blood sugar levels, which is the key to controlling hunger and thus keeping weight in a healthy range. I'm extremely proud to be associated with Hershey, a true leader in product innovation with an outstanding ability to deliver taste and convenience to the marketplace.

Building upon the science-based principles of my Zone Diet, we'll be able to give consumers both the great taste and balanced nutrition they want for a healthy lifestyle."

Dr. Sears is one of the world's leading experts on nutrition. A former research scientist at Boston University School of Medicine and the Massachusetts Institute of Technology, he holds 13 US patents in the areas of drug-delivery systems

and dietary control of hormonal response. In 1995, he first published his insights into hormonal effects of food in his landmark book, The Zone, which became a New York Times #1 best seller. He since has published nine additional books on his Zone dietary technology, which have been translated into 22 languages in 40 countries. Zone Labs provides research and development support for Dr. Sears' effort to bring evidence-based nutrition products to consumers.

Hershey Foods Corporation (NYSE: HSY) is the leading North American manufacturer of quality chocolate and non-chocolate confectionery and chocolate-related grocery products. Some of the company's most popular products include Hershey's(R) chocolate and chocolate with almonds bars, Hershey's(R) Kisses(R) brand chocolates, Reese's(R) peanut butter cups, Jolly Rancher(R) and Twizzlers(R) candies, Hershey's(R)cocoa, and Hershey's(R) syrup. The company also is a market leader in the gum and mint category with such well-known brands as Ice Breakers(R), Breath Savers(R), and Bubble Yum(R).

Safe Harbor Statement

This release contains statements which are forward-looking. These statements are made based upon current expectations which are subject to risk and uncertainty. Actual results may differ materially from those contained in the forward-looking statements. Factors which could cause results to differ materially include, but are not limited to: changes in the confectionery and grocery business environment, including actions of competitors and changes in consumer preferences; customer and consumer response to selling price increases; changes in governmental laws and regulations, including taxes; market demand for new and existing products; changes in raw material and other costs; pension cost factors such as actuarial assumptions, market performance, and employee retirement decisions; adequacy of the Company's bad debt reserve; the Company's ability to implement improvements to reduce costs associated with its supply chain; and the Company's ability to successfully implement its rationalization and realignment initiatives, as discussed in the Company's Form 10-Q for the quarterly period ended September 28, 2003, and Annual Report on Form 10-K for 2002.

SOURCE Hershey Foods Corporation

Media Contact: Christine M. Dugan, +1-717-508-3238, or Financial Contact: James A. Edris, +1-717-534-7556, both of Hershey Foods

http://www.hersheys.com



Hersheys.com | Legal Info | Privacy Policy
Copyright © 1995-2003 Hershey Foods Corporation

EXHIBIT I

---

**To buy the *only* Zone products endorsed by Dr. Sears, go to www.zonediet.com**

# THE Omega Zone™

## Dr. Sears´ official e-magazine



Hershey's Foods Corporation and Zone Labs will introduce nutrition bar with a Dr. Sears Zone approval seal. Pictured at the Hotel Hershey in Hershey, PA., are standing from left, Hershey's Sylvia Buxton, Zone Labs Vice President of Marketing Doug Sears, Hershey's Dennis Eshleman and Ray Brace, Dr. Barry Sears, Hershey's Doug Lehrian and Tom Hernquist, Zone Labs Vice President of Medical Research and Education Dr. Stacey Bell and Zone Labs CEO George Jochum; seated from left Hershey's Andy England, Lois Duquette and Dan Azzara.

# Hershey's will create nutrition bar with Dr. Sears' stamp of approval

Hershey's Foods Corporation and Dr. Barry Sears have announced plans to introduce the first-ever nutrition bars with the science-based nutritional benefits of the Zone Diet and the great taste consumers expect from Hershey. The products will be the first to carry the "Dr.Sears Zone Approval" seal and will be introduced during the third quarter.

"Our new partnership with Dr. Sears is an outstanding match of Hershey's strong brand-building and business-system capabilities with his world-renowned dietary expertise," said Richard H. Lenny, chairman, president and chief executive officer of Hershey Foods Corporation. Together, we'll create innovative new products that deliver the superior nutritional benefits of his Zone Diet and the great taste consumers expect

For more information the Zone Diet:
www.drsears.con

## February 20
### INSIDE



**The Zone goes on road to Mexico**



**Spice up your oatn**



**Sherlock Zone visits Benihana**

### ALSO INSIDI

**Kim's Fitness tip**

**Dr. Stephen Sinatra**
Say no to super-sized avoid fast food

**Testimonial**
Chance dinner chang this couple's life

# THE Omega Zone™

## *Hershey Foods and Dr. Sears...*

from Hershey.This is an exciting opportunity for us as we further expand our presence in the nutrition snack segment and work with Dr. Sears to meet the growing consumer demand for sound nutrition, convenience and a healthy lifestyle."

"Good nutrition is the foundation not only for feeling and performing at your best, but also for better health," said Dr. Barry Sears, founder and president of Zone Labs. "The innovative products to be developed through this new partnership will provide a fusion of my Zone technology with the outstanding food technology expertise of Hershey Foods.  Due to the unique formulation of these products, they will help stabilize blood sugar levels, which is the key to controlling hunger and thus keeping weight in a healthy range.  I'm extremely proud to be associated with Hershey, a true leader in product innovation with an outstanding ability to deliver taste and convenience to the marketplace. Building upon the science-based principles of my Zone Diet, we'll be able to give consumers both the great taste and balanced nutrition they want for a healthy lifestyle."



Richard H. Lenny, chairman, president and chief executive officer of Hershey Foods Corporation, left, and Dr. Barry Sears, president of Zone Labs and creator of the Zone Diet, get together at the Hotel Hershey.

Back to front page