UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 MAY 24  P 4: 09

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ZONEPERFECT NUTRITION COMPANY,                    :

    Plaintiff and Counterclaim-Defendant,    :

                    v.                    :

HERSHEY FOODS CORPORATION, HERSHEY    :
CHOCOLATE & CONFECTIONERY
CORPORATION, BARRY D. SEARS and ZONE    :
LABS, INC.,
                                    :

    Defendants and Counterclaim-Plaintiffs.

CIVIL ACTION
NO.: 04-10760 (REK)

DISTRICT COURT
DISTRICT OF MASS.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE HERSHEY DEFENDANTS' INITIAL MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Seni M. Adio, BBO #566709
Matthew Hurley, BBO #643638
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
(617) 542-2241 (fax)

Thomas A. Smart
Richard A. De Sevo
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000
(212) 836-7154 (fax)

*Attorneys for Defendants and Counterclaim-
Plaintiffs Hershey Foods Corporation and
Hershey Chocolate & Confectionery Corp.*

Dated: May 24, 2004

30887323.WPD

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1.    Dr. Sears' Zone Diet and His Divorce from Plaintiff . . . . . . . . . . . . . . . . . . . . . . 4

      2.    Hershey's Consideration of Purchasing ZPNC . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      3.    Hershey's Later Involvement with Dr. Sears and Its Independent
          Creation of the *SmartZone* Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    Plaintiff's Complaint and the Claims at Issue on This Motion . . . . . . . . . . . . . . . . . . . . 13

C.    Hershey's Defenses and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    ZPNC's Burden on This Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.    ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on Its Claims . . . . . . . . 15

      A.    ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on
          Its Trademark Infringement Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          1.    Similarity of the Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          2.    Strength of the Mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          3.    Defendant's Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          4.    Channels of Trade, Advertising, and Prospective Purchasers . . . . . . . . 27
          5.    Similarity of Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          6.    Actual Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      B.    ZPNC Is Unlikely to Succeed on Its False Advertising Claim . . . . . . . . . . . . . . 29

      C.    ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on
          Its Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      D.    ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on
          Its Massachusetts Statutory Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      E.    Hershey Is Likely to Succeed on Its Defense of Unclean Hands . . . . . . . . . . . . 33

**Page**

III.   ZPNC Has Failed to Demonstrate that It Will Be Irreparably Injured if
       Its Motion Is Denied ..................................................... 35

IV.    The Balance of Harms Tips Decidedly in Hershey's Favor ........................ 36

V.     Denial of ZPNC's Motion Is in the Public Interest ............................. 36

CONCLUSION ......................................................................... 37

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A.V. by Versace, Inc. v. Versace,*
    87 F. Supp.2d 281 (S.D.N.Y. 2000) .............................. 25

*American Cyanamid Corp. v. Connaught Labs., Inc.,*
    800 F.2d 306 (2d Cir. 1986) ..................................... 1, 17

*Amstar Corp. v. Domino's Pizza, Inc.,*
    615 F.2d 252 (9th Cir. 1980) .................................... 23

*Armstrong Cork Co. v. World Carpets, Inc.,*
    597 F.2d 496 (5th Cir. 1979) .................................... 23

*Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.,*
    718 F.2d 1201 (1st Cir. 1983) ................................... 19

*Avis Rent A Car Sys., Inc. v. Hertz Corp.,*
    782 F.2d 381 (2d Cir. 1986) ..................................... 30

*Ball v. Wal-Mart, Inc.,*
    102 F. Supp.2d 44 (D. Mass. 2000) .............................. 32

*Bates v. State Bar of Arizona,*
    433 U.S. 350 (1977) ........................................... 36

*Beech-Nut, Inc. v. Warner-Lambert Co.,*
    346 F. Supp. 547 (S.D.N.Y. 1972) ............................... 18

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ........................................... 36

*Boston Athletic Ass'n v. Sullivan,*
    867 F.2d 22 (1st Cir. 1989) ..................................... 23

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,*
    799 F.2d 6 (1st Cir. 1986) ...................................... 14

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,*
    794 F.2d 38 (2d Cir. 1985) ..................................... 35

*Citibank, N.A. v. Citytrust & Citytrust Bancorp, Inc.,*
    756 F.2d 273 (2d Cir. 1985) .................................... 35

**Page(s)**

*Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.,*
  228 F.3d 24 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 29, 30, 31

*Coca-Cola Co. v. Snow Crest Beverages, Inc.,*
  162 F.2d 280 (1st Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 17

*Codex Corp. v. Milgo Elec. Corp.,*
  717 F.2d 622 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Continental Ins. Co. v. Bahnan,*
  216 F.3d 150 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Donoghue v. IBC USA (Publications) Inc.,*
  70 F.3d 206 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Donsky v. Bandwagon,*
  1976 U.S. Dist. LEXIS 11735 (D. Mass. Dec. 21, 1976) . . . . . . . . . . . . . .  17

*Dranoff-Perlstein Assocs. v. Sklar,*
  967 F.2d 852 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*EA Engr'g, Science, & Tech., Inc. v. Envtl. Audit, Inc.,*
  703 F. Supp. 853 (C.D. Cal. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Ebeling & Reuss, Ltd. v. Swarovski Int'l Trading Corp., A.G.,*
  1992 U.S. Dist. LEXIS 12731 (E.D. Pa. Aug. 24, 1992) . . . . . . . . . . . . . . .  18

*Eli Lilly & Co. v. Natural Answers, Inc.,*
  233 F.3d 456 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Enterpreneur Media, Inc v. Smith,*
  279 F.3d 1135 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Fleetwood Co. v. Hazel Bishop, Inc.,*
  352 F.2d 841 (7th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Fritz, DMA, Inc. v. Arthur D. Little, Inc.,*
  944 F. Supp. 95 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Grease Monkey Int'l, Inc. v. Ralco Lubrication Services, Inc.,*
  24 F. Supp.2d 120 (D. Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*Haagen-Dazs, Inc. v. Frusen Gladje, Ltd.,*
  493 F. Supp. 73 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

**Page(s)**

*I.P. Lund Trading Co. v. Kohler,*
    163 F.3d 27 (1st Cir. 1998) ..................................... 2, 15

*Johnson & Johnson Merck Consumer Pharm. Co. v. Rhone-Poulenc*
    *Rorer Pharm., Inc.,*
    19 F.3d 125 (3d Cir. 1994) ...................................... 30

*K-Mart Corp. v. Oriental Plaza, Inc.,*
    875 F.2d 907 (1st Cir. 1989) .................................... 4, 33

*Keebler Co. v. Murray Bakery Prod.,*
    866 F.2d 1386 (Fed. Cir. 1989) .................................. 18

*Lever Bros. Co. v. American Bakeries Co.,*
    693 F.2d 251 (2d Cir. 1982) ..................................... 19

*Levi Strauss & Co. v. Shilon,*
    121 F.3d 1309 (9th Cir. 1997) ................................... 33

*Lindy Pen Co., Inc. v. Bic Pen Corp.,*
    725 F.2d 1240 (9th Cir. 1984) ................................... 20

*Liquid Controls Corp. v. Liquid Control Corp.,*
    802 F.2d 934 (7th Cir. 1986) .................................... 16

*Lois Sportswear, U.S.A, Inc. v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986) ..................................... 31

*Maine Ave. Seafood, Inc. v. The Crab House, Inc.,*
    1998 U.S. Dist. LEXIS 23144 (D. Md. March 30, 1998) .............. 18

*McGregor-Doniger Inc. v. Drizzle Inc.,*
    599 F.2d 1126 (2d Cir. 1979) .................................... 18, 20

*McKernan v. Burek,*
    118 F. Supp.2d 119 (D. Mass. 2000) .............................. 33

*McMahon v. Digital Equip. Corp.,*
    944 F. Supp. 70 (D. Mass. 1996) ................................. 32

*Michael Caruso & Co. v. Estefan Enterprises, Inc.,*
    994 F. Supp. 1454 (S.D. Fla. 1998) .............................. 23

**Page(s)**

*Miss World (UK), Ltd. v. Mrs. Am. Pageants, Inc.*,
    856 F.2d 1445 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mongan v. O'Neill*,
    2002 U.S. Dist. LEXIS 13590 (D.N.H. July 24, 2002) . . . . . . . . . . . . . . . . 16

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
    580 F.2d 44 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*NEC Electronics, Inc. v. New England Circuit Sales, Inc*,
    722 F. Supp. 861 (D. Mass. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*,
    269 F.3d 122 (2d. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Northern Trust Corp. v. Northern Bank & Trust Co.*,
    1991 U.S Dist. LEXIS 20349 (D. Mass. Nov. 26, 1991) . . . . . . . . . . . . . . 14, 23, 25

*Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*,
    970 F.2d 273 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
    657 F.2d 482 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 18, 19, 26

*Polar Corp. v. The Coca-Cola Co.*,
    871 F. Supp. 1520 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Pump, Inc. v. Collins Mgmt., Inc.*,
    746 F. Supp. 1159 (D. Mass. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Q Division Records, LLC v. Q Records*,
    2000 U.S. Dist. LEXIS 1773 (D. Mass. Feb. 11, 2000) . . . . . . . . . . . . . . . 14, 23

*R.G. Barry Corp. v. A. Sandler Co., Inc.*,
    406 F.2d 114 (1st Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Renaud Sales Co. v. Davis*,
    104 F.2d 683 (1st Cir. 1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Page(s)**

*Sampson v. Murray,*
  415 U.S. 61 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    35

*Saxon v. Blann,*
  968 F.2d 676 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

*Smithkline Beckman Corp. v. Procter & Gamble Co.,*
  591 F. Supp. 1229 (N.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

*Stop & Shop Supermarket Co. v. Big Y Foods, Inc.,*
  943 F. Supp. 120 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19, 23

*Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,*
  651 F.2d 311 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

*T.A.D. Avanti, Inc. v. Phone-Mate, Inc.,*
  1978 U.S. Dist. LEXIS 19572 (C.D. Cal. Feb. 14, 1978) . . . . . . . . . . . . . .    20

*Technical Publishing Co. v. Lebhar-Friedman, Inc.,*
  729 F.2d 1136 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

*Thompson Medical Co. v. Pfizer Inc.,*
  753 F.2d 208 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*Transclean Corp. v. Bridgewood Servs.,*
  77 F. Supp.2d 1045 (D. Minn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

*Trustees of Columbia Univ. v. Roche Diagnostics,*
  272 F. Supp.2d 90 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

