UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN -3 P 4: 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ZONEPERFECT NUTRITION COMPANY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 04-10760-REK |
| ) | |
| HERSHEY FOODS CORPORATION, ) | |
| HERSHEY CHOCOLATE & ) | |
| CONFECTIONERY CORPORATION, and ) | |
| BARRY D. SEARS, ) | |
| ) | |
| Defendants. ) | |

## ZONEPERFECT NUTRITION COMPANY'S CONSOLIDATED REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Daniel L. Goldberg, BBO #197380
Charles L. Solomont, BBO # 557190
Joshua M. Dalton, BBO #636402
Matthew L. Mitchell, BBO #647902
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated:  June 3, 2004

## TABLE OF CONTENTS

Page

I.    ZonePerfect is likely to succeed on its claim of trademark infringement .............. 1

    A.    ZonePerfect's survey results offer conclusive proof that the
        "SmartZone" bar will cause consumer confusion as to
        ZonePerfect's strong brand name ................................................................. 2

    B.    Proper application of the Keds factors supports the survey results
        and confirms that confusion is likely ........................................................ 4

    C.    The 2001 Agreement confirms ZonePerfect's right to an injunction
        against consumer confusion .................................................................... 12

II.   ZonePerfect remains likely to succeed on its claims for false advertising
    and Hershey's breach of its confidentiality agreement ........................................ 13

    A.    The defendants have all but admitted that their public statements
        about the Dr. Sears ZONE Seal and the "SmartZone" bar are
        deceptive .............................................................................................. 14

    B.    Hershey has done nothing to dispel the fact that it reviewed all of
        ZonePerfect's confidential files and then chose to launch a nearly
        identical product only months later ........................................................ 14

III.  The degree and balance of harm continues to favor entry of a preliminary
    injunction ........................................................................................................ 15

IV.   Defendants' desperation claims of "unclean hands" on the part of
    ZonePerfect do not merit a denial of preliminary injunction against
    demonstrable confusion .................................................................................... 16

    A.    Use of the phrase "Zone Diet" and claimed copyright infringement
        are irrelevant to determining the need for a preliminary injunction ........ 16

    B.    These allegations are in any event insufficient to outweigh the
        impending consumer confusion .............................................................. 18

    C.    The ZONEPERFECT® mark is not misdescriptive, but is valid and
        enforceable ........................................................................................... 19

CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003) ....................11

*A.T. Cross Co. v. TPM Distributing, Inc.*, 226 U.S.P.Q. 521 (D. Minn. 1985)................11

*American Dairy Queen Corp. v. New Line Productions, Inc.*, 35 F. Supp. 2d 727
(D. Minn. 1998.) ..........................................................................................................11

*Amtra v. Russ Berrie and Co.*, 966 F.2d 1284 (9th Cir. 1992) ...........................................7

*Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003)................................................................17

*Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201
(1st Cir. 1983)..............................................................................................................10

*Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801 (2d Cir. 1973).............................14

*Bell v. Streetwise Records, Ltd.*, 761 F.2d 67 (1st Cir. 1985).............................................18

*Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2d Cir. 1961).............19, 20

*Boston Athletic Association v. Sullivan*, 867 F.2d 22 (1st Cir. 1989).........................3, 4, 11

*Charles of the Ritz Group v. Quality King Distributors*, 832 F.2d 1317 (2d Cir.
1987) ..............................................................................................................................7

*Coco Rico Inc. v. Fuertes Pasarell*, 738 F. Supp. 615 (D.P.R. 1990) .................................4

*Copy Cop v. Task Printing*, 908 F. Supp. 37 (D. Mass. 1995) ........................................3, 4

*Donoghue v. IBC/USA, Inc.*, 886 F. Supp. 947 (D. Mass 1995)........................................18

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1969)...........8

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987) .....................17

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591 (5th Cir.
1985) ............................................................................................................................12

*Goya Foods, Inc. v. Condal Distributings, Inc.*, 732 F. Supp. 453 (S.D.N.Y.
1990) ..............................................................................................................................3

*Hemmeter Cigar Co. v. Congress Cigar Co.*, 118 F.2d 64 (6th Cir. 1941)..........................7

*Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352 (7th Cir. 1983).....................3

*Jockey International v. Burkard*, 185 U.S.P.Q. 201 (S.D. Cal. 1975)..................................3

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989) ............................ 18, 19

*Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215 (1st Cir. 1989) ............. 4

*Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445 (9th Cir. 1988) ........................................................................................................................................ 8

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999) ........................................................................................................................................ 9

*Mutual of Omaha Insurance Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987) .......................... 2

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2nd Cir. 1999) ........................................ 16

*National Cable Television Associate, Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572 (Fed. Cir. 1991) .......................................................................................................... 9

*S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694 ............................................. 6

*Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455 (4th Cir. 1996) .................................... 3

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633 (1st Cir. 1992) ..................................................................................................................................... 11

*T & T Manufacturing Co. v. A. T. Cross Co.*, 449 F. Supp. 813 (D.R.I. 1978), aff'd, 587 F.2d 533 (1st Cir. 1978) ................................................................................................ 7

*Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076 (D. Mass. 1979) ....................................... 7

*W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970) ......................................... 12

## STATUTES

15 U.S.C. § 1125 ..................................................................................................................... 6

## OTHER SOURCES OF AUTHORITY

MCCARTHY ON TRADEMARKS § 7:18 ........................................................................................ 9

MCCARTHY ON TRADEMARKS § 24:23 ..................................................................................... 10

MCCARTHY ON TRADEMARKS § 24:72 ..................................................................................... 16

## INTRODUCTION

While defendants would prefer to attack straw man after straw man, their briefs do little to address, let alone disprove, the core issue in ZonePerfect's Motion for Preliminary Injunction: that the introduction of *this* "SmartZone" bar in *this* manner will cause immediate, widespread, and irreparable harm to ZonePerfect's goodwill, including *at least* in its *federally registered mark* ZONEPERFECT® and its common law "nickname" "Zone bar."[1] Now, two surveys from nationally-renowned experts offer conclusive proof that such confusion will occur if the defendants launch the "SmartZone" bar. Hence the need to preserve the status quo pending a full trial. ZonePerfect's point is simple: If defendants ultimately prevail, a preliminary injunction will cost them nothing—they can enter the market by simply changing the name of their as-yet-unreleased product. For ZonePerfect, though, a preliminary injunction will prevent irreparable harm to its core trademark on its core product. ZonePerfect's high likelihood of success on the merits squarely justifies entry of a preliminary injunction against the defendants' planned release of the "SmartZone" bar.

