UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZONEPERFECT NUTRITION COMPANY,<br>    Plaintiff and Counterclaim Defendant<br><br>v.<br><br>HERSHEY FOODS CORPORATION,<br>HERSHEY CHOCOLATE &<br>CONFECTIONERY CORPORATION,<br>DR. BARRY D. SEARS, and<br>ZONE LABS, INC.,<br>    Defendants and Counterclaim Plaintiffs | ) ) ) ) ) ) ) CIVIL ACTION NO: 04-10760 RGS ) ) ) ) ) ) ) ) ) |

### AFFIDAVIT OF STEPHEN A. HURWITZ

I, Stephen A. Hurwitz, being duly sworn, hereby depose and state:

1. I am a partner in the law firm of Testa, Hurwitz & Thibeault, LLP. Our law firm represented Barry D. Sears ("Dr. Sears" or "BDS"), Douglas Sears ("DS") and Surfactant Technologies, Inc. (collectively, the "Selling Shareholders") in connection with the negotiation of an agreement (the "Agreement") dated as of October 17, 2001, by and among ZonePerfect Nutrition Company (formerly known as "Eicotech Corporation") (the "Company"), the Selling Shareholders, and others. I was the principal attorney responsible for this engagement on behalf of the Selling Shareholders. I have personal knowledge of the facts stated herein.

2. During the negotiation of the Agreement, the parties found themselves in a situation involving various disputes, including disputes regarding the ownership, registration and use of a number of trademarks, including marks with the terms "Zone" and "Zone Diet." As the Agreement provides: "Whereas, the Company and the Selling

Shareholders desire to resolve the situation regarding the ownership, registration and use of their respective marks containing the terms "Zone" and "Zone Diet" as provided for herein;" The varying resolutions of this situation that the parties achieved as a result of such desire are set forth very specifically in the Agreement as follows:

(a) As set forth in paragraph 4(a) of the Agreement, the Company sold, assigned and transferred to Dr. Sears all the Company's right, title and interest in the trademark registration set forth in Schedule 3 of the Agreement. As set forth on such Schedule 3, this trademark registration was for the mark "Zone Diet" in Japan for various goods.

(b) Also in paragraph 4(a) of the Agreement, the Company agreed to cancel its U.S. Registration Nos. 2,298,235 (for the mark "Zone") and 2,335,083 (for the mark "Zone" with a cross hair design), both for a series of books in the field of diet and nutrition. It had been alleged on behalf of Dr. Sears that the Company, in effect, had previously obtained these registrations through the commitment of a fraud on the U.S. Patent and Trademark Office because the Company had made its filings without Dr. Sears' authorization and with full knowledge that it did not own the "Zone" trademark, of which Dr. Sears was the true owner, for a series of books in the field of diet and nutrition. Accordingly, attorneys in my firm had previously brought formal cancellation proceedings against these registrations. After being confronted with this serious claim by Dr.

Sears, the Company agreed to cancel these trademark registrations for "Zone," which agreement is embodied in such paragraph 4(a) of the Agreement, with the understanding that Dr. Sears would then register the mark "Zone" in his own name, which he ultimately did successfully.

(c) Also in paragraph 4(a) of the Agreement, Dr. Sears agreed to abandon his U.S. application Serial No. 76/054,553 that contained the cross hair design.

(d) Also in paragraph 4(a) of the Agreement and in further resolution of Dr. Sears' claim that the Company had committed a fraud on the U.S. Patent and Trademark Office by previously filing for the aforesaid registration for "Zone," and for other consideration in the Agreement, the Company agreed to sign any and all documents reasonably necessary to facilitate the registration of Dr. Sears' U.S. application Serial No. 76/054,646 (for the mark "Zone") for a series of books in the field of diet and nutrition.

(e) Also in paragraph 4(a) of the Agreement and in this same regard, the Company consented to, and on Dr. Sears' reasonable request agreed to sign, any and all documents reasonably necessary to facilitate the registration of any other applications by Dr. Sears for the marks ZONE and ZONE DIET solely for books in any medium published or communicated, including audio, digital, and electronic media, throughout the world. Furthermore, the

Company agreed that Dr. Sears may request from time to time that the Company consent to other marks containing the terms "Zone" and "Zone Diet" solely for books in any medium published or communicated, including audio, digital, and electronic media, throughout the world, and the Company agreed not to unreasonably withhold such consent or unreasonably refuse to sign such documents.

(f) In paragraph 4(b) of the Agreement, the Selling Shareholders agreed that as between them and the Company, the Company owns, all right and title in and to the design element set forth in Schedule 4 of the Agreement (the "Design Element"). A "cross hairs" mark was set forth on such Schedule 4. In addition, the Company agreed that Dr. Sears and all those in the chain of distribution shall have and shall be deemed to have had at all time prior to the date of the Agreement, an exclusive (except as to the Company), irrevocable, perpetual, royalty-free, worldwide license to use the Design Element solely in connection with the sale, marketing and distribution (whether in hardcover or paperback) of the books <u>Zone Perfect Meals in Minutes</u> and <u>Zone Food Blocks.</u> This license was deemed appropriate because both of these previously published books included the Design Element.