*Uncas Mfg. v. Clark & Coombs Co.,*
  309 F.2d 818 (1st Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

*United Drug Co. v. Theodore Rectanus Co.,*
  248 U.S. 90 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

*United Indus. Corp. v. Clorox Co.,*
  140 F.3d 1175 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

*Universal Money Centers, Inc. v. AT&T Co.,*
  22 F.3d 1527 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

*Volkswagenwerk Aktiengesellschaft v. Wheeler,*
  8124 F.2d 812 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

**Page(s)**

*W.W.W. Pharmaceutical Co. v. Gillette Co.,*
    808 F. Supp. 1013 (S.D.N.Y. 1992);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

*Walter v. Mattel, Inc.,*
    31 F. Supp. 2d 751 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

*Washington Nat'l Ins. Co. v. Blue Cross & Blue Shield,*
    727 F. Supp. 472 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20, 23

*YMCA of the USA v. Flint YMCA,*
    764 F.2d 199 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

**Statutes**

15 U.S.C. § 1064 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

15 U.S.C. § 1065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

15 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

15 U.S.C. § 1115(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

15 U.S.C. § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14, 29

Mass. Gen. L. ch. 93A § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13, 14, 32

Mass. Gen. L. ch. 93A § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13, 32

Mass. Gen. L. ch. 93A § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

**Other Authorities**

J. Thomas McCarthy, McCARTHY'S ON TRADEMARKS (4th ed. 2003)  . . . . . . . . . . . . . . . . . . . 23

Defendants and counterclaim-plaintiffs Hershey Foods Corporation ("Hershey Foods") and Hershey Chocolate & Confectionery Corporation (collectively, with Hershey Foods, "Hershey") submit this memorandum in opposition to the motion of plaintiff ZonePerfect Nutrition Company ("ZPNC") for a preliminary injunction.

## PRELIMINARY STATEMENT

ZPNC's motion is unhinged from the facts, the marketplace and the law. Using a definitional sleight of hand ("the ZONE Marks"), ZPNC attempts to create the impression that it owns trademark rights in the word "zone" when in reality it markets and sells its nutrition bars under the trademark ZONE*Perfect* and owns no federal registration for the mark ZONE. This sleight of hand is necessary because there are numerous third party trademark registrations at the United States Patent & Trademark Office ("PTO") for nutrition and food products that contain the common word "zone," which the PTO and the consuming public treat and recognize as a generic term for health and diet-related products. Indeed, ZPNC concedes that the logo for the ZONE*Perfect* bar was expressly "*designed . . . to closely approximate* the distinctive font used for the word 'ZONE'" on Dr. Sears' books and that ZPNC did so "in an effort to *expressly tie the ZonePerfect bar to the Zone Diet and Sears' publications*" (Complaint ¶ 29; Pl. Br. 5) (emphasis added). ZPNC also directly (and *falsely*) ties itself and its ZONE*Perfect* bars to the Zone Diet in proclaiming: "Zone Perfect The Official Website Of The Zone Diet" and offers on its website the "Official Zone Diet Newsletter." As a result, as the law in this Circuit and elsewhere requires, the generic word "zone" must be stripped from the parties' marks for purposes of likelihood of confusion analysis. *See, e.g, Coca-Cola Co. v. Snow Crest Beverages, Inc.*, 162 F.2d 280, 283 (1st Cir. 1947); *American Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2d Cir. 1986). This case, thus, boils down to a comparison

of two entirely different words – "perfect" and "smart." Needless to say, not even ZPNC contends that these words are confusingly similar.

The premise of ZPNC's motion is also directly belied by its contract with Dr. Sears. Thus, while ZPNC pretends that Dr. Sears granted it all of his rights to "zone" trademarks, in fact he did no such thing. To the contrary, the contract by which ZPNC bought out Dr. Sears' interests, (a) does *not* grant ZPNC the rights to the term "zone" or to all trademarks that contain the term "zone" – let alone the right to the mark *SmartZone*; (b) provides that ZPNC could *only* use Dr. Sears' "name, likeness, image, voice, signature or picture" to promote its products *until* July 1, 2001; (c) expressly provides that except as provided in the contract, "there shall be *no restrictions, limitations or prohibitions* on the activities" of Dr. Sears; and (d) does *not* contain any provision barring Dr. Sears from competing with ZPNC or from endorsing other food products. (Complaint Ex. 19 ¶¶ 1(a), 2(b), 2(e), 5(a), (a); *id.* Ex. 4 ¶¶ 1.1(p)(10), 1.1(p)(11), 4.1) (emphasis added). Indeed, during the negotiations, ZPNC requested a non-compete provision, but Dr. Sears flatly rejected this request. ZPNC also requested in negotiations that Dr. Sears agree not to use a trademark "containing the terms 'Zone' or 'Zone Diet'" in any business deal with a whole list of food companies, one of which was Hershey. Dr. Sears refused to agree to this provision as well. In short, ZPNC is attempting to obtain by this motion the very relief that it could not gain from Dr. Sears at the bargaining table.

It is further clear that, applying the First Circuit's multi-factor likelihood of confusion test, an "appreciable number of reasonably prudent purchasers exercising ordinary care" will not likely be confused by the parties' use of their respective marks. *I.P. Lund Trading Co. v. Kohler*, 163 F.3d 27, 43 (1st Cir. 1998). As can readily be seen from the attached pictures of the parties' products as they will appear in the marketplace (*see* Exhibits A, B), the trademarks – ZPNC's ZONE*Perfect* and Hershey's *SmartZone* – and the packages on which they appear (as well as the products themselves),

are distinctly different.  Moreover, the HERSHEY'S trademark appears prominently and directly above the mark *SmartZone* on the Hershey product, a fact that ZPNC conveniently ignores in its brief, presumably because it knows very well that under First Circuit law such use of a house mark is fatal to its claims of likely confusion here.  As the First Circuit has recognized, even "otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

ZPNC has also failed to demonstrate that the other *Pignons* factors support a finding of likelihood of confusion.  Thus, for example, Hershey chose its mark in good faith, knowing that the Patent and Trademark Office ("PTO"), exercising its expertise in trademark matters, has registered a large number of "zone" marks for a wide variety of food and related products, thus indicating the weakness of trademarks containing the word "zone" and the PTO's conclusion that "zone" marks are not likely to be confused with each other.  But even more fundamentally, the notion that Hershey chose the *SmartZone* mark to create confusion and trade on ZPNC's good will is preposterous.  In using the name *SmartZone* together with its well known house mark HERSHEY's and Dr. Sears' seal of approval, Hershey plainly is attempting to capitalize on *its own* goodwill and that of Dr. Sears.  Hershey wants consumers to associate the *SmartZone* bars with the famous company that makes HERSHEY chocolate bars and other well-known and well-liked products as well as with Dr. Sears and his ZONE Diet.  The last thing Hershey would want is to be confused with ZPNC and ZPNC's products, particularly since Dr. Sears does not endorse ZPNC's products and the ZPNC products are *not* compliant with the Zone Diet.

Indeed, if there is any confusion it will be because of ZPNC's, not Hershey's, actions.  It is ZPNC that is falsely communicating to consumers that its products are affiliated with or sponsored

by Dr. Sears, the founder of the Zone Diet, when they are not, and that its nutrition bars are compliant with the Zone Diet, when they are not. These acts of unclean hands provide a separate and independent basis for denying ZPNC's motion. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir. 1989)

ZPNC is also not likely to succeed on its false advertising claim, for the simple reason that the statements it challenges are literally true and, therefore, it must submit (which it has not) consumer survey evidence to support its claim. *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 (1st Cir. 2000). Moreover, it is highly doubtful that any consumers even heard the statements – which were made in a press release and at a stock analysts' conference – and, if they did, that the statements were material and likely to affect their purchasing decisions. Indeed, the alleged false implied claim – that Dr. Sears did not previously endorse ZONE*Perfect* nutrition bars – would appear to be immaterial given that Dr. Sears no longer endorses the products and believes that they are not compliant with the Zone Diet.

As for ZPNC's claim that Hershey breached its confidentiality agreement with ZPNC, suffice it to say that Hershey is the premier candy and bar maker in this country and that it did not need – and did not use – any proprietary or confidential information of ZPNC to independently develop the *SmartZone* bar.

## A.    The Facts

The basic facts, which will be developed in discovery and presented to the Court at the preliminary injunction hearing, are as follows:

### 1.    Dr. Sears' Zone Diet and His Divorce from Plaintiff

Defendant Barry Sears holds a PhD in biochemistry and has conducted extensive research on fat derivatives and diets. Based on his research and work with the Stanford University men's and

women's swimming teams, he developed a diet that he entitled the "Zone Diet." In 1995, he published <u>The Zone</u>, in which he explained the Zone Diet. The diet is a nutrition program designed to control the body's level of blood glucose and insulin in order to treat obesity, type II diabetes and heart disease. The Zone Diet provides, *inter alia*, for a diet of 40% carbohydrates, 30% low-fat protein, and 30% monounsaturated fats comprised of foods that produce a low glycemic response. <u>The Zone</u> subsequently became a best seller and continues to sell well today. Dr. Sears has also published several other books regarding the Zone Diet, including <u>Mastering the Zone</u> and <u>The Omega Rx Zone</u>.

In 1996, Dr. Sears went into business with Christopher Baker, forming the Eicotech Corporation, whose name later changed to the ZonePerfect Nutrition Company ("ZPNC"). Dr. Sears developed a nutrition bar compliant with the Zone Diet, which ZPNC sold under the name ZONE*Perfect*. The logo for the product was, as ZPNC concedes, "designed, with Sears' approval, to closely approximate the distinctive font used for the word 'ZONE' on the book covers of <u>The Zone</u> and <u>Mastering the Zone</u>." (Pl. Br. 5). As ZPNC further concedes, "[m]any ZonePerfect customers know Sears and his books" and "consumers are aware that he endorsed and approved its products – including bars – for a number of years." (*Id.* at 28-29).