ZonePerfect hereby replies to the opposition briefs filed by Barry D. Sears ("Sears Brief") and Hershey Foods and Hershey Chocolate & Confectionery. ("Hershey Brief").

## I.      ZonePerfect is likely to succeed on its claim of trademark infringement.

Survey results now demonstrate that defendants' attempt to argue that there will be no confusion caused by the introduction of a second nutrition bar with ZONE-dominated branding in the exact same primary channels of trade as the ZonePerfect® bar fails. Rather, widespread confusion will occur, and defendants argue otherwise only by misstating the facts and misapplying them to the relevant legal test for confusion.

---

[1] Sears attempts to expand the scope of the injunction sought by ZonePerfect in an effort to suggest that ZonePerfect's delay in pursuing Sears for his use of OMEGAZONE on bars merits denial of any injunction. *See* Sears Brief, p. 26-28. In fact, ZonePerfect seeks only to maintain the status quo until a trial on the merits. As such, it would only request an injunction against Sears if Sears intends to expand his sales of the OmegaZone bar beyond the narrow channels of trade currently used. If he were to attempt to do so, that change in circumstance would merit an injunction, even after some period of inaction by ZonePerfect in response to the lower level of activity. *See* sources cited *supra* note 4. Otherwise, the OmegaZone bar will be unaffected by the requested preliminary injunction, and the Court can thus disregard any discussion of the impact of an injunction on the OmegaZone bar.

-1-

**A.    ZonePerfect's survey results offer conclusive proof that the "SmartZone" bar will cause consumer confusion as to ZonePerfect's strong brand name.**

As discussed below, the defendants attempt to twist and misapply the eight likelihood of confusion factors to cobble together an argument that the release of a product in the identical product category (nutrition bars) and channel of trade (retail outlets) using the same highly diagnostic word as the centerpiece of its name (Zone) will not cause widespread and irreparable consumer confusion. The error of such misapplication of the law is now plain given the results of two consumer surveys conducted by nationally-recognized survey experts. These reports offer conclusive proof—and certainly more than sustain a likelihood of success—that if the defendants release the "SmartZone" bar in the form and manner currently planned, irreversible and irreparable consumer confusion will occur.

**1.    Dr. Simonson's report confirms a strong likelihood that the "SmartZone" bar will cause widespread consumer confusion.**

As fully described in his report, attached hereto as *Exhibit A* (and hereafter the "Simonson Report").[2] A consumer survey by Dr. Itamar Simonson revealed that fully *25%* of potential consumers demonstrated confusion as to the relationship between the "SmartZone" bar and the ZonePerfect bar. Dr. Simonson, the Sebastian S. Kresge Professor of Marketing at Stanford University and one of the premier survey experts in the country, designed a survey based on well-established practices to determine whether consumers would be confused as to the source, affiliation, or sponsorship of "SmartZone" bars in relation to ZonePerfect® bars.

It is all but black-letter law that evidence of consumer confusion in an amount at or over 10% of those surveyed is sufficient to confirm that there is a likelihood of confusion between the subject products or services. *See Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (survey evidence that "approximately ten percent of all the persons surveyed thought that Mutual 'goes along' with Novak's product" was sufficient to demonstrate actual confusion despite the existence of "some ambiguity" in the survey

---

[2]Expert reports have been attached without exhibits. The full reports have been served on the defendants and will be submitted to the Court in connection with affidavits.

-2-

question).[3]. This Court has cited *Mutual of Omaha* in finding that a confusion rate in the mid-teens was adequate evidence of actual confusion. *See Copy Cop v. Task Printing*, 908 F. Supp. 37, 38 (D. Mass. 1995) (finding *summary judgment* for plaintiff in a case where survey indicating a 16.5% rate of confusion existed).

Whether the benchmark is 10% or 12% or even 15%, the Simonson Report confirms that the consumer confusion caused by defendants' planned "SmartZone" bar existed at levels far higher. In fact, even after reducing the raw percentage by the amount of confusion demonstrated regarding the two survey controls, *one in four* of those presented with the "SmartZone" bar demonstrated confusion as to that bar's relationship with the ZonePerfect® bar. This, according to Dr. Simonson, "represents a highly significant likelihood of confusion." Simonson Report, p. 14. Indeed, evidence of confusion at this high rate minimizes the need to hypothesize as to the mere *likelihood* that consumers will be confused; it serves as tangible evidence that all but proves that they *will* be confused. *See, e.g., Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 & n.9 (1st Cir. 1989) (emphasis added) (recognizing that surveys are a "valuable method of demonstrating *actual confusion*").

      **2.    Dr. McDonald's survey confirms that the "zone" in ZONEPERFECT® signifies a brand, not a type, and is thus part of a strong and protectible mark.**

Defendants have attempted to minimize the strength of the ZONEPERFECT® mark by claiming the word "zone" does nothing more than serve as a generic description of the bar as being the type of bar compliant with the Zone Diet—much like "diet" merely confirm

---

[3] *See also Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983) (holding that survey evidence indicating 10-12% confusion sufficient to demonstrate actual confusion); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996) (noting 10% confusion as a threshold and concluding that a survey finding 15% confusion of similarity in marks demonstrated actual confusion to a "significant degree"); *Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F. Supp. 453, 457 (S.D.N.Y. 1990) (concluding at preliminary injunction hearing that a 10% rate of confusion was "statistically meaningful"); and *Jockey Int'l v. Burkard*, 185 U.S.P.Q. 201, 205 (S.D. Cal. 1975) (finding infringement in part because survey demonstrated that 11.4% of adults associated the defendant's product with the plaintiff's mark).

what type of soda a "Diet Coke" is and "English" merely confirms what type of muffin a "Thomas' English Muffin" is.    It is their assertion that the word "zone" in "ZONEPERFECT®" is thus entitled to little if any trademark protection.