(g) In paragraph 4(c) of the Agreement, the Selling Shareholders acknowledged that the Company "claims ownership" of the

composite mark ZONE PERFECT, and the Company agreed that Dr. Sears and all those in the chain of distribution shall have and shall be deemed to have had at all time prior to the date of the Agreement, a non-exclusive, irrevocable, perpetual, royalty-free, worldwide license to use ZONE PERFECT solely in the title of the book <u>Zone Perfect Meals in Minutes</u>. In negotiating this paragraph 4(c), the Company had previously submitted a draft Agreement dated 1/24/01 containing proposed language identical to the language of paragraph 4(b) of the Agreement, that is, a specific acknowledgment by the Selling Shareholders that "as between the Selling Shareholders and the Company, the Company owns, all right and title into the mark ZONE PERFECT . . .". However, Dr. Sears and the other Selling Shareholders refused to agree that the Company owned the mark ZONE PERFECT. The Company, after considerable negotiation, accepted that Dr. Sears and the Selling Shareholders would not agree that the Company owned the mark ZONE PERFECT. Instead, Dr. Sears and the other Selling Shareholders agreed in a revised paragraph 4(c) only that the Company "claims ownership" in the mark ZONE PERFECT. The language "claims ownership" was chosen and drafted with care and precision, and I believe everyone involved understood its meaning. The Selling Shareholders were not thereby acknowledging, and did not acknowledge, the validity of the

Company's claim to the mark ZONE PERFECT but merely that the Company "claims ownership" of that mark. That was as far as Dr. Sears and the other Selling Shareholders were willing to go. Further, the licensing language was retained in that paragraph in case any rights of the Company to ZONE PERFECT were ultimately upheld.

3. In summary and to my best recollection, in 2001, at the time of signing of the Agreement and shortly thereafter when Dr. Sears filed his application (followed by the successful grant to him of the trademark therein) to register the mark "Zone", as between the Company and Dr. Sears only Dr. Sears had any trademark registration rights in the mark "Zone" (for a series of books in the field of diet and nutrition), and the Company had no trademark registration rights in the mark "Zone" for any purpose. In summary and to my best recollection, in 2001, at the time of signing of the Agreement and shortly thereafter when the assignment of the mark "Zone Diet" was completed by the Company to Dr. Sears, as between the Company and Dr. Sears only Dr. Sears had any trademark registration rights in the mark "Zone Diet" (for various goods), and the Company had no trademark registration rights in the mark "Zone Diet" for any purpose. As of the signing of the Agreement in 2001, the Company had accepted that Dr. Sears and the other Selling Shareholders would not and did not acknowledge the Company's ownership of the mark ZONE PERFECT, and the Company had conceded this issue in its entirety. Instead, Dr. Sears and the other Selling Shareholders did acknowledge in the Agreement only that the Company "claims ownership" of the mark ZONE PERFECT, but would not and did not acknowledge the validity of that claim.

4. The Agreement also included paragraph 8, entitled <u>NO RESTRICTIONS ON ACTIVITIES</u>, and subparagraph 8(a) that provided: "<u>No Restrictions on Activities.</u> Except as expressly provided for herein or required by law, there shall be no restrictions, limitations or prohibitions on the activities of the Selling Shareholders or the Company upon consummation of the Closing." To my best recollection, this provision was included at the request of Testa, Hurwitz & Thibeault, LLP, to make it absolutely clear that the parties were completely free to engage in any activities except as **expressly** [emphasis supplied] provided in the Agreement or required by law. This clause was intended to ensure in the broadest and clearest of terms that no restrictions of any kind could later be implied or inferred in the Agreement in the absence of explicit language containing such restrictions.

5. To my best recollection, the parties in varying ways expressed their full awareness in the negotiations of the reality that there were a multitude of outstanding registered trademarks in the world held by a multitude of differing owners combining the mark "Zone" with other marks, including those respective combined marks of the Company and of Dr. Sears, and that the U.S. Patent and Trademark Office would decide on a case by case basis who in the United States would receive a registered trademark in such combined marks when submitted to it.