In 1996, Dr. Sears, along with Mr. Baker and others, formed ZPNC. Dr. Sears worked for the company until 1988 and was a consultant for about six months thereafter. By 1999, however, the relationship between Dr. Sears and ZPNC had soured because, among other things, of ZPNC's decision to develop new ZONE*Perfect* bars that Dr. Sears believed were not compliant with the Zone Diet. As a result, the parties entered into lengthy negotiations that culminated in an agreement on October 17, 2001. In that contract, ZPNC transferred back to Dr. Sears almost all of the rights he had transferred to ZPNC in 1996. Significantly, the contract on its face makes clear that there is no

basis for ZPNC's claim that it was granted the right to "exclusive commercialization of Zone-related, non-book products." (Pl. Br. 7). Thus, for example:

- The contract does *not* grant ZPNC the rights to the term "zone" or to all trademarks that contain the term "zone" – let alone the right to the mark *SmartZone*. (*See* Complaint Ex. 19 ¶¶ 1(a), 2(b), *id.* Ex. 4 ¶¶ 1.1(p)(10), 1.1(p)(11), 4.1).

- The contact expressly provides that ZPNC "shall have *no* rights in or to *any* inventions, product formulations, developments, innovations, techniques, designs, processes, procedures, improvements, works of authorship created or developed by" Dr. Sears after December 31, 1998, "*including any intellectual property rights therein or thereto*." (*Id.* Ex. 19 ¶ 2(e)) (emphasis added).

- The contract provides that ZPNC could *only* use Dr. Sears' "name, likeness, image, voice, signature or picture" to promote its products *until* July 1, 2001 (and for three months thereafter to dispose of its inventory). (*Id.* Ex. 19 ¶ 5(a)).

- The contract also expressly provides that except as provided in the contract, "there shall be *no restrictions, limitations or prohibitions* on the activities" of Dr. Sears. (*Id.* Ex. 19 ¶ 8(a)) (emphasis added).

Also beyond dispute is that the contract does *not* contain a non-compete clause barring Dr. Sears from competing with ZPNC. Nor does the contract contain any provision prohibiting Dr. Sears from endorsing a competing product. Indeed, during the negotiations, ZPNC requested a non-compete provision, and Dr. Sears flatly rejected the request. ZPNC also asked Dr. Sears to agree to a provision that would have effectively barred Dr. Sears from using a trademark "containing the terms 'Zone' or 'ZoneDiet'" in agreement with a whole host of large food companies, including Hershey. Dr. Sears refused to agree to this provision as well. Faced with Dr. Sears' absolute

rejection of these suggested provisions, ZPNC nevertheless abandoned them and signed an agreement that clearly does not contain any such provisions.

### 2.    Hershey's Consideration of Purchasing ZPNC

In or about October 2002, Hershey learned that ZPNC was being offered for acquisition. Hershey retained UBS as its investment banker and assembled a team to investigate issues relevant to an acquisition.    Two types of information were reviewed in connection with Hershey's consideration of an acquisition – information that was publicly or independently available to Hershey, which included its own market research and sales information from outside vendors, and non-public information received from ZPNC. The latter was subject to a confidentiality agreement to the extent that the information was not already known to or independently developed by Hershey or received by Hershey from sources other than ZPNC.    To the extent that ZPNC revealed any information as part of the due diligence that was "proprietary or confidential," the agreement provided that if Hershey did not acquire ZPNC, it would return such information to ZPNC or destroy it. (Complaint Ex. 20 ¶¶ 1, 3). The agreement further provided that it "shall terminate" in two years, *i.e.*, on October 7, 2004.    (*Id.* Ex. 20 ¶ 7).    To insure that it complied with the confidentiality obligation, Hershey informed all persons receiving ZPNC proprietary or confidential information that the information was confidential and that they were not to use it for any purpose other than in connection with consideration of an acquisition of ZPNC.

During the next six months, Hershey looked into the desirability of acquiring ZPNC, an effort it internally designated as "Project Twilight." In addition to doing its own independent investigation of the market and of ZPNC, Hershey received limited information from ZPNC – not the "full access" to ZPNC's "confidential and proprietary information" its attorneys now assert. (Pl. Br. 35).  Thus, for example, Hershey personnel visited ZPNC's headquarters and met with some of its management,

and also visited a portion of the plants of two of ZPNC's contract manufacturers. ZPNC gave Hershey's personnel access to no more than two boxes of documents, and they were permitted to copy only a minimal number of the documents. Moreover, ZPNC did *not* disclose to Hershey the recipes for making the ZONE*Perfect* bars; it refused to show Hershey the portion of its contracts manufacturing plants where the receiving and mixing of ingredients were performed, and it refused to disclose its trademark files. Nor did ZPNC provide Hershey with its specifications of the cost of goods of the ZONE*Perfect* bars.

In conversations with ZPNC's management, the Hershey individuals working on the potential acquisition learned that, contrary to the position it has taken in this lawsuit, ZPNC did not believe that it had rights to the terms "zone" or "Zone Diet" and confirmed that Dr. Sears was no longer affiliated with ZPNC. They also learned from their own research that Dr. Sears was selling his own nutrition bar under the name OMEGA ZONE. Hershey further learned that Dr. Sears was no longer associated with ZPNC. As a result, early on Hershey asked to meet privately with Dr. Sears. Rather than approach Dr. Sears directly, Hershey asked ZPNC to set up the meeting because the confidentiality agreement barred Hershey from disclosing to any third-party, such as Dr. Sears, that it was interested in acquiring ZPNC. It was very important to Hershey that it learn what the attitude of Dr. Sears – the developer of both the Zone Diet and the original ZONE*Perfect* bar – would be toward Hershey and the ZONE*Perfect* bar in the event that Hershey acquired ZPNC. ZPNC, however, dragged its feet and repeatedly delayed in agreeing to schedule a meeting with Dr. Sears. Accordingly, in Hershey's two non-binding proposals to acquire ZPNC, Hershey explicitly stated that it "required] . . . [a] meeting between Hershey and Dr. Barry Sears which produces results satisfactory to Hershey" before it would make a binding offer. (Complaint Ex. 22 p. 3 ¶ 7(i), Ex. 23 p. 3 ¶ 7(i)).

ZPNC finally set up a meeting at the Radius restaurant in Boston for April 1, 2003. Attending were Chris Baker, the co-founder with Dr. Sears of ZPNC and a major shareholder in the company; Richard Lenny, Chairman, President and Chief Executive Officer of Hershey Foods; Dennis Eshleman, Hershey Foods' Vice President of Strategy and Innovation; Dr. Sears and his brother and business partner Douglas Sears; George Jochum, the chief operating officer of Dr. Sears' company, Zone Labs, Inc. ("Zone Labs"), and an investor in Zone Labs. Most of the lunch was devoted to a discussion of nutrition. After dessert, Mr. Baker left and the meeting continued for about one-half hour or so.

Mr. Lenny and/or Mr. Eshleman told Dr. Sears that they were very interested in his view of ZPNC and its products. Dr. Sears replied that it was very appropriate that Hershey would buy ZPNC because ZPNC's products were basically glorified candy bars. He stated that ZPNC's original products were consistent with the Zone Diet, but that after he left the company, ZPNC had created new slab bars without his approval that it sold under the ZONE*Perfect* name. When a customer indicated that it liked the new bars, ZPNC became committed to the new bars. Dr. Sears said that even though the new bars met the 40/30/30 requirement, they were not compliant with the Zone Diet because they caused an initial spike in blood sugar levels, causing users to become hungry again in a few hours. He stated that Zone Diet products have to have low glycemic load to avoid such an initial spike and that the original ZONE*Perfect* bars had such a low glycemic load. He further stated that he was upset about the new slab bars and that the development of the new bars took place after he left ZPNC. Contrary to ZPNC's unfounded speculation in this lawsuit, there was no discussion at the lunch about Dr. Sears doing any kind of deal with Hershey or in developing products with Hershey.

In short, Dr. Sears confirmed Hershey's worst fears – that there was a realistic possibility that if Hershey had purchased ZPNC, Dr. Sears might have responded to questions from the press that

would result in a headline – A Perfect Match:  Hershey Buys a Glorified Candy Bar.  Hershey felt

that there was a high likelihood of such bad press coverage based on negative comments from Dr.

Sears, and the story would have "legs" and would not blow over quickly.  This would result in lower-

ing the value of the business Hershey would be buying and would hurt not just that business'

reputation, but Hershey's reputation as to the thoroughness with which it conducts due diligence.

Under these circumstances, an investment in ZPNC – let alone one for over $100 million – would

be too risky.  Accordingly, shortly after the lunch, UBS, Hershey's investment banker, informed

ZPNC that Hershey was withdrawing its proposal.  In accordance with the confidentiality agreement,

Hershey then destroyed (except for a few inadvertent exceptions) the proprietary and confidential

information it had received from ZPNC.[1]

### 3.    Hershey's Later Involvement with Dr. Sears and<br>Its Independent Creation of the *SmartZone* Bar

There was no further contact with Dr. Sears until the end of June 2003, when Mr. Eshleman

received an unsolicited note from Dr. Sears accompanying some small product samples and when,

a few days later, Dr. Sears inquired what Mr. Eshleman thought of the taste and texture of the pro-

duct.  Mr. Eshleman advised Dr. Sears that he was not interested in the product.  There was no sub-

stantive business contact with Dr. Sears until September – five months after the restaurant meeting

and after Abbott Labs announced that it had purchased ZPNC.  In a telephone call with Mr. Eshle-

man, Dr. Sears commented on Abbott Labs' acquisition and mentioned that Abbott had not spoken

to him in connection with the acquisition.  Dr. Sears further indicated that he was planning to

develop a "seal" to be used to endorse food products and items on restaurant menus.  This led to a

---

[1]    The few items that inadvertently were not destroyed were not discovered until documents
were collected for production in this case and were not referred to or used after Project
Twilight ended.

discussion regarding the use of such a seal on a Hershey nutrition bar. A meeting was then held at which Dr. Sears gave a detailed explanation of the Zone Diet. Hershey indicated that it was interested in developing a product which would be compliant with the Zone Diet and which Dr. Sears would endorse with his seal. Mr. Eshleman then worked with Mr. Jochum to agree on the terms of an agreement with Dr. Sears and Zone Labs, which was completed in early January 2004. Andrew England was assigned the responsibility for development of the Hershey nutrition bar, including its sales and marketing. Mr. England became head of the Hershey Snacks Division in September 2003 – five months after the restaurant meeting – and had no involvement with Project Twilight.