As detailed below, the suggestion that the word "zone" is generic utterly ignores First Circuit law establishing the types of words deemed to be generic for trademark purposes. Moreover, in response to this claim, Dr. Susan McDonald of National Analysts conducted a survey to determine whether "zone" in "ZONEPERFECT®" is perceived as a "type," as defendants contend, or a "brand," a word signifying the source of ZonePerfect® products. As more fully described in her report, attached hereto as *Exhibit B* (the "McDonald Report"), the word "zone" in the ZONEPERFECT® mark as used by ZonePerfect is perceived to signify the brand of the bar, not the type of bar that the bar is.    *See* McDonald Report, p. 13. "In sum, these data refute the contention that the word, "zone," has been genericized by familiarity with the Zone Diet such that consumers in this category now deem it to be descriptive of a specific type of product, diet, nutritional strategy, etc." *Id.* at 19. Thus, Dr. McDonald confirms that the "zone" portion of the ZONEPERFECT® mark is associated with ZonePerfect and is part of a strong mark and entitled to substantial protection.[4]

### B.    Proper application of the *Keds* factors supports the survey results and confirms that confusion is likely.

ZonePerfect has already demonstrated in its Initial Brief that the First Circuit's eight factor test for a likelihood of confusion, *see, e.g., Keds Corp. v. Renee International Trading*

---

[4] Defendants' other arguments that ZonePerfect's mark is weak are also unpersuasive. While defendants assert that ZonePerfect's decision not to sue Sears earlier for his sale of OmegaZone bars was a failure to police its mark, Hershey Brief, pp. 22-24, this Court has said that a markholder need not sue until infringement threatens a tangible negative affect on its business. *See, e.g., Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 47 (D. Mass 1995) ("'Failure to object to limited geographic use of a mark does not bar . . . objecting later to widespread use of the mark.' . . . Wait[ing] until some viable impact on its business is excusable delay."); *Coco Rico Inc. v. Fuertes Pasarell*, 738 F. Supp. 615, 619 (D.P.R. 1990) ("Laches should be measured from the date defendants' acts first impacted plaintiff's business reputation, not when the competing mark is first used."). The small volume of mostly internet sales by Sears and other bars never impacted ZonePerfect's primary channel of trade and source of revenue, retail stores. Upon learning about a planned launch of the "SmartZone" bar into this market, ZonePerfect promptly initiated the instant litigation.

-4-

*Corp.*, 888 F.2d 215 (1st Cir. 1989), reflect that there is a strong likelihood that the planned release of the "SmartZone" bar will cause consumer confusion with ZonePerfect® bars. *See* Initial Brief, pp. 17-25. ZonePerfect will now touch on selected instances in which the *Keds* factors were misstated or misapplied in defendants' counter-intuitive assertion that the "SmartZone" bar will not cause consumer confusion.

### 1. The totality of the ZONEPERFECT® and "SMARTZONE" marks demonstrates their similarity.

While defendants accuse ZonePerfect of performing "sleight of hand" in connection with its trademarks, it is actually the defendants that are attempting an illusion as to the law. As ZonePerfect made clear in its complaint and Initial Brief, it owns a number of registered trademarks—chief among them ZONEPERFECT® as a wordmark and in its current stylized form—as well as those trademarks developed through common law—chief among them, the word ZONE itself-for nutrition bars. As discussed below, the widespread use of the nickname "Zone bar" to describe the ZonePerfect® bar has created goodwill among the bar-consuming public, which goodwill inures to the plaintiff. However, to be clear, there *is* significant similarity between the ZONEPERFECT® *registered* marks and the "SMARTZONE" mark as used on the packaging at issue in this case, and that similarity alone weighs in favor of a likelihood of confusion.

In fact, rather than even arguing that these two marks are dissimilar, Hershey and Sears would have this Court simply ignore the very similarity which obviously led them to use the "zone" mark. They rely on arguments that the "zone" portion of the marks is so generic that it must be ignored, and assert that the Court should only compare the word "perfect" with the word "smart." They do so, however, on faulty premises.

The only instance in which a Court is to discount portions of a trademark in comparing similarity is when that portion is a generic descriptor of the product at issue. Such cases are entirely immaterial when considering a word that has now been demonstrated by Dr. McDonalds's survey to serve as a brand indicator, not a type indicator. *See, e.g.,* McDonald Report, p. 29. Stripped of this false rubric, the marks are indeed substantially similar. In fact, the defendants failed even to attempt the legal analysis used to determine

-5-

whether a term is in fact generic, more than likely because under the First Circuit's test it is clear that the term "zone" when applied to food or nutritional products is not generic. In the First Circuit, in order for a term to be found generic, it must "refer to a genus of which the particular product is a species, without distinguishing its source or origin." *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 and n.4 (1st Cir. 1979) (citing "the pill" for oral contraceptive tablets and "cola" for soft drinks made from cola nuts as two such examples). What defendants must show in order for the Court to find a term to be generic, then, is that *every* product using that term must be referring to, and thus be a subset of, a common and defined *type* of product in the eyes of the public.

What little evidence defendants cite in support of the mark's claimed genericness in fact belies this very assertion. The Hershey Brief cites dozens of registered trademarks for food or nutritional supplements that contain the term "zone." The vast majority of these products, however, appear to have nothing to do with the Zone Diet, instead using the word "zone" in its truly generic sense, namely to connote a region or an area in which something may be found (e.g. ALKA ZONE for an alkaline solution added to drinking water or FITNESS ZONE for retail outlets for fitness equipment). Given this fact, it is clear that the term "zone" when applied to food or nutrition products does not merely "refer to a genus of which the particular product is a species," and thus cannot be found to be generic. This is again borne out by the high degree of "brandedness" associated with the term "zone" in the ZONEPERFECT® mark. *See* McDonald Report, p. 13.