6. Relatively late in the negotiations, which involved numerous drafts and spanned several years, the Company's counsel, without advance notice, delivered a draft dated April 19, 2001 in which they had changed the title of Section 8 from "<u>NO RESTRICTIONS ON ACTIVITIES</u>" to "<u>NON-COMPETE/NON-DISPARAGEMENT</u>." The proposed provision the Company was then seeking would have for a three-year

period (which period would now be almost over) expressly prohibited the Selling Shareholders including Dr. Sears from directly or indirectly marketing, advertising, promoting, **endorsing** [emphasis supplied], accepting orders for, selling or otherwise distributing any Bar Product, or from authorizing a third party to do the same. The proposed provision included an exception for Bar Products marketed exclusively through Direct Response Channels, defined as sales directly to consumers that are offered to consumers via the Internet, mail order catalogs, direct mail promotions or telemarketers. I informed Company counsel that this proposed set of restrictions, in its entirety, was unacceptable to Dr. Sears and the other Selling Shareholders. Counsel for the Company then expressed a willingness to negotiate a compromise in the non-compete language and asked whether we would be willing to do so. We told him that Dr. Sears and the other Selling Shareholders would agree to no compromise on a non-compete and would agree to no non-compete covenant of any kind. After considerable negotiation, the Company conceded this issue in its entirety, and removed all references to non-compete restrictions from the Agreement.

7. Also relatively late in the lengthy negotiations and at the same time as the Company unsuccessfully sought to add a non-compete covenant, the Company also unsuccessfully sought to include a "non-disparagement" covenant. This proposed covenant would have prohibited Dr. Sears and the other Selling Shareholders from making any disparaging comments about the Company's products or services. We informed Company counsel that the proposed covenant was unacceptable to Dr. Sears. Dr. Sears was intractable on this point, and Company counsel conceded this point in its

entirety and removed all references to the non-disparagement covenant from the Agreement.

8. During the negotiation of the Agreement, the Company also sought to include a mutual "Covenant Not to Sue" provision. For example, in a draft of the Agreement, the Company proposed a provision in which it agreed that it would "not initiate legal action for trademark infringement or dilution as to, or otherwise take action to oppose the registration or use of, or to seek to cancel any registration for, marks containing the terms "Zone" or "Zone Diet" in combination with any other non-generic or non-descriptive word(s) or design element(s) . . . by [Dr. Sears], DS or any other company or other entity controlled by [Dr. Sears] or DS (and [Dr. Sears'], DS's or such other company's or entity's respective successors, assigns and licensees **except for the Persons listed on Schedule 7** . . ." (emphasis supplied). The proposed Schedule 7 was entitled "Designated Competitors" and included "Hershey," along with many other companies. None of these provisions, including the exception to the covenant not to sue allowing the Company to sue Hershey, were included in the final form of the Agreement.

9. The Agreement also includes Section 6 entitled TERMINATION OF AGREEMENTS, and paragraph 6(b), in which the Company acknowledged and agreed, among other things, that the BDS Employment Agreement and any other employment agreements, understandings or arrangements by and between the Company and BDS terminated as of December 31, 1998. The BDS Employment Agreement had included an agreement by BDS that he would not compete with the Company for two years following termination of his employment. Therefore, the agreement by Dr. Sears not to compete with the Company had expired on December 31, 2000, and there were no non-compete

restrictions of any kind on his activities after that date. The absence of any such restrictions was confirmed by paragraphs 6(b) and 8(a) of the Agreement. Again in the negotiation of the Agreement, I personally made it very clear to Company counsel that Dr. Sears and the other Selling Shareholders would not agree to any such restrictions on their activities.

10. Section 6 of the Agreement also terminated the Stock Purchase and Holders Agreement dated September 19, 1996 (the "1996 Agreement"), in which Dr. Sears, Douglas Sears and Surfactant Technologies, Inc. (i) sold, transferred and assigned certain tangible and intangible assets and rights to the Company, and (ii) entered into certain covenants and agreements. The 1996 Agreement contained a number of representations, warranties and covenants, including Section 7.1(e) relating to trademarks. Section 7.1(e) is a "representation, warranty and covenant" (not a license grant or transfer clause) that the assets transferred to the Company in 1996 "include all of the registered or unregistered trademarks, tradenames, and service marks owned or controlled by the Sellers related to or necessary to market and exploit the Transferred Products." Paragraph 6(a) of the Agreement provides: "As of the Closing, the 1996 Agreement is hereby terminated in its entirety and shall be of no further force and effect hereafter, and all rights, covenants, obligations, and liabilities of any party and of any nature whatsoever pursuant to the 1996 Agreement are hereby terminated and the respective parties thereto shall have no future, and irrevocably waive all past obligations and liabilities thereunder." Accordingly, Section 7.1(e) of the 1996 Agreement and any obligations and liabilities thereunder were terminated as of the date of the Agreement.

11. On May 10, 2002, I sent a letter to Terrence A. Dixon, intellectual property counsel to the Company, setting forth alleged material continuing violations of the Agreement and of law by the Company. In the last paragraph of such letter, there is an explicitly clear reference to the OmegaZone™ bar of Dr. Sears. We never received any response of any kind that in any way suggested that Dr. Sears' ownership or use of the mark OmegaZone™ was infringing any rights of the Company in any of its marks.

Signed under the penalties of perjury this 30th day of June, 2004.

_____
Stephen A. Hurwitz