Hershey began developing its nutrition bar in or about October 2003. The bar was developed without use of any information that had been obtained from ZPNC – and indeed could not have been *since ZPNC had never disclosed to Hershey how its bars were made.* A prototype bar was prepared based on Dr. Sears' OMEGA ZONE bar. The prototype bar, however, failed to meet Hershey's standards for taste and stability. With Dr. Sears' advice, development of the bar continued until May 2004, when the final composition of the product was determined. All of the prototypes and the final bar are markedly different from the ZONE*Perfect* bar, in appearance, size, taste, texture and ingredients. Among other things, in addition to the obvious differing ingredient statements printed on the back of the packages, the *SmartZone* bar has a nougat type texture whereas the ZONE*Perfect* bar is crunchy. Moreover, unlike the ZONE*Perfect* bar, the bar that Hershey will sell has a low glycemic load and, thus, unlike the ZONE*Perfect* bar, is compliant with the Zone Diet.

While Hershey was developing the bar with Dr. Sears, it considered numerous names for the bar, including SMART ZONE. In doing so, it conducted trademark searches, which revealed that – in addition to numerous marks and applications owned by Dr. Sears, the searches revealed numerous marks containing the terms "zone" that the PTO had registered or had permitted approved for

registration, as well as numerous additional common law uses of marks containing the term "zone".

These include, for example, "ProZone" bars, OPTIZONE bars, TREAT ZONE bars, BODYZONE

bars, ZONE RX bars, XTREME ZONE bars and ZONE GOURMET vitamin and nutritional supple-

ments. (*See* Ex. C hereto). Hershey also developed distinctive packaging for the *SmartZone* bars,

which included a prominent reference to Hershey's – using the distinctive HERSHEY'S trademark

with its maroon background – so that potential customers would associate the bar with the great taste

and reputation of Hershey and its products. (*See* Exhibit B). HERSHEY'S is one of the most

famous trademarks in the country, with an almost unheard of consumer awareness rate of 99%.

On February 9, 2004, Hershey issued a press release in Hershey, Pennsylvania, announcing:

> Hershey Foods Corporation and Dr. Barry Sears today announced
> plans to introduce the first-ever nutrition bars with the science-based
> nutritional benefits of the Zone Diet and the great taste consumers
> expect from Hershey. The products will be the first to carry the 'Dr.
> Sears Zone Approval' seal and will be introduced during the third
> quarter of 2004. (Complaint Ex. 24; *see id.* Ex. 26).

Two weeks later, on February 28, in Scottsdale, Arizona, Richard Lenny, Hershey's Chairman, Presi-

dent and Chief Executive Officer, made a presentation to the CAGNY conference of stock analysts.

At that conference, he showed a picture of the planned packaging of the four flavors of the

*SmartZone* bar, which included the seal that Dr. Sears had developed for products that he endorses.

Mr. Lenny stated that the bar "brings consumers great taste and the balanced nutrition they want"

and that the bars were the "only nutrition bars to carry the seal" of Dr. Sears. Each of the statements

about which ZPNC complains is fully accurate. The *SmartZone* bar is, in fact, the only (and the first)

nutrition bar to carry Dr. Sears' seal. The ZONE*Perfect* bar certainly does *not* have Hershey's great

taste.

**B.** **Plaintiff's Complaint and the Claims at Issue on This Motion**

On April 15, 2004, two months after the CAGNY conference, ZPNC commenced this action. It asserts 15 counts in its 231-paragraph complaint.[2] As made clear in its motion and brief, however, ZPNC's preliminary injunction motion is far more limited. ZPNC is seeking preliminary injunctive relief based only on its trademark infringement and false advertising claims under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and MASS. GEN. LAWS ch. 93A §§ 2, 9, and for breach of the confidentiality agreement. Thus, ZPNC is *not* seeking preliminary injunctive relief on its claims against Hershey for, *inter alia*, dilution, commercial disparagement, tortious interference with contractual relations, and breach of the covenant of good faith and fair dealing.

**C.** **Hershey's Defenses and Counterclaims**

In its answer, Hershey denied the material allegations in the complaint. Among its other defenses, Hershey has asserted an unclean hands defense in which it alleges that ZPNC has misleadingly used the term "zone" in its marks and on its website, and has made false and misleading statements by misrepresenting that Dr. Sears endorses its products and is affiliated with it and its products. Specifically, the banner on the top of each page of ZPNC's website states that it is "The Official Website Of the Zone Diet," and the website invites viewers to subscribe to the "Official Zone Diet Newsletter." These statements, and the web site itself, are false and misleading because Dr. Sears, the developer of the Zone Diet, does not endorse either the website or ZPNC's products, and the website has no affiliation with him or the products he endorses. In addition, ZPNC has

---

[2]      ZPNC subsequently served an amended complaint adding Zone Labs as a defendant. We cite to the original complaint since that is the complaint to which ZPNC refers in its brief.

represented that its nutrition bars are compliant with Dr. Sears' Zone Diet when, in fact, they are not.[3]

Finally, Hershey asserted that while it believes that there is no likelihood of confusion between the ZONE*Perfect* bar and the *SmartZone* bar, to the extent there is or would be any confusion, it would be because consumers associate the term "zone" with the Zone Diet or with Dr. Sears. As a result, it would be ZPNC's products – not Hershey's – that would be causing such confusion.

## ARGUMENT

### I.    ZPNC's Burden on This Motion

ZPNC correctly acknowledges that, as the First Circuit stated in *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986), the plaintiff "must satisfy four criteria in order to be entitled to a preliminary injunction." (Pl. Br. 13). In particular, "plaintiff must establish 1) a likelihood of success on the merits; 2) irreparable harm; 3) that the balance of harms favors plaintiff; *and* 4) that an injunction serves the public interest." *Northern Trust Corp. v. Northern Bank & Trust Co.*, 1991 U.S Dist. LEXIS 20349, *3 (D. Mass. Nov. 26, 1991) (emphasis added). Moreover, as Judge O'Toole explained in denying a preliminary injunction motion where, as here, the plaintiff alleged trademark infringement, "[a] preliminary injunction, though often sought in trademark cases, is still extraordinary relief. It constitutes the exercise of a far-reaching power which ought not to be indulged in lightly." *Q Div. Records, LLC v. Q Records*, 2000 U.S. Dist. LEXIS 1773, *6 (D. Mass. Feb. 11, 2000).

---

[3]    Based on the same facts on which it bases its unclean hands defense, Hershey has also asserted counterclaims, which assert claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for cancellation of trademark registrations under 15 U.S.C. § 1064, for common law unfair competition, and for unfair methods of competition and unfair and deceptive acts and practices pursuant to MASS. GEN. LAWS ch. 93A §§ 2, 11. At this time, Hershey is not seeking preliminary injunctive relief on these counterclaims.

As demonstrated below, ZPNC has not established any of the four prerequisites for preliminary injunctive relief, let alone all of them.

## II.     ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on Its Claims

ZPNC correctly states that the "most critical factor" in determining whether it has met its burden on its motion is whether it has established a likelihood of success on the merits. (Pl. Br. 13). As demonstrated below, ZPNC has not met its burden on any of the three claims on which it seeks injunctive relief.

### A.     ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on Its Trademark Infringement Claim

As the First Circuit has stated, "'[t]he law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *I.P. Lund Trading Co. v. Kohler*, 163 F.3d 27, 43 (1st Cir. 1998). "Likelihood of confusion is thus an essential element of a claim of trademark infringement." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir. 1981). As the First Circuit has instructed, in assessing whether the plaintiff has met its burden of establishing likelihood of confusion, the courts must consider "the following factors: the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark." *Id.* at 487. These factors "are meant to be used as guides" and no one factor is "determinative." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996). Application of the full panoply of the *Pignons* factors makes clear that ZPNC has failed in establishing a likelihood of success on its infringement claim.

1.    **Similarity of the Marks**

Before turning to this factor, there is a predicate issue that ZPNC attempts to glide over. Throughout its brief it refers to something it terms the "Zone Marks." According to ZPNC, these marks are ZONE, ZONE DIET, ZONE PERFECT, the "stylized ZONE logo" and "other related registered and common law 'ZONE' trademarks" – "related" marks that it notably fails to identify. (Pl. Br. 1). ZPNC, however, does not dispute – nor could it – that it has not marketed or sold its nutrition bars or any other products under the stand alone mark ZONE, although it repeatedly tries to create the impression that it has done so by using the definitional sleight of hand "ZONE Marks" throughout its brief. Nor can ZPNC dispute that it does not own any federal trademark registrations for the stand alone mark ZONE. Rather, ZPNC sells its bars under the mark ZONE*Perfect*, and that is the mark that it has registered at the PTO. Put another way, the only thing confusing in this case is ZPNC's attempt to conflate its use of the ZONE*Perfect* mark with use of a "zone" mark.[4]

Turning to the marks that are at issue – ZONE*Perfect* and *SmartZone* – it is clear that they are not similar. The only thing that they have in common is the term "zone." (Not even ZPNC asserts that there is any confusing similarity between the terms "perfect" and "smart"). No one disputes that the term "zone" refers to the Zone Diet. Indeed, in its complaint and brief ZPNC

---

[4]    Indicative of its sleight of hand, ZPNC, in referring to the statutory presumption of validity of 15 U.S.C. § 1115(a), that attaches to registered marks, refers to its "registration of the Registered ZONE Marks." (Pl. Br. 16 n.10, 24 n.13). The presumption, however, attaches to the mark ZONE*Perfect*, the mark used on ZPNC's nutrition bars; it does not attach to "ZONE Marks," let alone the ZONE mark – which ZPNC does not own and does not use. In any event, the presumption is just that – a presumption that, as one of the cases ZPNC itself cites, "serves only to shift the burden of production to the defendant." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir. 1986). As the Supreme Court has explained, notwithstanding any presumption, "[t]he Lanham Act expressly provides that . . . an opposing party may prove *any* legal or equitable defense which might have been asserted if the mark had not been registered." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985) (emphasis added). *See Mongan v. O'Neill*, 2002 U.S. Dist. LEXIS 13590 (D.N.H. July 24, 2002).

alleges that the logo for the ZONE*Perfect* bars "was *designed*, with Sears' approval, to closely approximate the distinctive font used for the word 'ZONE' on the book covers of The Zone and Mastering the Zone *in an effort to expressly tie the ZONEPerfect bar to the Zone Diet and Sears'* publications." (Complaint ¶ 29; Pl. Br. 5) (emphasis added). And on its website, in a banner headline on each page, it proclaims (*falsely*): "Zone Perfect  The Official Website Of The Zone Diet." In short, the term "zone" is a clear reference to the Zone Diet. Thus, just as no person has a "monopoly on the use of the word 'Cola' in the name of its beverage," *Coca-Cola Co. v. Snow Crest Beverages, Inc.*, 162 F.2d 280, 283 (1st Cir. 1947), no person has a monopoly on use of the word "zone" for a food product that allegedly is compliant with the Zone Diet. *See id.* (POLAR COLA does not infringe COCA COLA).