Equally unpersuasive is the argument that Hershey's use of its house mark HERSHEY absolves it of all possible trademark-related sin. Particularly in the era of aggressive cross-marketing (witness the "Atkins®-friendly Subway® sandwich"), the mere existence of the word "Hershey" on the "SmartZone" bar does little to clarify the matter. Indeed, the Lanham Act itself establishes that a trademark holder has the right to prevent not just conduct creating confusion as to source, but also confusion "as to the *affiliation, connection, or association* of such person with another person, or as to the origin, *sponsorship, or approval* of his or her goods, services, or commercial activities by another person." *See* 15 U.S.C. § 1125 (emphasis added). It is not surprising, then, that this Court

-6-

has often found trademark infringement in spite of the prominent use of a house mark. *See, e.g., Trak Inc. v. Benner Ski KG,* 475 F. Supp. 1076 (D. Mass. 1979) (rejecting the argument that defendant could use the mark FISHSTEP on cross-country skis when plaintiff owned the mark FISHSCALE for such skis, even when FISHSTEP was displayed in *smaller letters* next to the housemark BENNER).[5] Even consumers who notice the (markedly smaller) HERSHEY mark on the "SmartZone" bars are likely to simply assume that Hershey has some arrangement or affiliation with ZonePerfect. Thus here, as in the *Trak* case, the use of a housemark does not, and will not, prevent confusion. *See id.* at 1082 ("[T]he presence of 'Benner' on the ski might suggest to the consumer that Benner somehow is licensed to do business by Trak [the owner of the FISHSCALE mark].").[6]

The defendants' final attempt to attack the similarity of the mark—relying on subtle differences in the two marks (such as the defendants' use of a different color to offset the letter "o" in the admittedly identically-fonted word "Zone," as opposed to plaintiffs used of

---

[5] Numerous other Courts have likewise rejected the suggestion that a housemark acts as a shield to confusion. *See, e.g., Amtra v. Russ Berrie and Co.* 966 F.2d 1284, 1288 (9th Cir. 1992) (stating that the prominence of an alleged infringer's housemark may create "reverse confusion," causing consumers to believe that the registrant's product is produced by the alleged infringer); *T & T Mfg. Co. v. A. T. Cross Co.,* 449 F. Supp. 813 (D.R.I. 1978), aff'd, 587 F.2d 533 (1st Cir. 1978) (holding that to permit a junior user to appropriate senior user's well-known mark merely by adding a house mark "would make a mockery of trademark law" because purchasers may assume that the infringer is an authorized brand of the owner of the mark). Furthermore, courts have long recognized that the addition of a housemark to a well known registered trademark can be further evidence of bad faith on the part of the infringer. *See Hemmeter Cigar Co. v. Congress Cigar Co.* 118 F.2d 64, 71 (6th Cir. 1941) (noting that the use of a housemark along with another's trademark may "be an aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor.").

[6] A related and unpersuasive argument is Sears' claim that the existence of one of his domain names, zonediet.com (in small letters) on the "Dr. Sears ZONE seal," "alone assures that there will be no confusion as to the source of the goods." Sears Brief, p. 14. Like a housemark or even a disclaimer, the mere existence of such a website will do little to prevent the confusion caused by the dominant use of "ZONE" on the proposed packaging for the "SmartZone" bar, particularly where confusion is otherwise likely. *See, e.g., Charles of the Ritz Group v. Quality King Distributors,* 832 F.2d 1317, 1324 (2d Cir. 1987) (concluding that it is the affirmative burden of the defendant to provide evidence establishing that use of disclaimers or tradenames are effective in alleviating confusion).

cross-hairs to offset the letter "o")—cannot salvage their argument.   The totality of the marks' presentation is to be considered, with minor changes in the marks accorded little weight.   *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 161 (9th Cir. 1969) ("It is not necessary to constitute infringement that every word of a trademark be appropriated.   It is sufficient that enough be taken to deceive the public in the purchase of a protected article.").[7]   Likewise, arguments that the packaging contains different colors, etc. will not prevent the marks from being deemed similar—and apparently did not serve to do so among consumers surveyed for the Simonson Report.

### 2.   ZONEPERFECT® and ZONE are strong marks in connection with nutrition bars.

Defendants' argument that the ZONEPERFECT® mark is "hemmed in" by other marks and accordingly merits only narrow protection is improperly based on its inclusion of numerous irrelevant marks and products.   No doubt after an expansive search, defendants have only been able to identify a few smaller companies that use a ZONE-related mark on nutrition bars and *none* that is marketed in ZonePerfect's primary and essential channel of trade, retail stores.[8]   Use of the word "zone" anywhere in the name of any food product— even use as a secondary element such as in "THE SANDWICH ZONE" for food services— does not impact the mark's strength in the only area relevant to this injunction, nutrition bars.   Once again, Hershey's own citations prove the point, citing a lack of confusion regarding the word "Northern" among banks when several *banks* featured the word in their title, or a lack of confusion between two beauty pageants featuring "Mrs." or "Miss" where a marital prefix is common among *beauty pageants*.[9]   Unrelated uses do not bear on the

---

[7]  While Hershey claims to take issue with the size of the ZONE Seal in the demonstrative at Exhibit 1 of ZonePerfect's complaint, there was no "alteration" of the bars presented to consumers by Dr. Simonson, and confusion still resulted in 25% of respondents.

[8]  Sears' bar is only available through the internet and other narrow channels, the BodyZone and Ezone bars appear only to be available via a few websites, and are junior to ZonePerfect anyway.   Optizone and Biozone bars do not appear to be available at all.

[9]  *Northern Trust v. Northern Bank & Trust*, 1991 LEXIS 20349, at *12-13; *Miss World (UK), Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449-50 (9th Cir. 1988).

-8-

strength analysis. *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) ("Importantly, a mark's strength is examined principally in the market in which the mark is used. . . . Use of a like mark in a different market for different products or services need not undermine the mark's strength in its own market.").