As a court in this District explained in holding that the mark CENTURY NIGHT LIGHT did not infringe 100-YEAR NITE-LITE, where "respective marks have a common element which is generic, . . . the court must look to the non-generic aspects of the marks" to determine if they are confusingly similar. *Donsky v. Bandwagon*, 1976 U.S. Dist. LEXIS 11735, *10 (D. Mass. Dec. 21, 1976). Similarly, after acknowledging that the term "hib" refers to influenza diseases, the Second Circuit held that the mark HIB-IMUNE when used for an influenza vaccine did not infringe the mark HibVAX. *American Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2d Cir. 1986). The Court explained that "because the generic term 'Hib' may not be appropriated by Lederle for its exclusive use, any likelihood of confusion between HibVAX and HIB-IMUNE, and any consequent finding of infringement, must be based on a similarity between the suffixes 'VAX' and 'IMUNE.'" *Id.* at 308. The Court then held: "The very statement of the issue, however, resolves it. The suffixes are totally different. They are of different length, sound and appearance." *Id.* So, too, here. "PERFECT" and "SMART" "are totally different." They are of "different length, sound and

appearance," and have a different number of syllables. And that, as confirmed by the legion of cases that apply this analysis of stripping away the generic element of combination marks, should be the end of the matter and of ZPNC's infringement claim.[5]

Further confirming the absence of any similarity between the marks is their "total effect." *Pignons*, 657 F.2d at 487. As one circuit court recognized in applying the total effect test, the "alternation, addition or elimination of only a single letter" from the plaintiff's mark may significantly reduce the likelihood of confusion between two marks. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir. 1979). Here, as can easily be seen in the attached pictures (*see* Exhibits A, B), the differences are far more significant. The word "zone" appears at the end of Hershey's mark, whereas it appears at the beginning of ZPNC's mark. In Hershey's mark, the word "zone" is in script – in ZPNC's words, in a "dynamic font" (Pl. Br. 19) – with the Z used as a horizontal divider. By contrast, in ZPNC's mark the word "zone" appears first and appears above – not next to – the word "perfect." In addition, the word "zone" in Hershey's mark is always in a different color from the word "smart," and the colors do not change from flavor to flavor. By

---

[5]     *See, e.g., Keebler Co. v. Murray Bakery Prod.*, 866 F.2d 1386, 1390 (Fed. Cir. 1989) (PECAN SANDIES does not infringe PECAN SHORTEES for cookies); *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 860-62 (3d Cir. 1992) (I-N-J-U-R-Y-1 does not infringe INJURY-1 for personal injury legal services); *Fleetwood Co. v. Hazel Bishop, Inc.*, 352 F.2d 841, 844 (7th Cir. 1965) (TINTSTIK does not infringe TINTZ for hair coloring products); *Maine Ave. Seafood, Inc. v. The Crab House, Inc.*, 1998 U.S. Dist. LEXIS 23144, *17 (D. Md. March 30, 1998) (THE CRAB HOUSE does not infringe BETHESDA CRAB HOUSE for seafood restaurants); *Ebeling & Reuss, Ltd. v. Swarovski Int'l Trading Corp., A.G.*, 1992 U.S.Dist. LEXIS 12731, *27-28 (E.D. Pa. Aug. 24, 1992) (CRYSTAL COLLECTIBLES does not infringe CRYSTAL SIGNATURES for crystal products); *Smithkline Beckman Corp. v. Procter & Gamble Co.*, 591 F. Supp. 1229, 1238 (N.D.N.Y. 1984) ("The 'RIN' ending contained in both ECOTRIN and ENCAPRIN is a derivative of the generic term 'aspirin' and as such cannot be the basis for a likelihood of confusion."); *Beech-Nut, Inc. v. Warner-Lambert Co.*, 346 F. Supp. 547, 549 (S.D.N.Y. 1972) (BREATH PLEASERS does not infringe BREATH SAVERS for breath mints).

contrast, the color of the word "zone" in ZPNC's packages differs from flavor to flavor and is different from the color of "zone" in Hershey's mark.

The packages for the products are also distinctly different. *See Lever Bros. Co. v. Am. Bakeries Co.*, 693 F.2d 251, 257 (2d Cir. 1982) (in assessing likelihood of infringement of word marks, differences "in the overall packaging" should be given considerable weight). Not only are the bold background colors of the packages for Hershey's bars markedly different from the background beige color of the packages for ZPNC's bars, but the sizes and overall appearances of the packages are also distinctly different.

Even more significantly, the HERSHEY'S trademark appears prominently and directly above the mark *SmartZone* – a fact that ZPNC remarkably ignores. As the First Circuit has recognized, even "otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Pignons*, 657 F.2d at 487. Thus, in *R.G. Barry Corp. v. A. Sandler Co., Inc.*, 406 F.2d 114 (1st Cir. 1969), the Court affirmed judgment for the defendant, holding that its use of "Angel Touch" in connection with women's pumps and step-ins did not infringe plaintiff's "Angel Treads" and "Angelite" marks for slippers. The Court explained that the "conjunction" of the parties' housemarks with the contested trademarks on the products to be of "exceptional significance," stating that "the housemark rather than the trademark or product seems to have been relied upon to reveal the source of origin." *Id.* at 116. *Accord, e.g., Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983) (ASTRA as brand name for blood analyzer when used in conjunction with house name BECKMAN on another part of the machine does not infringe ASTRA when used as house brand together with other brand names) (summary judgment for defendant affirmed); *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120, 124 (D. Mass. 1996) (WE MAKE LIFE SIMPLE when used

with strong housemark does not infringe IT'S THAT SIMPLE for stores selling home improvement

products) (preliminary injunction denied); *Pump, Inc. v. Collins Mgmt., Inc.*, 746 F. Supp. 1159,

1168 (D. Mass. 1990) ("[o]therwise similar marks are not likely to be confused where used in

conjunction with the clearly displayed name and/or logo of the manufacturer").[6]

The same is true here. The HERSHEY'S trademark is clearly displayed in its distinctive font

and maroon color. Not only is this mark federally registered and incontestable, 15 U.S.C. § 1065,

but market research confirms what every candy lover knows – that the mark is exceptionally strong.

Indeed, the HERSHEY'S word mark alone has a stunning 99% awareness level among consumers.

Given the extraordinary strength of the HERSHEY'S name and the name's prominence on the

*SmartZone* packages, consumers who see the products will – as Hershey intends – associate them

with Hershey and *its* products and will not associate them with the maker of the ZONE*Perfect* bars.

---

[6]     *See also Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 122, 123 (2d. Cir.
2001) ("prominent use of distinctive brand labels alone negates any possibility of a likeli-
hood of confusion"); *McGregor-Doniger*, 599 F.2d at 1133-34 (use of a trademark in
conjunction with a company name mitigates against finding likelihood of confusion); *Lindy
Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 n.4 (9th Cir. 1984) (AUDITOR'S and
AUDITOR'S FINEPOINT distinguishable because they were always used in conjunction
with prominent house marks); *Universal Money Ctrs., Inc. v. AT&T Co.*, 22 F. 3d 1527, 1531
(10th Cir. 1994) (UNIVERSAL MONEY, UNIVERSAL MONEY CARD, and UNIVER-
SAL MONEY CENTER not confusingly similar to THE AT&T UNIVERSAL CARD
"especially in light of the distinctive AT&T house mark prominently displayed on the front
of AT&T's card"); *Walter v. Mattel, Inc.*, 31 F. Supp.2d 751, 760 (C.D. Cal. 1998) (identical
marks held not likely to be confused where defendant also used its well known brand name
"Mattel"); *Wash. Nat'l Ins. Co. v. Blue Cross & Blue Shield*, 727 F. Supp. 472, 474 (N.D.
Ill. 1990) (use of house mark in conjunction with trademark "unequivocally identifies the
source" of the service, making confusion unlikely); *EA Engr'g, Science, & Tech., Inc. v.
Envtl. Audit, Inc.*, 703 F. Supp. 853, 857 (C.D. Cal. 1989) ("the addition of a company's full
name to its logo serves to sufficiently separate itself from a competitor using a somewhat
similar logo); *T.A.D. Avanti, Inc. v. Phone-Mate, Inc.*, 1978 U.S. Dist. LEXIS 19572, *19
(C.D. Cal. Feb. 14, 1978) ("[t]he use of the alleged infringer's trademark, trade name or
'house mark' in advertising its products and on its products and packaging mitigates against
finding of 'likelihood of confusion,' particularly where the allegedly infringing mark or term
and the plaintiff's mark are recognizably different").

Finally, as for Dr. Sears' seal that appears to the left of the *SmartZone* mark, we note at the outset that ZPNC's packaging has no seal. Thus, the seal itself is a distinguishing – not common – factor.[7] Second, the seal clearly states "Dr. SEARS" and "APPROVED" – statements that are indisputably true. Dr. Sears *does* approve of the *SmartZone* products and expressly endorses them, while he does not approve of nor endorse ZPNC's products. Indeed, in its October 17, 2001 contract with Dr. Sears, ZPNC expressly agreed that it cannot state that Dr. Sears approves or endorses its products. As for the "zone" that appears in the seal, it does not contain the letter "o" with cross-hairs through it, which is the distinguishing feature of ZPNC's stylized mark. Rather, the "zone" in Dr. Sears' seal is identical in all respects to the "zone" on the cover of his first book – a design that Dr. Sears clearly owns. (*See* Complaint Exs.1, 6).

In short, ZPNC's assertions that "[t]he marks at issue here are essentially identical" and the "packaging remarkably similar" are, in a word, preposterous. (Pl. Br. 2, 19). Seeing is believing. We urge the Court to look at the marks and the packages on which they appear. (*See* Exs. A, B). Indeed, if there is any similarity among packages, it is between the *SmartZone* package and Hershey's *Smore's* bar, which uses the distinctive Hershey's housemark – not between the *SmartZone* package and the ZONE*Perfect* package. (*See* Ex. D). Put another way, if consumers make any association between the *SmartZone* products and other products, it will be with these and other Hershey products, not with ZPNC's products.