Further, the word "zone" in the mark ZONEPERFECT® is viewed as a brand by consumers, directly undercutting defendants' argument that "zone" is merely a descriptive term. *See* McDonald Report, p. 13. In fact, "the word 'Zone' on a nutrition bar is highly diagnostic and, to the extent two nutrition bar brands use that word, it is likely to have a very significant impact on perceived similarity." Simonson Report, p. 17.

As can be readily seen from even a quick search of popular internet search engines such as www.google.com and www.yahoo.com for "zone bar," the success of the ZONEPERFECT® mark in the nutrition bar market, in fact, has spawned widespread use of the nickname "Zone bars" for the ZonePerfect® bar. *See, e.g.*, www.webvitamins.com (selling ZonePerfect bars, and only ZonePerfect bars, under the heading "Zone Bars"); www.nutritionblvd.com (same); www.foodservicedirect.com (same), and other related cites attached hereto as **Exhibit C.** Such use both underscores Dr. McDonald's finding that the word serves as a brand indicator (rather than an indicator of type) and in fact creates cognizable trademark rights that inure to ZonePerfect's benefit. *See, e.g., McCarthy on Trademarks* § 7:18 ("Americans are prone to abbreviate recognized trademarks and to use nicknames. Such abbreviations and nicknames are just as entitled to legal protection as the original full trademark."). This is the case even where the source company does not itself use the nickname. *See, e.g., National Cable Television Assoc., Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1578 (Fed. Cir. 1991) (holding that public adoption and use of a nickname for a product or organization "inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use 'by' that party in the sense of a use on its behalf."). The extensive use of the nickname "Zone bars" for ZonePerfect® bars, as evidenced by the numerous websites cited above, shows that ZonePerfect is entitled to the sole use of "Zone" in the narrow context of widely distributed nutrition bars, a context that the "SmartZone" bar would be the first to enter.

### 3.   Defendants' plan to market the new bar in the same key channel of trade and to the same consumers will cause confusion.

Defendants each acknowledge that the three *Keds* factors channels of trade, advertising, and prospective consumers factors are considered together. These factors are considered together because they measure who each product's target consumers are to gauge how that class of consumers will react. *See, e.g., Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983) (concluding that "these three factors are interrelated and will be considered together here," and conflating the inquiry into an investigation as to the intended consumers of the products at issue). Here, as Hershey admits, "it is, of course, the case that both parties' product will be sold in the same types of stores . . . ." Hershey Brief, p. 27. It is equally undisputable that two nutrition bars sold in the same channels of trade will be sold to the same prospective consumers—consumers of nutrition bars. Indeed, it was that precise group of consumers that were surveyed in the Simonson Report, *see* p. 5 ("[S]urvey was conducted with 310 respondents . . . who had purchased a nutrition bar in the previous three months and planned to purchase a nutrition bar in the following three months."). Among this key group, as previously discussed, widespread consumer confusion was found.

### 4.   The products are the same.

Both products are, and will continue to be, nutrition bars that offer a balance of proteins with carbohydrates and fat. Of course, distinctions such as the taste or texture of the bar, as cited by the defendants, do nothing to prevent consumer confusion caused by the product's actual marking. *See, e.g.,* McCarthy on Trademarks, § 24:23 (For purposes of likelihood of confusion analysis, exact similarity is not required and goods are directly competitive "that are reasonably interchangeable by buyers for the same purposes.").

### 5.   The Simonson survey demonstrates that the "SmartZone" bar causes actual confusion among consumers.

Due to ZonePerfect's swift efforts to seek an injunction prior to the release of the "SmartZone" bar, there has been very little opportunity for the average consumer even to

-10-

see —let alone be confused by—the new bar.[10]    Given the pre-release status of the Hershey product, such actual confusion has largely been avoided, which certainly cannot be held against ZonePerfect. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992) ("[A] plaintiff need only show that a likelihood of confusion is in prospect; a showing of actual confusion is not required."); *American Dairy Queen Corp. v. New Line Productions, Inc.*, 35 F. Supp. 2d 727 (D. Minn. 1998.) ("[I]t is the *likelihood* of confusion that serves as a test for infringement, not actual confusion. This is especially so where the allegedly infringing item has not been advertised or released. In such a case, the plaintiff is not required to prove any instances of actual confusion.").

In all events, ZonePerfect has strong evidence that consumers are actually confused by the "SmartZone" bar. When real consumers were given the opportunity in a survey environment to see the actual "SmartZone" bar's packaging, confusion abounded. One in four of those surveyed conveyed confusion as to the relationship between the two bars. Such confusion among real consumers strongly portends actual confusion, and has been widely deemed evidence of actual confusion in trademark jurisprudence. *See, e.g., Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 29 & n.9 (1st Cir. 1989) (surveys are a "valuable method of demonstrating *actual confusion*" (emphasis added)).[11]

---

[10] In his brief, Sears makes much of the fact that ZonePerfect does not have direct evidence of consumer confusion concerning the OmegaZone bar. *See* Sears Brief, pp. 26-28. This argument, however, again ignores the fact that the OmegaZone bar has enjoyed only modest sales, has been offered only through very narrow and specific channels of trade, and is not widely available through the retail stores that make up ZonePerfect's principal channel of trade. A lack of sufficient consumer confusion to bubble to the surface in the form of emails or calls, for example, is thus not hard to understand, and does little to undercut the substantial likelihood that Hershey's bar will cause consumer confusion if it is allowed to be released into ZonePerfect's principal channel of trade.

[11] *See also 1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 499 (S.D.N.Y. 2003) ("Proof of actual confusion, in the form of market research survey evidence, is highly probative of the likelihood of consumer confusion. . ."); *A.T. Cross Co. v. TPM Distributing, Inc.*, 226 U.S.P.Q. 521, 524 (D. Minn. 1985) ("[T]he plaintiff's survey demonstrates the existence of actual confusion in the marketplace, and, by implication, that there was a strong likelihood of confusion").