---

[7]     The copy of the seal that ZPNC attaches to its complaint was misleadingly blown up to a size many times larger than that in which the seal appears on the *SmartZone* package. (*See* Complaint Ex. 1; Ex. B hereto). ZPNC then compared this outsized image to an outsized image of ZONE*Perfect* as that mark appears on the product package. But that is not a comparison that consumers see in the stores. Rather, they see the two products' packages, which, as explained above, are distinctly different in overall appearance.

2.      **Strength of the Mark**

ZPNC asserts that its "ZONE Marks are strong" and are "synonymous . . . with . . . nutrition bar[s] distributed by ZonePerfect for over six years." (Pl. Br. 22). To begin with, in using its made-up term "Zone Marks," ZPNC elides that it does not have a registration of or rights in the term "zone" alone and that it was unsuccessful in attempting to get Dr. Sears to agree to give up his right to use "zone" and to endorse "zone" products used by him or others, including, specifically, Hershey. (*See* pp. 5-7, *supra*).[8] Second, as explained above, the word "zone" is generic for the "Zone Diet," as ZPNC all but admits. Thus, as noted above, the logo for the ZONE*Perfect* bar was expressly "*designed . . . to closely approximate* the distinctive font used for the word 'ZONE' on" Dr. Sears' books" and that ZPNC did so "in an effort to *expressly tie the ZONEPerfect bar to the Zone Diet and Sears' publications.*" (Complaint ¶ 29; Pl. Br. 5) (emphasis added). ZPNC also directly (and falsely) ties itself and its ZONE*Perfect* bars to the Zone Diet in proclaiming: "Zone Perfect The Official Website Of The Zone Diet" and offers on its website the "Official Zone Diet Newsletter."

Wholly apart from the generic nature of the "zone" in ZPNC's ZONE*Perfect* mark, it is clear that the mark is weak. The evidence will demonstrate that ZPNC has not engaged in much advertising of the mark, leaving it with just its allegedly "strong sales" to support its claim of strength. That, without more, is hardly persuasive that the ZONE*Perfect* mark is a so-called "strong," source-identifying mark.

The most persuasive evidence as to the alleged strength (or weakness) of the mark is the vast number of trademark registrations and uses of marks containing the term "zone" for food and other

---

[8]      Whether or not the October 17, 2001 contract is determined to be ambiguous under the parol evidence rule, the negotiating history in which ZPNC unsuccessfully attempted to obtain the very relief that it is seeking in this case is plainly admissible to show that the parties understood that ZPNC would not be entitled to such relief. *See Donoghue v. IBC USA (Publications) Inc.*, 70 F.3d 206, 212-16 (1st Cir. 1995)

products, including Dr. Sears' OMEGA ZONE mark that ZPNC for years failed to challenge. Time

and again, the First Circuit and other courts have looked to the PTO's registration of similar marks

as persuasive evidence of the weakness of a mark because the PTO is the expert agency Congress

has created to evaluate marks and their likelihood of being confused with each other.[9] As Professor

McCarthy explains in the leading treatise on trademark law, in words that fit this case to a tee:

> The ultimate test of relative strength is the distinctiveness of a mark in the mind and perception of the relevant customer group. But a mark that is hemmed in on all sides by similar marks on similar goods cannot be very "distinctive." It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other. (J. Thomas McCarthy, McCARTHY'S ON TRADEMARKS § 11:85 (4th ed. 2003).[10]

---

[9]     *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989); *R.G. Barry Corp. v. A. Sandler Co.*, 406 F.2d 114, 116 (1st Cir. 1969); *Q Div. Records*, 2000 U.S. Dist. LEXIS 1773, at \*10; *Stop & Shop Supermarket Co. v. Big Y Foods*, 943 F. Supp. 120, 125 (D. Mass 1996); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (9th Cir. 1980).

[10]     *See, e.g., N. Trust*, 1991 U.S. Dist. LEXIS 20349, at \*12-13 (NORTHERN BANK & TRUST not likely to be confused with NORTHERN TRUST and NORTHERN for banking services given widespread use of NORTHERN in bank names); *Miss World (UK), Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449-50 (9th Cir. 1988) (MRS. OF THE WORLD not likely to be confused with MISS WORLD for beauty pageants because most pageants use a marital prefix and a defining geographic term); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (extensive third party use of SUN, including a significant number of financial institutions, is persuasive evidence of no likelihood of confusion between SUN BANKS and SUN FEDERAL); *Wash. Nat'l Ins.*, 727 F. Supp. at 476 (ADVANTAGE for health care programs held to be weak because of extensive use by competitors and others in the insurance and financial services industry); *Michael Caruso & Co. v. Estefan Enter., Inc.*, 994 F. Supp. 1454, 1460 (S.D. Fla. 1998) (BONGO held to be weak mark for wearing apparel because of extensive third-party use, including 75 businesses other than plaintiff's using the Bongo mark in their businesses, and 17 registrations for marks incorporating the term); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979) (existence of 85 different carpet companies using WORLD without objection evidences no likelihood of confusion); *Enterpreneur Media, Inc v. Smith*, 279 F.3d 1135 (9th Cir. 2002) (ENTREPRENEUR in title of public relations company not likely to be confused with ENTREPRENEUR magazine given that six other magazines use "entrepreneurs" in their titles and numerous companies' registration of the word "entrepreneur"); *Technical*

(continued...)

Similarly, a plaintiff's failure to police its mark is relevant to a determination as to the strength of the mark.[11]

Here, there are numerous third-party registrations and uses of the mark "zone" in connection with nutrition bars and other food products, including Dr. Sears' OMEGA ZONE bars, DR. SEARS ZONE LABS bars and DR. SEARS ZONE DIET bars, as well as OPTIZONE bars, TREAT ZONE bars, BODYZONE bars, ZONE RZ bars, XTREME ZONE bars and ZONE GOURMET vitamin and nutritional supplements. (A list of such marks that are either registered or for which the PTO has indicated it will grant registrations is attached hereto as Exhibit C). Indeed, since *each* of these numerous registrations has the same presumption of validity and distinctiveness on which ZPNC so heavily relies for its mark, it makes no sense to say that the term "zone" is the distinctive element of any of the marks, including ZONE*Perfect*. Rather, it is the other components of the marks – *e.g.*, "opti", "treat", "body", "perfect" – that the PTO has found distinctive and not confusingly similar. In addition, there are over a thousand registered marks in all fields that contain the term "zone." ZPNC, except for its over two year old tardy claim as to OMEGA ZONE, has apparently not attempted to stop others from using the term "zone" in a mark, let alone succeeded in doing so. Nor can ZPNC attempt to avoid the consequences of its inaction by arguing that the sales of other "zone" bars are on the internet. (Pl. Br. 24 n.14). Not only does ZPNC itself directly compete with these internet companies by selling the ZONE*Perfect* bar on the internet itself (indeed, it sells more

---

10    (...continued)
      *Pub'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136 (7th Cir. 1984) (COMPUTER +
      SOFTWARE NEWS not likely to be confused with SOFTWARE NEWS where there was
      evidence of a crowded field of numerous publications in the computer field, many of them
      using "software" in their titles).

11    *See* cases cited at p. 23 nn.9, 10, *supra*; *Uncas Mfg.v. Clark & Coombs Co.*, 309 F.2d 818
      (1st Cir. 1962).

nutrition bars on the internet than many competing brands), but the same people who purchase bars on the internet also shop in retail stores in which ZPNC's bars are sold.[12] Indeed, ZPNC itself argues that Dr. Sears' OMEGA ZONE, which is sold on the internet, is marketed to the same consumers as is ZONE*Perfect* – "consumers interested in balanced nutrition products." (Pl. Br. 20). As for ZPNC's argument that the sales of "zone" bars and other products on the internet are allegedly "small," Hershey doubts that this is anything other than speculation. But even if it were true, ZPNC cites no case authority that it can ignore such third-party use and sit back for years permitting other parties to crowd the field with "zone" marks.

The bottom line is that ZONE*Perfect* is just one of many marks in a crowded field of "zone" marks – marks that ZPNC has made no apparent effort to stop. Actions speak louder than words. The reason for ZPNC's inaction is simple – until it decided to attempt to achieve in litigation what it could not achieve at the bargaining table with Dr. Sears, it, like the PTO and any objective observer today, realized that the numerous "zone" products and registrations can continue to exist side by side without any likelihood of confusion.

### 3.   Defendant's Good Faith

ZPNC asserts that "there can be little doubt as to the willful nature of the defendants' conduct." (Pl. Br. 21). ZPNC is dead wrong.

The law in this circuit (and elsewhere) is clear that it is *not* bad faith to pick a mark knowing of the existence of the plaintiff's mark. To the contrary, "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *NEC Elecs., Inc. v. New England Circuit Sales,*

---

[12]   *See, e.g., Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000) (injunction enjoining internet sales affirmed in favor of plaintiff who sells at retail and on internet); *A.V. by Versace, Inc. v. Versace*, 87 F. Supp.2d 281 (S.D.N.Y. 2000) (defendant held in contempt for selling infringing products on internet where plaintiff sold at retail).

*Inc*, 722 F. Supp. 861, 866 (D. Mass. 1989). *Accord, Northern Trust*, 1991 U.S. Dist. LEXIS 20349, at *10; *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978). Rather, as the First Circuit has held, to establish bad faith the plaintiff must establish "palming off," an "intent to deceive," or an "effort to benefit" from the plaintiff's "reputation." *Pignons*, 657 F.2d at 491.[13] Indeed, in words fully applicable here, the Second Circuit explicitly repudiated the notion that "the second-comer who knows about the name . . . of the first-comer has some obligation to name his product . . . so as to avoid confusion." *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 218 (2d Cir. 1985). Finding that such a rule would "confer exclusive trademark protection to the first user of a mark, regardless of the mark's distinctiveness," Judge Kaufman rejected it "as inimical to the purposes of trademark law." (*Id.*).