-11-

### 6. The defendants' conduct belies their claimed lack of bad faith intent in adopting the "SMARTZONE" mark.

Not surprisingly, the defendants have lined up to swear that they had no intent to deceive the public or trade off of ZonePerfect's goodwill in developing their planned "SmartZone" bar. Little else can be expected in the face of ZonePerfect's lawsuit. Of course they now turn their noses up at ZonePerfect and claim the *last* thing they would want would be an association with such a market-leading brand. However, a review of the actual conduct of the defendants, including Hershey's offer to purchase ZonePerfect for $127 million in light of its "strong name," *see* Initial Brief, pp. 3-4, suggests otherwise. *See W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970) (finding bad faith infringement and stating that the defendant's explanation for its choice of the infringing mark "has little credibility *particularly in view of its attempt to buy [plaintiff's] business.*" (emphasis added)).

In any event, defendants' claimed lack of bad faith certainly does not spare them from liability for consumer confusion. *See, e.g., Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985) ("Good faith is not a defense to trademark infringement. . . . The reason for this is clear: if potential purchasers are confused, no amount of good faith can make them less so. Bad faith, however, may, without more, prove infringement."). Having now seen the degree of confusion the "SmartZone" bar will cause, innocent or not, defendants' infringement must be enjoined before irreparable harm is caused to ZonePerfect's trademarks and goodwill.

### C. The 2001 Agreement confirms ZonePerfect's right to an injunction against consumer confusion.

As already described in ZonePerfect's Initial Brief, the 2001 Agreement between Sears and ZonePerfect provides for Sears' registration of the marks "ZONE" and "ZONE DIET" only for use in books, and does nothing to limit (or even license to Sears) ZonePerfect's well-established trademark rights in its ZONE Marks. See Initial Brief, p.7. While defendants attempt to make much of the agreement, they do nothing to undermine at least those rights necessary to support ZonePerfect's request for injunction.

-12-

Defendant Sears has all but acknowledged that ZonePerfect would at a minimum retain the statutory and common law right to defend against the type of substantial consumer confusion described above.[12] In his answer to ZonePerfect's complaint, Sears admits that "[b]ecause the parties had been unable to agree on who owned various trademarks and other intellectual property, the 2001 Agreement was largely silent on pending and contemplated trademark or other intellectual property ownership. . . ." *See* Sears Answer, p. 35. Despite this admission, in their briefs, both defendants attempt to point to the 2001 Agreement as somehow providing some basis for Sears' (and Hershey's) planned trademark infringement. Incredibly, they both do so by omitting a key provision of that agreement. The defendants repeatedly quote section 8(a) of the 2001 Agreement, which says *in part* that "there shall be no restrictions, limitations, or prohibitions on the activities" of Dr. Sears. Yet *not once* does either defendant quote the full sentence, which states: "Except as expressly provided for herein *or required by law*, there shall be no restriction, limitations or prohibitions on the activities of [Sears] or [ZonePerfect] upon consummation of the closing." 2001 Agreement, § 8(a) (emphasis added). This key clause, of course, makes clear that ZonePerfect preserved its statutory and common law rights, most importantly in its trademarks, and that Sears has no permission to tread on those rights.

## II.    ZonePerfect remains likely to succeed on its claims for false advertising and Hershey's breach of its confidentiality agreement.

While the defendants' trademark infringement merits this Court's attention in and of itself, it is important to remember that it did not occur in a vacuum. Both defendants were well aware of ZonePerfect and its extensive use of the ZONE Marks before ever entering into the "SmartZone"-related conduct that is the subject of ZonePerfect's request for injunction. Against this backdrop of extensive knowledge of the company, the defendants issued intentionally misleading press releases and launched into an endeavor that Hershey (hubris aside) could not—and it is now obvious *did not*—do without the detailed knowledge

---

[12]Indeed, ZonePerfect feels that the relevant provisions of the 2001 Agreement are unambiguous in their confirmation of these rights, and sees defendants' plans to take extensive discovery into parole evidence as unnecessary.

of the nutrition bar industry that Hershey was provided for the limited purpose of considering acquiring ZonePerfect. These claims, then, support enjoining the release of the "SmartZone" bar until a trial can fully determine the scope of Hershey's misconduct.

### A.    The defendants have all but admitted that their public statements about the Dr. Sears ZONE Seal and the "SmartZone" bar are deceptive.

Hiding behind a reading of their public statements that applies a level of nuance completely inappropriate for considering the veracity of a statement about a new food product, defendants attempt to convince the Court that it should be allowed to make statements that are counter-intuitive with actual past events. Sears co-founded ZonePerfect, ran its day-to-day operations as its President, and *did* endorse the ZonePerfect® bar for years, and to make any statement that suggests otherwise is improper.    Claims that consumers will somehow reason out the subtle distinction between a recently-coined "seal of approval" and a prior "signature and testimonial of approval" go too far.  *See generally Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801, (2d Cir. 1973) ("In testing for likelihood of confusion in the impulse-purchaser market, a court must disregard minutiae of differences and look to the overall appearance of the package as seen by a potential purchaser.").  Particularly given the high degree of confusion the "SmartZone" bar will clearly cause, the defendants' distribution of plainly misleading statements furthers the need for an injunction in advance of final resolution of the merits.

### B.    Hershey has done nothing to dispel the fact that it reviewed all of ZonePerfect's confidential files and then chose to launch a nearly identical product only months later.

In responding to ZonePerfect's counts alleging misappropriation of confidential information, Hershey haughtily asserts that it had no need for any of the years of experience and insight provided to it during due diligence of ZonePerfect, and claimed in open court that it established a strict "Chinese wall" to ensure that no such intermingling of information occurred.    This assertion is belied by the facts.    Even at the time of its complaint, ZonePerfect knew that at least two people, Hershey's CEO Richard Lenny and its Vice President of Innovation, David Eshelmen, were involved in both the ZonePerfect and the "SmartZone" projects (i.e. were on both sides of the "Chinese wall"). Now, having received

-14-

Hershey's response to an interrogatory asking for the identification of the individuals involved with each project, ZonePerfect has learned that a total of 19 people worked on both projects. While ZonePerfect intends to submit evidence further describing the breadth and depth of information provide to Hershey (which was, suffice to say, substantially more than the amount Hershey suggests was provided in its Brief), the mere fact that this volume of people worked on both projects demonstrates that Hershey has failed to guard ZonePerfect's confidential information, and should not be allowed now to benefit from that conduct by expediting its entry into the market with a competitive product.