Here, the evidence – as opposed to ZPNC's speculation – will show that Hershey chose the name in good faith and independently developed the *SmartZone* bars with the guidance of Dr. Sears. In addition, it uses the term "zone" in the products' name to associate the products with the Zone Diet – a diet with which the products are compliant and a diet that was developed by Dr. Sears, who endorses Hershey's (not ZPNC's) products. Moreover, the vast number of registrations for food products that contain the word "zone" confirm that Hershey acted in good faith in picking a distinctly different name than ZONE*Perfect* and in using it in conjunction with the well known Hershey trademark. The PTO's deliberate decision to register numerous marks that contain the word "zone"

---

[13]    *Accord, W.W.W. Pharm. Co. v. Gillette Co.*, 808 F. Supp. 1013, 1024-25 (S.D.N.Y. 1992) ("the relevant intent in a likelihood of confusion inquiry is whether the defendant adopted a mark *with the intent of promoting confusion and appropriating the prior user's good will*") (emphasis added); *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1201 (S.D.N.Y. 1979) (Leval, J.) (good faith found where "[t]here is no suggestion that the defendant is *seeking to capitalize* on good will obtained by the plaintiff through the use of its Sure mark to obtain any kind of a free ride. . . . [T]he defendant is relying on its own quality and publicity and not on plaintiff's.) (emphasis added), *aff'd*, 636 F.2d 1203 (2d Cir. 1980).

for the same or related food products indicates that in its expert opinion there is no likelihood of confusion between such marks, a determination that is entitled to deference by this Court. Where the PTO has consistently registered a large number and variety of marks that contain the word "zone" on the ground that there is no likelihood of confusion, it cannot constitute bad faith for Hershey, based on an awareness of the PTO's decisions in this regard, to conclude that it is free to use the mark *SmartZone*. Similarly, ZPNC's willingness to live for years side by side with Dr. Sears' OMEGA ZONE bar confirms Hershey's good faith.

In short, in using the name *SmartZone* together with its well known house mark HERSHEY's and Dr. Sears' seal of approval, Hershey is attempting to capitalize on *its own* good will and that of Dr. Sears. The last thing Hershey would want to do is be confused with ZPNC and ZPNC's non-Zone-Diet-compliant products.

### 4. Channels of Trade, Advertising, and Prospective Purchasers

Although ZPNC acknowledges that these factors "are almost always considered together" (Pl. Br. 20), it makes no mention of advertising. This is not surprising since Hershey believes that the evidence will show that ZPNC has engaged in only minimal advertising. By contrast, Hershey intends significant advertising that will highlight the well-known HERSHEY'S brand, causing consumers to associate *SmartZone* with Hershey, thus lessening any possibility of confusion.

As for channels of trade, it is, of course, the case that both parties' products will be sold in the same types of stores and on the internet. Although Hershey hopes that its product will be placed near other nutrition, balance, performance and diet bars, it is simply not true that the CAGNY presentation stated that "Hershey contemplates that [the] 'SmartZone' bars and ZonePerfect bars are *to sit side by side* in store aisles." (Pl. Br. 20) (emphasis added). (*Compare* Complaint Ex. 27). In fact, it is undisputable that the retailer has complete discretion as to where to place the parties'

products in its stores. Moreover, Hershey intends having stand-alone displays of its *SmartZone* bars at the front of aisles during the products' introduction to acquaint consumers with the products. What is especially significant is that, unlike in the decision on which ZPNC relies (Pl. Br. 20), here, the "affiliation" of the *SmartZone* products with Hershey is "obvious to the general public," lessening any possibility of confusion as a result of the fact that the parties' products are sold in the same types of channels. *See Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 818 (1st Cir. 1987). In addition, ZPNC's failure to sue Dr. Sears in connection with his OMEGA ZONE bar over the past two years – which, like ZONE*Perfect*, is sold on the internet – speaks volumes about ZPNC's non-litigation-driven business view of the "likelihood" of confusion between two nutrition bars that contain the term "zone" in their name. Finally, although both parties' products will be sold to similar kinds of customers, Hershey intends, using its advertising and the broad appeal of the HERSHEY'S name, to broaden the market for its product.

### 5.    Similarity of Products

To be sure, both parties' products are nutrition bars. However, the products are not the same in content, texture or appearance and taste distinctly different. Moreover, only one of the products – the *SmartZone* bar – is endorsed by Dr. Sears and is compliant with the Zone Diet. If there is any likelihood of confusion between the bars – which Hershey contends there is not – it will be because ZPNC, playing on its misuse of the word "zone" and its use of its website falsely to promote itself as the Official Website of the Zone Diet, is attempting to confuse consumers into believing that its bars are compliant with the Zone Diet and endorsed by Dr. Sears.

### 6.    Actual Confusion

ZPNC asserts that "actual confusion can be presumed when a party's use of another's mark is obviously and intentionally identical." (Pl. Br. 21). As explained above, there is no basis for the

assertion that the marks are "identical," let alone "intentionally" so. In any event, actual confusion is something to be proved not presumed, and, not surprisingly, none of the cases ZPNC cites says anything to the contrary.

**B.    ZPNC Is Unlikely to Succeed on Its False Advertising Claim**

The law governing false advertising claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is well settled. "A plaintiff can succeed on a false advertising claim by proving either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers." *Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24, 33 (1st Cir. 2000). "If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction." *Id.* "In the absence of such literal falsity, an additional burden is placed upon the plaintiff to show that the advertisement . . . conveys a misleading message to the viewing public." *Id.* "To satisfy its burden the plaintiff must show how consumers have actually reacted to the challenged advertisement rather than merely demonstrating how they could have reacted." *Id.* Accordingly, if the plaintiff is asserting a claim of implied falsity, it must submit consumer survey evidence "proving that a substantial portion of the audience for that advertisement was actually misled." *Id.* at 36.

Here, it is clear that ZPNC's false advertising claim is one of alleged implied falsity. The press release that Hershey and Dr. Sears issued announced that they:

> plan[ned] to introduce the first-ever nutrition bars with the science-based nutritional benefits of the Zone Diet and the great taste con-sumers expect from Hershey. The products will be the first to carry the 'Dr. Sears Zone Approval' seal and will be introduced during the third quarter" of 2004. (Complaint Ex. 24; *see id.* Ex. 26).

At the subsequent analysts conference in Arizona, Mr. Lenny stated that the *SmartZone* bar "brings consumers great taste and the balanced nutrition they want" and that the bars were the "only nutrition

bars to carry the seal" of Dr. Sears. Each of these statements is literally true. The ZONE*Perfect* bars

certainly do *not* have Hershey's great taste and the *SmartZone* bars are, in fact, the only (and the

first) nutrition bars that carry Dr. Sears' seal. Accordingly, to establish a § 43(a) claim based on any

of these statements, ZPNC would have to submit survey evidence showing that consumers took away

the message ZPNC alleges they took away – that the *SmartZone* bar is "the 'first' nutrition bar

'approved' by Sears." (Pl. Br. 3). Since the challenged statements were made in business press

releases and at an analysts conference about a product yet to be released for sale, it is exceedingly

unlikely that ZPNC will be able to show that any consumers were even aware of these statements,

let alone that a "substantial portion" of consumers were misled "as a result" of any allegedly false

implied message. *Clorox*, 228 F.3d at 33, 36.[14] Moreover, even if ZPNC had survey evidence that

consumers took away a message that *SmartZone* was the first bar approved by Dr. Sears, that

message is not likely to be material given that *none* of the bars ZPNC offers for sale are endorsed

today by Dr. Sears.

---

[14]     ZPNC's attempt to avoid the requirement of a survey by selective quotation of the releases
and statements violates one of the black letter rules of § 43(a) jurisprudence – that "[i]n
assessing whether an advertisement is literally false, a court must analyze the message
conveyed within its full context." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180
(8th Cir. 1998) (affirming denial of preliminary injunction). That is, the "court must 'consi-
der the advertisement in its entirety and not . . . engage in disputatious dissection. The entire
mosaic should be viewed rather than each tile separately.'" *Avis Rent A Car Sys., Inc. v.
Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986). *See also Johnson & Johnson * Merck
Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994)
("[a] determination of literal falsity rests on an analysis of the message in context"). As for
the *Polar Corp. v. The Coca-Cola Co.*, 871 F. Supp. 1520 (D. Mass. 1994), which predated
the First Circuit's decision in *Clorox*, it involved a clear disparagement of Coca-Cola. That
the court loosely used the word "implied" does not detract from the fact that the challenged
commercial contained a literally false visual disparagement; nor, of course, could the court's
decision be relied on in this manner given the later clear holding of the First Circuit in
*Clorox* that implied claims must be established by consumer survey evidence. 228 F.3d at
33.

Finally, ZPNC argues that Hershey's alleged "intent to deceive . . . relieves [ZPNC] from its burden of establishing consumer deception" with survey evidence. (Pl. Br. 28). As a threshold matter, as explained above, there is absolutely no evidence of any intent to deceive and, indeed, such an intent would be directly contrary to Hershey's desire – as prominently indicated on the *SmartZone* packages – that consumers *know* that the products come *from Hershey* so that *Hershey* can reap the benefits of *its* great goodwill and reputation. In any event, as the Second Circuit recognized in the very case ZPNC cites, "[t]he history of advertising suggests that consumer reactions usually are unrelated to manufacturer intentions." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). This recognition of the vagaries of consumer perception is fully consistent with the First Circuit's holding in *Clorox* that in a case of an allegedly implied claim, "the plaintiff must show how consumers have *actually reacted* to the challenged advertisement rather than merely demonstrating how they could have reacted" and "must" submit consumer survey evidence "proving" that the target audience "was *actually misled*." *Clorox*, 228 F.3d at 33, 36 (emphasis added).

## C.   ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on Its Breach of Contract Claim

Notwithstanding its overheated rhetoric, ZPNC fails to identify *any* of its proprietary or confidential information that Hershey allegedly obtained from it and used to develop its *SmartZone* products or otherwise used in violation of the confidentiality agreement – an agreement that expires in four months. The closest ZPNC comes to attempting to justify its allegations is its incredulous tone in questioning how "Hershey was able to formulate and market a 40-30-40 [*sic*] bar (and the entire business structure around it) – a feat that took ZonePerfect years to accomplish – in a matter of months," and concluding that "[c]ommon sense suggests" that the only way Hershey was able to do so was "because it had access to [ZPNC's] successful (confidential) road map." (Pl. Br. 34). Suffice it to say that Hershey is the premier candy and bar maker in this country and that six months is not

at all an unusually short time for it independently (with the assistance of Dr. Sears but independent of any information that might have been obtained from ZPNC) to develop new products. And the evidence will show that is exactly what Hershey did – independently develop the *SmartZone* bars. Put another way, a nutrition bar is not an airplane that takes years of effort to design and develop. Moreover, ZPNC never disclosed its recipes for its bars to Hershey, and Hershey therefore could not have used it. Given the public policy in favor of competition, the Court should require more than just rhetoric and speculation before even considering using the litigation process to deny consumers the benefits of competition.