**III.    The degree and balance of harm continues to favor entry of a preliminary injunction.**

At base, the collective argument made by both defendants with regard to irreparable harm and the balance of harm is simply "we say that there will be no confusion, so there will be no irreparable harm either."  Given that the correct application of the *Keds* factors portends a substantial likelihood of confusion, and that the Simonson and McDonald surveys demonstrate consumer confusion to be a certainty, these arguments obviously fail.  In fact, the high likelihood of confusion creates a threat of immediate and irreparable harm that entirely outweighs any claimed economic damage that a delay in releasing a nutrition bar would cause Hershey and Sears—and even that damage could have been avoided by simply adopting a different product name and packaging.

As already extensively discussed in ZonePerfect's Initial Brief, this and other Circuits have found that the goodwill a company enjoys in its trademarks is uniquely vulnerable to an immeasurable degree of harm from consumer confusion as to the source, affiliation, association, or sponsorship of that company's products with another's.  *See* Initial Brief, p. 31.  Because of this fact, markholders are entitled to a presumption of irreparable harm in the face of conduct that is likely to cause such confusion, allowing the markholder to seek an injunction in advance of a final resolution on the merits, lest a plaintiff's victory at trial be made pyrrhic when the damage is already done.

The danger posed to ZonePerfect's trademarks is heightened in this particular context.  As discussed in Dr. McDonald's report, the dominant element of ZonePerfect's

-15-

registered mark ZONEPERFECT® is currently viewed as a brand by consumers. However, the release of another ZONE-dominant bar in major national retail channels will, in addition to causing immediate confusion and thus harm, run the risk that consumers will begin to believe that "zone" *is* merely a descriptive term, and cause the cornerstone of ZonePerfect's mark and goodwill to slip toward becoming more generic. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 222 (2nd Cir. 1999) ("we conclude that Pepperidge Farm has demonstrated a high likelihood of success in proving that Nabisco's commercial use of its goldfish shape will dilute the distinctiveness of Pepperidge Farm's nearly identical famous senior mark."); 2 J. McCarthy, Trademarks and Unfair Competition, § 24:72 (concluding that "[t]he Restatement takes the position that dilution can result from unauthorized use of the mark on competing goods"). This danger is articulated by both Dr. McDonald and Dr. Simonson. *See* McDonald Report, pp. 19-20 ("The availability through retail store channels of a second nutritional bar with the word, "ZONE," positioned as a trademark element could change current conceptions rather quickly."); Simonson Report., p. 17 ("The diagnosticity of the term "Zone" and its ability to identify a unique brand of nutrition bars will be diminished if additional significant brands of nutrition bars are allowed to use this term.").

Irreparable harm will occur absent an injunction, and such harm handily outweighs any potential harm from a delayed product release even in the unlikely event that the defendants ultimately prevail.

## IV.    Defendants' desperation claims of "unclean hands" on the part of ZonePerfect do not merit a denial of preliminary injunction against demonstrable confusion.

Perhaps aware of the weakness of their position on the merits and the questionable nature of their own conduct, defendants point to unrelated alleged misconduct and unsupported allegations of misdescription and claim that it provides a basis to strip ZonePerfect of all rights to defend itself against the impending wave of confusion the "SmartZone" bar will cause. The law does not support this effort.

### A.    Use of the phrase "Zone Diet" and claimed copyright infringement are irrelevant to determining the need for a preliminary injunction.

The First Circuit has consistently held that "[t]he doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy

-16-

between the parties [and] 'in some measure affect[s] the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003). The sole issue relevant to ZonePerfect's request for injunction is whether or not defendants' proposed "SmartZone" bar infringes ZonePerfect rights in ZONE Marks *on nutrition bars*. Allegations of misdeeds on the part of ZonePerfect collateral to ZonePerfect's use of its ZONE Marks on nutrition bars cannot justify application of the unclean hands doctrine to prevent injunctive relief.

This is particularly the case in connection with Sears' claim that ZonePerfect is improperly suggesting an affiliation with Sears by using the term "Zone Diet" on its website, including it the statement that ZonePerfect.com is "The Official Website of the Zone Diet." The use of this internet slogan is simply irrelevant to the question of infringement of ZonePerfect's trademark on nutrition bars, and cannot form the basis of an unclean hands defense. *See, e.g., Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987). In *Fuddruckers*, an alleged infringer of plaintiff's restaurant trade dress argued that plaintiff was guilty of unclean hands in falsely advertising its hamburger meat as "ground steak." The court rejected defendant's assertion of unclean hands, concluding that even assuming that the ad was false, the misstatement was not material to the subject matter of the litigation and did not constitute an unclean hands defense. *See id.* at 847.

Furthermore, the defendants' suggestion that references on ZonePerfect's websites to the "Zone Diet" is somehow an act of unclean hands given that Sears is no longer affiliated with the company is factually undercut by the existence of literally dozens of other websites related to the Zone Diet that appear to have no affiliation with Sears. *See, e.g.*, www.the-zone-diet.com (Seattle-area merchant delivering meals "inspired by the author of The Zone Diet, Dr. Barry Sears."); www.formulazone.com (FormulaZone company offers diet and menu planning for those interested in the Zone Diet, explaining that "the Zone diet means getting your calories in a 40-30-30 ratio."); www.zonedietathome.com, (New York-based Zone Diet At Home offers home delivery of meals "contain[ing] a balance of 40% carbohydrates, 30% protein and 30% favorable fats.") and similar websites attached hereto as **Exhibit D**. Even less related is Sears' claim that portions of the ZonePerfect website

-17-

authored by him and formerly attributed to him are no long so identified, and as such do not merit interference with ZonePerfect's right to an injunction.