### D.    ZPNC Has Failed to Demonstrate that It Is Likely to Succeed on Its Massachusetts Statutory Claims

In its complaint, ZPNC contends that Hershey's conduct "constitutes unfair and deceptive acts or practices within the meaning of M.G.L. ch. 93A, §§ 2, 9." (Complaint ¶ 228). ZPNC is not likely to succeed on this claim for four independent reasons.

First, as the statute states on its face, only consumers have standing to sue under Section 9.[15] Second, ZPNC failed to give notice to Hershey of its claim before it sued, as required by Mass. Gen. Laws ch. 93A § 9(3). *See McMahon v. Digital Equip. Corp.*, 944 F. Supp. 70, 77 (D. Mass. 1996) (claim dismissed for failure to give notice); *Ball v. Wal-Mart, Inc.*, 102 F. Supp.2d 44, 54 (D. Mass. 2000) (summary judgment granted for failure to give notice). Third, even if ZPNC had sued under Section 11, to the extent ZPNC bases its claim on the statements Hershey made in its press releases issued in Hershey, Pennsylvania or at the CAGNY conference that was held in Scottsdale, Arizona,

---

[15]    *See Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) ("By their terms, . . . the two sections of chapter 93A that create private rights of action are mutually exclusive: section 11 entitles '[a]ny person who engages in the conduct of any trade or commerce' to bring an action for unfair or deceptive practices, whereas section 9 grants essentially the same entitlement to aggrieved consumers. Withal, section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce.").

the claim fails because the section requires that the defendant's actions must have "occurred primarily and substantially" in Massachusetts. Finally, ZPNC bases its claim on the same allegation on which it bases its Lanham Act claims. (*See* Pl. Br. 13 n.7). Accordingly, wholly apart from these fatal infirmities in its claim, ZPNC likely would not succeed on its claim because, as demonstrated above, it is not likely to establish that Hershey committed trademark infringement or false advertising. *See McKernan v. Burek*, 118 F. Supp. 2d 119, 125 (D. Mass. 2000).

**E.     Hershey Is Likely to Succeed on Its Defense of Unclean Hands**

A successful unclean hands defense arises from the equitable maxim, "he who comes into equity must come with clean hands." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir. 1989) (citing *Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 633 (1st Cir. 1983)). "It prevents one who is 'tainted with inequitableness or bad faith relative to [the] matter in which he seeks relief' from obtaining relief from a court of equity." *Trustees of Columbia Univ. v. Roche Diagnostics*, 272 F. Supp.2d 90, 112 (D. Mass. 2002). In particular, the doctrine of unclean hands may arise when a party, who seeks equitable relief against a competitor's trademark infringement, has used the mark its seeks to protect "as a means of misrepresentation or fraud upon the public." *Renaud Sales Co. v. Davis*, 104 F.2d 683, 685 (1st Cir. 1939) (reversing grant of injunction against defendant for trademark infringement because, given its unclean hands, "plaintiff had no standing in equity to ask for an injunction against the defendant").[16]  That is exactly what ZPNC is attempting to do here.

---

[16]     *See also, e.g., Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997) ("Unclean hands is a defense to a Lanham Act infringement suit. To prevail . . . equity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue."); *Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992) (barring enforcement of valid copyright due to unclean hands); *Transclean Corp. v. Bridgewood Servs.*, 77 F. Supp.2d 1045, 1096 (D. Minn. 1999), *aff'd in part and vacated in part on other grounds*, 290 F.3d 1364 (Fed. Cir. 2002) ("The doctrine of unclean hands, which has its roots in the maxim 'he who seeks equity must present himself in court with clean hands,' may arise when a
(continued...)

At the very time it is asking the Court to enjoin Hershey from using the term "zone" in the name of the *SmartZone* bar, ZPNC is using the term "zone" falsely to advertise on its website: "Zone Perfect  The Official Website Of The Zone Diet." Indeed, ZPNC all but concedes that any confusion that may arise (which Hershey does not believe will occur) will be the result of *its* misbranding of *its* product when it alleges in its complaint and brief that the ZONE*Perfect* bar was expressly "*designed . . .* to *closely approximate* the distinctive font used for the word 'ZONE' on" Dr. Sears' books" and that ZPNC did so "*in an effort to expressly tie the ZONEPerfect bar to the Zone Diet and Sears' publications.*" (Complaint ¶ 29; Pl. Br. 5) (emphasis added). Even more fundamentally, the ZONE*Perfect* mark itself is misleading and thus constitutes unclean hands because it expressly states that the ZONE*Perfect* bars are in compliance with the Zone Diet when they are not because, unlike the *SmartZone* bars, they do not have a low glycemic load.

In short, if there is any confusion it will be because of ZPNC's, not Hershey's, actions – it is ZPNC that is falsely communicating to consumers that its products are affiliated with or sponsored by Dr. Sears, the founder of the Zone Diet, when they are not, and that its nutrition bars are compliant with the Zone Diet, when they are not. If ever there were a case where a plaintiff comes into court with unclean hands, this is it.

---

[16]    (...continued)
party, who seeks equitable relief against a competitor's false advertising, has itself made false representations about its product to the public."); *Haagen-Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980) (doctrine of unclean hands prevented plaintiff from obtaining preliminary injunction against defendant's false designation of its ice cream as Scandinavian, when plaintiff's labeling falsely suggested that its ice cream was from Sweden); *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281-82 (7th Cir. 1992) (denying preliminary injunction seeking to reinstate franchise agreement allegedly wrongfully terminated where party seeking relief continued to use opposing party's mark after termination, thereby infringing plaintiff's mark).

### III.    ZPNC Has Failed to Demonstrate that It Will Be Irreparably Injured if Its Motion Is Denied

As the Supreme Court has recognized, "[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (emphasis by the Court). Yet the only allegation that ZPNC makes to support a finding of irreparable harm is that there is a presumption of such harm which follows from a finding of likelihood of confusion. Having failed to demonstrate likelihood of confusion, however, it is entitled to no presumption and its claim of irreparable injury should be rejected. In any event, the presumption is just that – a presumption, which is rebuttable. Here, given the weakness of ZPNC's showing, there is very little basis for concluding that the presumption should stand absent actual evidence of irreparable harm.[17] Indeed, the fact that for years ZPNC did not object to the sale of OMEGA ZONE bars is powerful evidence that the sale of competing bars whose names contain the term "zone" cause no – let alone irreparable – injury to ZPNC. *See, e.g., Fritz, DMA, Inc. v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98-99 (D. Mass. 1996) (denying preliminary injunction on trade dress copyright claims based on plaintiff's over two year delay); *Citibank, N.A. v. Citytrust & Citytrust Bancorp, Inc.*, 756 F.2d 273, 276 (2d Cir. 1985) (reversing preliminary injunction based on plaintiff's delay of *ten weeks* in asserting its trademark infringement claim). Finally, ZPNC has failed to establish its breach of contract claim and therefore cannot rely on any presumption with respect to that claim. *See Grease Monkey Int'l, Inc. v. Ralco*

---

[17]    *See YMCA of the USA v. Flint YMCA*, 764 F.2d 199, 201 (6th Cir. 1985) ("a preliminary injunction should not issue unless 'there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows.'" "*Omega [Importing Corp. v. Petri-kine Camera Co.*, 451 F.2d 1190 (2d Cir. 1971)] is not authority for a per se rule on trademark confusion. If it were, there would be no need for a 'balance of hardship' test for determining irreparable injury."). *See also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1985).

*Lubrication Servs., Inc.*, 24 F. Supp.2d 120, 126 (D. Mass. 1998) (irreparable injury not shown even though confidentiality agreement contained an acknowledgment "that harm will result from its breach" because "the financial or monetary injury which Plaintiff might suffer is ordinarily compensable, and is not usually considered to be irreparable").

## IV.     The Balance of Harms Tips Decidedly in Hershey's Favor

Since ZPNC has failed to establish that it is likely to succeed on its claims, the balance of harms tips decidedly in Hershey's favor. Moreover, Hershey has the obvious financial wherewithal to satisfy any judgment (as unlikely as the entry of a money judgment would be in this case). By contrast, if an injunction were issued, Hershey would be severely harmed. Hershey has invested substantial time, effort and money in independently developing its *SmartZone* bar, and it adopted the name in good faith. Particularly given ZPNC's failure to police its mark, it would be manifestly unfair to enjoin Hershey from using a mark containing the term "zone" – especially since, unlike ZPNC's bar, the *SmartZone* bar is compliant with the Zone Diet and is endorsed by the developer of that diet. Under these circumstances, there would be nothing equitable about singling out Hershey for an injunction – particularly after ZPNC unsuccessfully attempted to obtain a non-compete agreement from Dr. Sears and an agreement that would have effectively barred him from endorsing any product by Hershey that was marketed with the term "zone."

## V.     Denial of ZPNC's Motion Is in the Public Interest

The public interest does not favor an injunction because ZPNC has failed to establish that it is likely to prove that there is a likelihood of confusion, false advertising or breach of the confidentiality agreement. Absent such a showing, ZPNC's suit is nothing more than an attempt to obtain rights in gross to the mark "zone," which is manifestly against the public interest. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918). As the Supreme Court has recognized,

"[t]he law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting *consumers* from confusion as to source." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) (emphasis by the Court). In short, denial of injunctive relief would affirmatively promote the public interest in competition and "the free flow of commercial speech." *Bates v. State Bar of Arizona*, 433 U.S. 350, 364 (1977).

## CONCLUSION

For the foregoing reasons, ZPNC's motion for a preliminary injunction should be denied.

Dated: May 24, 2004

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.

Seni M. Adio, BBO #566709
Matthew Hurley, BBO #643638
One Financial Center
Boston, MA 02111
(617) 542-6000
(617) 542-2241 (fax)

KAYE SCHOLER LLP

Thomas A. Smart
Richard A. De Sevo
425 Park Avenue
New York, NY 10022
(212) 836-8000
(212) 836-7154 (fax)

*Attorneys for Defendants and Counterclaim-
Plaintiffs Hershey Foods Corporation and
Hershey Chocolate & Confectionery Corp.*

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party by
mail (hand) on *May 24, 2004*

30887323.WPD

37