**B.    These allegations are in any event insufficient to outweigh the impending consumer confusion.**

Even if anything on ZonePerfect's website does somehow foster an association with Sears (which ZonePerfect denies), such collateral conduct would not justify turning a blind eye to the confusion to the public that will occur if Hershey releases the "SmartZone" bars, rendering the unclean hands defense inapplicable. In *Donoghue v. IBC/USA, Inc.*, 886 F. Supp 947 (D. Mass 1995), the court held that the "unclean hands doctrine should not be used to justify the continued confusion of the public with respect to the origin of goods and services." *Id.* at 954 (citing *Bell v. Streetwise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir. 1985). In *Donoghue*, the defendants had infringed on the plaintiffs trademark rights, but claimed a defense of unclean hands based on the fact that plaintiff had breached a contract with the defendant. The court acknowledge that plaintiff may have breached the agreement, but due to the fact that "in a trademark infringement case, the court must show solicitude for the public in evaluating an unclean hands defense," the court still issued the injunction. *Id.* In the instant case, the high likelihood of confusion demonstrated by the facts as well as the Simonson Report confirms that the requested injunction is in the public interest. Therefore, even if some facet of ZonePerfect's website was somehow slightly misleading (which it is not), the confusion to the public that would occur absent an injunction dwarfs any claimed misconduct by ZonePerfect and renders the unclean hands doctrine inapposite here.

Finally, the court has wide discretion when considering such a defense, and thus can reject it particularly in a case such as this in which the alleged infraction, even as claimed and if fully accredited, is minor. The principal case cited in Hershey's brief in favor of the unclean hands defense actually cuts against its application to these facts. Hershey cites *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir. 1989) for the proposition that "he who comes into equity must come with clean hands." However the full sentence containing this quote actually says: "The maxim of 'he who comes into equity must come with clean hands' of necessity gives wide range to a court's use of 'discretion to withhold

-18-

punishment of behavior which it considers not to warrant so severe a sanction." *Id.* (quoting *Codex Corp. v. Milgro Elec. Corp*, 717 F.2d 623, 633 (1st Cir. 1983)).    The court quoted this language in support of a *denial* of the unclean hands defense.    Similarly, the minor infractions alleged by defendants do not render ZonePerfect's trademark infringement claim barred by the doctrine of unclean hands.

**C.    The ZONEPERFECT® mark is not misdescriptive, but is valid and enforceable.**

The defendants' final argument against ZonePerfect's right to an injunction is that its trademarks' use of the word "Zone" are misdescriptive of ZonePerfect's products and therefore ZonePerfect is not entitled to enforce or even protect its trademarks against confusion caused by a junior user. This theory is both factually and legally meritless.

As demonstrated by the McDonald Report, the word "Zone" in the ZONEPERFECT® mark is perceived as a brand by the consumer public, and not as a descriptor of any particular type of product. Thus, if in the consuming public's eyes, the word "zone" is not descriptive, it by default cannot be *mis*descriptive. *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 699 (2d Cir. 1961) (holding that the "test of descriptiveness is the meaning attached to the designation by prospective purchasers rather than the scientific meaning"). In other words, while ZonePerfect's products *are* compliant with the Zone Diet, because the consuming public has come after seven years simply to view the ZONEPERFECT® mark as an indicator of source alone, there can be no claim of misdescriptiveness. A brand develops, in essence, its own definition—namely anything that actually does emanate from the company or source associated with that company's mark.

Even if some portion of ZonePerfect's customers associate the bar with the Zone Diet, the defendants have provided no proof that the consuming public is, in fact, not getting what they paid for with ZonePerfect® bars. After all, the centerpiece of the Zone Diet is simply a balance of proteins, carbohydrates, and fats, roughly into a 40/30/30 ratio. *See* § IV discussion of third-party websites and stated definitions. As defendants have now admitted, ZonePerfect's bars *do* comply with that expectation. *See* Hershey Brief, p. 9 ("Dr. Sears said that . . . the new bars met the 40/30/30 requirement."). Defendant's claim instead that

-19-

the ZonePerfect® bars are not in compliance with the Zone Diet due to their claimed "lack of low glycemic load." Hershey Brief, p. 34. Aside from the inherent vagueness and subjectivity of this assessment, the claim lacks both legal and factual merit.

When deciding whether a claimed trademark is descriptive, "its meaning to a nonpurchasing segment of the population is not important. The critical question is whether the mark is descriptive to the prospective purchasers of the trademark." *Blisscraft*, 294 F.2d at 699. In *Blisscraft*, the court denied the defendant's assertion that the use of the term "Poly" to refer to a polyethylene pitcher was descriptive, despite defendant's myriad evidence that those in the trade testified that poly was short for polyethylene. *Id.* As was the case in *Blisscraft*, the defendant's have provided no evidence that when prospective purchasers of ZonePerfect® bars see the word "Zone," they equate that with "low glycemic load." Their claim of misdescriptiveness necessarily fails for this reason as well.

## CONCLUSION

For the reasons set forth above and in ZonePerfect's Initial Brief, this Court should preserve the status quo until trial by enjoining defendants from releasing their proposed bar in its confusingly similar form (leaving defendants free to release a nutrition bar product in any non-confusing manner). To do otherwise would be to ignore the consumer confusion that clearly will occur and to subject ZonePerfect's goodwill to harm that no subsequent victory at trial could ever repair.

Respectfully submitted,

**ZONEPERFECT NUTRITION COMPANY**

By its attorneys,

Daniel L. Goldberg, BBO #197380
Charles L. Solomont, BBO #557190
Joshua M. Dalton, BBO #636402
Matthew L. Mitchell, BBO #647902
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

Dated: June 3, 2004

-20-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel for each defendant via facsimile and by hand to Ms. Arrowood and Mr. Adio and by mail to Mr. Smart this 3rd day of June, 2004.

*Matthew T. Mitchell*

Matthew L. Mitchell

-21-